No. 23-1969

# In The United States Court of Appeals for the Federal Circuit

XEROX CORPORATION,

*Appellant,*

v.

FACEBOOK, INC.,

*Appellee.*

Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in No. IPR2021-01461.

## BRIEF FOR XEROX CORPORATION

Kevin L. Burgess
*Principal Attorney*
MCKOOL SMITH, P.C.
104 East Houston Street, Ste. 300
Marshall, TX 75670
(903) 923-9000

David Sochia
Alexandra F. Easley
MCKOOL SMITH, P.C.
300 Crescent Court, Ste. 1500
Dallas, TX 75201
(214) 978-4000

Joel L. Thollander
James E. Quigley
Kyle N. Ryman
MCKOOL SMITH, P.C.
303 Colorado Street, Ste. 2100
Austin, TX 78701
(512) 692-8700

*Attorneys for Appellant*
*Xerox Corporation*

October 30, 2023

**U.S. Patent No. 9,208,439 B2 (the ’439 patent)**

(Claim 1 treated as representative by the Board.)

**1.** A method, comprising:

receiving, from a mobile device, event data derived from contextual data collected using detectors that detect a physical context surrounding the mobile device;

modifying a context graph that stores facts and assertions about a user’s behavior and interests using the event data;

in response to determining that there exists a registration for notification of changes that matches the modification to the context graph, sending a notification of context graph change to a recommender.

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 2023-1969 |
| **Short Case Caption** | Xerox Corp. v. Facebook, Inc. |
| **Filing Party/Entity** | Xerox Corporation |

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Signature: /s/ *Joel L. Thollander*

Name: Joel L. Thollander

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☒ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Xerox Corporation | | Xerox Holdings Corporation (wholly owns Xerox Corporation) |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ ADDITIONAL PAGES ATTACHED

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | |
|---|---|
| **McKool Smith, P.C.** | George T. Fishback, Jr., Carra Rentie, Ashley Moore (no longer with the firm) |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☒ Yes (file separate notice; see below) ☐ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☒ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |

# TABLE OF CONTENTS


TABLE OF AUTHORITIES…..................................................................... iii

STATEMENT OF RELATED CASES ..........................................................vi

STATEMENT OF JURISDICTION..............................................................1

STATEMENT OF THE ISSUES..................................................................2

STATEMENT OF THE CASE…..................................................................3

I. PRELIMINARY STATEMENT. ...............................................................3

II. BACKGROUND. .....................................................................................6

A. Xerox's legacy of innovation includes the '439 patent.........................6

B. Facebook infringes the '439 patent and then files for *inter partes* review based on an obviousness combination Cheng and Falchuk. ..........................................................................10

C. The Board finds Xerox's claims obvious over Cheng and Falchuk. ...............................................................................................18

SUMMARY OF THE ARGUMENT ..........................................................21

STANDARD OF REVIEW ........................................................................26

ARGUMENT ...........................................................................................28

I. THE BOARD ERRED IN CLAIM CONSTRUCTION. ...............................28

A. The Board misconstrued "facts and assertions" by reading "and assertions" out of the claim term. ..............................................28

B. The Board misconstrued "notification of context graph change" by reading "of context graph change" out of the claim term. ...................................................................................................33

II. THE BOARD ERRED IN DETERMINING THAT FACEBOOK MET ITS BURDEN TO PROVE THAT XEROX'S CLAIMS ARE OBVIOUS. .........................................................37

A. The petition identified no prior art combination that discloses claim limitations 1[b] and 1[c]. ....................38

1. *Facts and assertions*. No combination discloses limitation 1[b]: "modifying a context graph that stores facts and assertions about a user's behavior and interests using the event data." ....................38

2. *Registration and notification*. No combination discloses limitation 1[c]: "in response to determining that there exists a registration for notification of changes that matches the modification to the context graph, sending a notification of context graph change to a recommender." ....................43

B. The Board also erred in finding a motivation to combine. ....................45

1. The motivation to combine adopted by the Board was not the motivation to combine offered in the petition. ....................47

2. The Board's motivation-to-combine analysis was conclusory, generic, and unsupported. ....................49

CONCLUSION ....................53

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*ActiveVideo Networks, Inc. v. Verizon Comm., Inc.*,
694 F.3d 1312 (Fed. Cir. 2012) ....................39, 40, 46, 50

*AMC Multi-Cinema, Inc. v. Fall Line Patents, LLC*, No. 21-1051,
2021 WL 4470062 (Fed. Cir. Sept. 30, 2021) (unpublished)....................39

*Arthrex, Inc. v. Smith & Nephew, Inc.*,
935 F.3d 1319 (Fed. Cir. 2019) ....................27, 49

*Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*,
672 F.3d 1335 (Fed. Cir. 2012) ....................32, 36

*Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*,
616 F.3d 1249 (Fed. Cir. 2010) ....................30, 32, 36, 37

*Bicon, Inc. v. Straumann Co.*,
441 F.3d 945 (Fed. Cir. 2006) ....................32, 36

*CAE Screenplates, Inc. v. Heinrich Fiedler GmbH & Co.*,
224 F.3d 1308 (Fed. Cir. 2000) ....................29, 32, 36

*Carrum Techs., LLC v. Unified Patents, LLC*, No. 20-2204,
2021 WL 3574209 (Fed. Cir. Aug. 13, 2021) (unpublished)....................42, 45

*Corning v. Fast Felt Corp.*,
873 F.3d 896 (Fed. Cir. 2017) ....................42, 45

*Exmark Mfg. Co. v. Briggs & Stratton Corp.*,
830 F. App'x 305 (Fed. Cir. 2020) (unpublished)....................32, 36

*HTC Corp. v. Cellular Comm. Equip., LLC*,
701 F. App'x 978 (Fed. Cir. 2017) (unpublished)....................30, 32, 36

*In re Magnum Oil Tools Int'l, Ltd.*,
829 F.3d 1364 (Fed. Cir. 2016) ....................39, 40, 46, 50

*In re NuVasive, Inc.*,
841 F.3d 966 (Fed. Cir. 2016) ....................27, 49

*Intel Corp. v. Qualcomm Inc.*,
21 F.4th 801 (Fed. Cir. 2021) ....................................................................36

*Intelligent Bio-Systems, Inc. v. Illumina Cambridge, Ltd.*,
821 F.3d 1359 (Fed. Cir. 2016) ..............................................29, 39, 42, 53

*InTouch Techs., Inc. v. VGo Comm., Inc.*,
751 F.3d 1327 (Fed. Cir. 2014) ..................................................................50

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007)...................................................................................45

*PersonalWeb Techs., LLC v. Apple, Inc.*,
848 F.3d 987 (Fed. Cir. 2017) ..............................................................passim

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc) ..................................................34

*Quantum v. Intel*,
6 F.4th 1256 (Fed. Cir. 2021) ....................................................................37

*Rovalma, S.A. v. Bohler-Edelstahl GmbH & Co. KG*,
856 F.3d 1019 (Fed. Cir. 2017) ..................................................................27

*SAS Inst., Inc. v. Iancu*,
138 S. Ct. 1348 (2018).........................................................................passim

*SEC v. Chenery Corp.*,
318 U.S. 80 (1943)...............................................................................26, 42

*Thorner v. Sony Comput. Entm't Am. LLC*,
669 F.3d 1362 (Fed. Cir. 2012) ..................................................................36

*TQ Delta, LLC v. Cisco Sys.*,
942 F.3d 1352 (Fed. Cir. 2019) ..............................................39, 40, 46, 50

*University of Strathclyde v. Clear-Vu Lighting LLC*,
17 F.4th 155 (Fed. Cir. 2021) ...................................................37, 45, 46, 50

**STATUTES**

35 U.S.C. § 103 ...................................................................................1, 18

35 U.S.C. § 141 .........................................................................................1

35 U.S.C. § 142 .......... 1

35 U.S.C. § 312(a)(3) .......... 29, 39, 40, 41

**OTHER AUTHORITIES**

37 C.F.R. § 42.104(b)(4) .......... 41

37 C.F.R. § 90.3 .......... 1

*A Legacy of Inventing the Future*, PARC, https://www.parc.com/about-parc/parc-history (last visited Oct. 30, 2023) .......... 6

FED. CIR. R. 15 .......... 1

*Xerox Recognized in Derwent Top 100 Global Innovators List, 2018–2019*, XEROX, https://www.xerox.com/en-us/innovation/derwent-top-100 (last visited Oct. 30, 2023) .......... 6

## STATEMENT OF RELATED CASES

Pursuant to FED. CIR. R. 47.5, Appellant provides as follows:

(a) There have been no other previous appeals in this case; and

(b) The following cases and petitions for *inter partes* review are related and may be directly affected by this Court's decision in the pending appeal:

- Case No. 2:20-cv-10753-AB, *Xerox Corp. v. Meta Platforms, Inc.* (C.D. Cal.);
- Case No. 2:20-cv-10754-AB, *Xerox Corp. v. X Corp., F/K/A Twitter, Inc.* (C.D. Cal.);
- Case No. 2:20-cv-10755-AB, *Xerox Corp. v. Snap, Inc.* (C.D. Cal.);
- *Inter partes* review of U.S. Patent No. 9,208,439 B2 (the '439 patent), No. IPR2021-00986 (P.T.A.B. Mar. 22, 2023), *appeal pending in Xerox Corp. v. Snap, Inc.*, No. 23-1967 (Fed. Cir.); and
- *Inter partes* review of the '439 patent, No. IPR2021-01430 (P.T.A.B. Mar. 22, 2023), *appeal pending in Xerox Corp. v. X Corp.*, No. 23-1968 (Fed. Cir.).

## STATEMENT OF JURISDICTION

On March 22, 2023, the Patent Trial and Appeal Board (the Board) issued its final written decision in IPR2021-01461. Appx1. The Board found claims 1-5, 7-11, 13-17, 19, and 20 of U.S. Patent No. 9,208,439 B2 (the '439 patent) unpatentable as obvious under 35 U.S.C. § 103. Appx62-63. On May 23, 2023, Xerox Corporation (Xerox)[1] timely filed its notice of appeal in this Court. 37 C.F.R. § 90.3(a)(1); 35 U.S.C. § 142; FED. CIR. R. 15(a)(1); Appx778-781. The Court has exclusive jurisdiction. 35 U.S.C. § 141(c).

[1] During the proceeding before the Board, the '439 patent was owned by Xerox's predecessor in interest, Palo Alto Research Center LLC (PARC). After the final written decision was issued, PARC assigned its interest in the '439 patent to Xerox and Xerox subsequently donated PARC to another research institute. For ease of reference, this brief refers to the patent owner, both then and now, as Xerox.

## STATEMENT OF THE ISSUES

1. Whether the Board erred in claim construction by reading the disputed words out of the claim terms when it concluded that "facts" alone would read on the recited "facts and assertions," and that "notification" alone would read on the recited "notification of context graph change."

2. Whether the Board erred in determining that Facebook met its burden to show that the challenged claims were obvious when: (A) the petition identified no combination of prior art references that included all of the recited claim limitations, including among other elements the missing "facts and assertions" and "notification of context graph change"; and (B) the motivation-to-combine theory adopted by the Board was generic, conclusory, and lacking any substantial evidentiary support—and it was *not* the theory presented by Facebook in the petition.

## STATEMENT OF THE CASE

### I. Preliminary Statement.

This appeal is one of three that this Court will hear and decide together. *See* Dkt. No. 2 (providing that appeal Nos. 23-1967, -1968, and -1969 are considered companion cases and will be assigned to same merits panel). Snap, Inc. (Snap), X Corp. (X), and Facebook, Inc. (Facebook)—each a defendant in litigation brought by Xerox Corporation in the Central District of California—coordinated their invalidity theories and then filed three staggered petitions for IPR on the claims of the ’439 patent. The Board treated the IPRs separately, but issued its final written decision in all three on the same day, determining that Snap, X, and Facebook had each met its burden to show the challenged claims were unpatentable as obvious.

Viewing all three decisions together reveals not only that the Board erred in each of these IPRs, but also the striking nature of the Board’s errors in repeatedly ruling for Snap, X, and Facebook, and against Xerox and the ’439 patent. In Snap’s IPR, the Board read the word “graph” out of the claim term “context graph.” In Facebook’s IPR, the Board read the words “and assertions” out of the claim term “facts and assertions,” and then further read the words “of context graph change” out of “notification of context graph change.” In X’s IPR, the Board based its obviousness determination on a specific theory that was never presented in the

petition. In each IPR the Board also hand-waved missing limitations and found a motivation to combine based on generic, conclusory, and unsupported assertions.

This appeal is about the third IPR, filed by Facebook. Facebook's petition changed direction in one important respect: "Facebook's expert … assumed, for his analysis"—unlike the positions taken by Snap and X—"that the term 'context graph' requires a 'graph-based model.'" Appx13.

But in order to read Facebook's proposed prior art combination on the challenged claims of the '439 patent, the Board misconstrued two other terms recited in those claims. Because Facebook's identified prior art disclosed only "facts," the Board was forced to conclude that a collection of "facts" alone reads on the recited term "facts and assertions." Appx14-16. The Board thus rendered the words "and assertions" meaningless surplusage. It then found that Facebook's identified prior art satisfied that limitation on this basis alone. Appx27 ("Facebook persuasively shows that, by disclosing a context graph comprising a collection of facts, Cheng discloses 'facts and assertions' as recited in claim 1."). That was error. Further, because Facebook's identified prior art disclosed only a "notification triggered *by* a context graph change," Appx32 (emphasis added), the Board was forced to conclude that any notification following a context graph change read on the recited "notification *of* context graph change." Appx32 (emphasis added). In doing so, the Board rendered the words "of context graph change" meaningless surplusage,

reading them straight of the term "notification of context graph change." And it then found that Facebook's identified prior art satisfied that limitation on this basis alone. Appx33 (finding Facebook's showing "sufficient to meet limitation 1[c], whatever the context of th[e] notification"). Again, that was error.

Finally, the Board combined Facebook's first and second references based on the simple observation that the first reference "provides little detail" with respect to the elements that it fails to disclose, and a skilled artisan would have looked to the second reference "to fill in the missing details." Appx34-35. There are a number of critical problems with this finding. The "fill in the missing details" theory was *not* presented in the petition; the petition presented a markedly different "timely recommendation" theory that the Board did not adopt. Furthermore, this kind of conclusory analysis cannot support an obviousness determination as a matter of law. And the "fill in the missing details" theory makes sense only if the two references effectively work in the same way. But at the hearing, Facebook made clear that, as to the functions with missing details, the first reference says "the exact opposite and reverse of what [the second reference] says." Appx752.

This Court should reverse.

## II. Background.

### A. Xerox's legacy of innovation includes the '439 patent.

Xerox believes in "solving problems—constantly questioning the world around you to find new answers to old challenges." *Xerox Recognized in Derwent Top 100 Global Innovators List, 2018–2019*, XEROX, https://www.xerox.com/en-us/innovation/derwent-top-100 (last visited Oct. 30, 2023). In 1970, Xerox "assemble[d] a team of world-class experts in information and physical sciences to become what is known as 'The Architects of Information.'" *A Legacy of Inventing the Future*, PARC, https://www.parc.com/about-parc/parc-history (last visited Oct. 30, 2023). That team became Xerox PARC; later simply PARC, a Xerox subsidiary. *Id.* In the decades between PARC's founding in 1970 and PARC's donation to SRI International in 2023, PARC and Xerox solved countless real-world problems in new and useful ways—including seminal inventions underlying personal computers, ethernet, and word processing—earning thousands of patents along the way.

The '439 patent, part of this legacy of innovation, describes a multi-user, multi-recommender platform that analyzes contextual data to make recommendations to a user. The platform includes "client-side architecture and [] server-side architecture." Appx75 (2:56-57). The client side includes a number of "mobile devices 102, 104, and 106 [that] collect contextual data using detectors such

as a GPS, an accelerometer, and/or a compass." Appx76 (3:49-51). Portions of an exemplary client-side architecture are shown in Figures 1 and 7:




FIG. 1




FIG. 7

Appx67 (Fig. 1), Appx73 (Fig. 7).

Figure 1 shows several mobile devices (102, 104, 106). Appx76 (3:49). These exemplary mobile devices include a display (705), processor (702), memory (704), storage (706), a number of applications (707, 709), a data logger (210), and detectors (202, 204, 206) as shown in Figure 7. Appx79 (9:32-41). The mobile devices collect contextual data "from inside a client application … through the operating system … [or] from devices such as GPS receivers, accelerometers, etc." Appx76 (4:31-40). The contextual data is processed into event data, which may be characterized as "low-level" or "high-level." Appx76 (3:4-15). "Low-level event data indicate events that are detected from context, and not generated, by the client-side architecture. For

example, a low-level event can be a walking pattern sensed by an accelerometer, the selection of a button in an application, or a screen capture. The client-side architecture may generate high-level events using the contextual data and send the high level events to a server. A high-level event can be, for example, a user reading e-mail." Appx76 (3:4-15). From here, the mobile device data is processed and sent to the server-side architecture, which is shown in Figure 4:




FIG. 4

Appx70 (Fig. 4), Appx77 (6:59-60).

The mobile device data comes to the server-side architecture through the event posting interface (302). Appx78 (7:7-9). One option is to send this data to a context

graph (406). The context graph "is a per-user, in-memory, graph-based model that stores facts and assertions about user behavior and actions." Appx78 (7:26-28). The context graph is further "a database of information about the user … [and] may include data relating to the personal habits of the user. Such data may include that a user tends to drink coffee at four o'clock, or that the user tends to go to work at two o'clock." Appx78 (7:28-33). Context graph data may change over time, resulting in "topological changes and/or changes to individual properties on objects (e.g., nodes and edges) in [the] context graph." Appx78 (7:56-60).

The '439 patent system connects recommenders to the context graph(s) through a dependency system. Appx78 (7:54-55). "A recommender is an application that recommends items or activities for a user. These recommenders maintain application-specific user models using user information derived from the context graph." Appx76 (3:23-27). Recommenders register for notifications, and then, "the system may notify recommenders of context graph changes." Appx78 (7:54-56). That is, when new data results in a context graph change, the system generates an "alert[] via the dependency system." Appx78 (7:56-57). Recommenders may then use "callbacks, in conjunction with graph queries … [or] an interface layer for propagating changes from [the] context graph" to the recommenders' systems. Appx78 (8:6-17). Then, the "recommender[s] may push recommendations [] to the client." Appx78 (8:2-3). In this way, clients may receive contextually relevant

recommendations based on, for example, their "location and movement …, nearby devices, and other surrounding conditions." Appx75 (1:30-31).

The Board found that independent claim 1 of the '439 patent was representative of the challenged claims, and focused its analysis in the final written decision on that claim. Appx6, Appx10-35. Claim 1recites:

> A method, comprising:
>
> [1a] receiving, from a mobile device, event data derived from contextual data collected using detectors that detect a physical context surrounding the mobile device;
>
> [1b] modifying a context graph that stores facts and assertions about a user's behavior and interests using the event data;
>
> [1c] in response to determining that there exists a registration for notification of changes that matches the modification to the context graph, sending a notification of context graph change to a recommender.

Appx79 (claim 1) (with limitation numbering used by the Board).

### B. Facebook infringes the '439 patent and then files for *inter partes* review based on an obviousness combination Cheng and Falchuk.

Compared to Xerox, Snap, X, and Facebook are young social media companies. In response to their infringement of the '439 patent, Xerox (through its predecessor in interest PARC) brought suit against each company in the Central District of California in 2020. *Supra* viii & 1 n.1; Appx3. While coordinating their invalidity arguments in the district court litigation, each of these defendants filed

their own IPR petition against claims of the ’439 patent, offering different proposed obviousness combinations purportedly rending those claims unpatentable.

Facebook filed its petition for IPR third, on August 31, 2021—about one week after X filed its petition, and over three months after Snap had filed its initial petition for IPR on the ’439 patent. Appx298. While Snap had offered a combination of the so-called Nitz and Nykänen references, and X had offered a combination of the so-called Huomo and Cheng references, Facebook offered yet another combination: Cheng in view of Falchuk. Appx63. In particular, and as relevant to the issues in this appeal, Facebook argued that Cheng satisfied the elements recited in limitation 1[b], and that a combination of Cheng and Falchuk satisfied the elements recited in limitation 1[c]. Appx24, Appx30.

**Cheng.** Cheng is U.S. patent application number 2013/0018954A1, published on January 17, 2013, but later abandoned. Appx7, Appx968. Cheng “relates generally to user modeling” and “using situation-aware user sentiment social interest models.” Appx979 (¶ 3). Cheng posits that the “main weakness of [prior solutions] is their blindness about the user’s situation. At a particular moment, what a user needs or likes and what is appropriate to suggest to the user can be highly variable based upon the user’s situation.” Appx979 (¶ 10). Further, “[w]hile improving recommendation is important on any computing platform, it is especially important

for devices with small form factors such as mobile phones, due to small display areas, lower processing speed, and more limited user input." Appx979 (¶ 11).

To that end, Cheng "provides a solution where user interests and social networking preferences can be modeled in various situation." Appx980-981 (¶ 30). In Cheng, "[a] situation may be defined as the values of a set of variables that affect and sometimes determine a user's preference, behaviors, and decision making." Appx981 (¶ 31). Variables defining a situation can include: (1) variables that define a physical environment (e.g., location time, weather, sound, lighting); (2) variables that define a social circumstance (e.g., people around the user, category of venue the user is in); (3) variables that define a user state (e.g., mood, emotion, heart rate, blood pressure, glucose level); and (4) variables that define user activity (e.g., physical activities such as walking, driving, sleeping, and dancing, and online activities such as email, phone calls, shopping, social networking, web surfing, viewing and interacting with content). Appx981 (¶ 31).

Cheng explains that "[a] situation-aware activity tracker 200 logs user usage activity data and corresponding situation data at the time of the usage," and "[a] user model construction/update module 202 builds and updates user models." Appx981 (¶ 37). Furthermore, "[a] situation data gathering and pre-processing module 210 gather the data of the variables that are selected to define the situations," and "[an] activity data gathering and pre-processing module 212 may collect the data about

user usages of a device." Appx981 (¶¶ 38-39). "The raw data can be gathered from one or more devices used by the user to access/interact with the web or Internet, such as phones, televisions, tables, computers, and smart home devices. … The data can be processed and stored in various places, such as in a cloud, on a home server, or on a computer, or distributed on various connected devices." Appx981 (¶ 40). This is depicted in Figure 2:




FIG. 2

Appx970 (Fig. 2).

In Cheng, "an interest modeling component 222 builds user interest models and updates them as needed," and "FIG. 5 is a diagram illustrating the output of

interest modeling in accordance with an embodiment of the present invention." Appx982 (¶ 45). "A node of the personal interest graph 500 represents a concept and an edge connecting two concept nodes represents the ontological relationship between the concepts." Appx982 (¶ 45).



FIG. 5

Appx973 (FIG. 5). Cheng's "personal sentiment social and interest graphs built above can then be directly used by applications, such as for predicting user needs,

for making recommendations, and for decision making." Appx983 (¶ 52). "At recommendation time, the client device identifies the current situation, and asks the server/cloud to identify the items for recommendation," or, alternatively, "the long-term interests and social relations, latent patterns, and similar users can be cached on the client device, with the client device identifying the items for recommendation." Appx983 (¶ 55), Appx983 (¶ 54) ("At the time of the recommendation, the system first gathers the current situation data 1000, and derives the user's interests, sentiments, and influences in similar situations. It then ranks and selects the top few concepts to be recommended based on the current situation.").

**Falchuk.** Falchuk is U.S. Patent No. 8,694,901 B2, issued on April 8, 2014. Appx6. Falchuk discloses a "system and method for determining and presenting contextual suggestions on a mobile device." Appx986 (Abstract). According to the inventors, Falchuk stemmed from the belief that "[w]hat is needed is a system and method capable of providing a more elaborate model of, and management method for, user context," which can "provide the right reminder at the right time and place." Appx996 (2:5-9). Examples of "user context include calendar appointments, physical location, notes, and personal goals, e.g., on matters such as life, financial, wellness, and so on." Appx996 (2:15-18).

Figure 2, reproduced below, identifies the components of the Falchuk system. Appx997 (3:29). "The client 12 has components that can include a context-

presentation manager 14 having a queue of notifications and/or suggestions, a notifier 16, goal resolution 18, goal inferral 20, and user context 22. Appx997 (3:29-33). On the other hand, "[t]he server 10 components can include incoming context handler and/or context polling 24, visual or user interface 26 for context, query input, etc., goal resolution 18, goal inferral 20, and user context 22." Appx997 (3:33-36). "A goal can be entered explicitly by a user for the system, e.g., typed in using the mobile keypad, chosen from a list, or any other mechanism," or "a goal can be inferred implicitly by the system, e.g., based on other actions, based on other goals, and/or based on any other context such as physical location." Appx998 (5:39-44).

FIGURE 2




Appx988 (Fig. 2).

Falchuk's "context-presentation manager 14 can operate to queue up notifications and/or suggestions that are to be conveyed to the user." Appx997 (3:56-58). "As events occur, such as the creation of new scheduled calendar of events or a change of location by the user in question, they pass through the system and have some effect on the context, e.g., modify it." Appx997 (4:10-13).

"Given the goal stored by the system for the user, the goal resolution component 18 scours the user context 22, possibly applying rules, to see whether a given goal can be advanced by a given event(s)." Appx997 (4:13-16). "For example, if even e (that just happened) makes goal g possible, then a notification may be readied." Appx997 (4:16-18). And if "a goal-resolution component 18 on the mobile 12 determines that the event has caused a change to context 22 that now allows a goal to be achieved (S7=YES), then the goal-resolution 18 asks for a notification in step S8." Appx998 (6:22-25). In this situation, "[t]he context-presentation manager 14 is told of the possible notification to the user in step S9, and queues it up for presentation at a later moment." Appx998 (6:25-27). As depicted in Falchuk's Figure 4, events are sent by the server to mobile device (S5), the mobile device determined whether the event changes its context (S7), and, if so, asks for a notification." Appx998 (6:15-47) (describing Figure 4's steps). In other words, Falchuk's server determines events, and Falchuk's client determines context and queues up and renders a notification of a context change. Appx998.




Appx990 (Fig. 4).

### C. The Board finds Xerox's claims obvious over Cheng and Falchuk.

The Board instituted the IPR on claims 1-5, 7-11, 13-17, 19, and 20 of the '439 patent, and ultimately determined that Facebook carried its burden to show the challenged claims were unpatentable as obvious under 35 U.S.C. § 103. Appx62-63.

The Board began its final written decision with claim construction. Appx10-16. Reasoning that "Facebook's expert … assumed, for his analysis, that the term 'context graph' requires a 'graph-based model,'"—which Snap and X had disputed in the two initial IPRs—the Board concluded that it did "not need to construe the term 'context graph' to reach [its] decision" in this one. Appx13. The Board did recognize, however, that a dispute had arisen between the parties over the scope of the claim term "facts and assertions." Appx13-16. In particular, the parties disputed whether, in the '439 patent, "facts and assertions" referred to two things (Xerox's position), or instead to one (Facebook's position). Appx15. The Board came down on Facebook's side of the dispute, and concluded that "facts" alone read on the recited "facts and assertions." Appx16, Appx27.

The formal claim-construction section of the Board's decision noted that, to "the extent that other claim terms are significant," the Board would "discuss them below in the context of the asserted prior art." Appx11. And the Board did engage in further claim construction in its decision. In the context of discussing limitation 1[c], the Board recognized that a dispute had also arisen over the scope of the term "notification of context graph change" recited in that limitation. Appx32-33. In particular, the parties disputed whether the recited "notification of context graph change" had to be a specific notification "of context graph change" (Xerox's position), or instead whether "any notification triggered by a context graph change

would meet limitation 1[c]" (Facebook's position). Appx32. The Board again came down on Facebook's side of the dispute, reasoning that, "by the plain claim language, any notification that alerts the recommender that the context graph has changed in a manner matching the registration is sufficient to meet limitation 1[c], whatever the content of the notification." Appx33, Appx79 (claim 1).

Turning to limitation 1[b], the Board applied its first claim construction to find that "Facebook persuasively shows that, by disclosing a context graph comprising a collection of facts, Cheng discloses 'facts and assertions' as recited in claim 1." Appx27. Then turning to limitation 1[c], the Board applied its second claim construction to find that Falchuk satisfied the recited "registration" and "notification" elements—even though registration and notification in Falchuk were for reminders of a user's goal (e.g., mailing a package), rather than for specific changes to a context graph (e.g., changes in location). Appx32-33, Appx484, Appx997 (4:29-36). Under the Board's construction, as long as the reminder was "triggered by a context graph change," it would be considered "a notification of [a] context graph change." Appx32-33.

Finally, with respect to a motivation to combine Cheng and Falchuk, the Board noted simply that it "agree[d] with Facebook that Cheng provides little detail about how its recommender would interact with its personal interest graph, and [it] found persuasive Facebook's argument that a person of ordinary skill in the art

would have had reason to look to other references, particularly Falchuk, to fill in the missing details." Appx34-35.

Based on these and other findings, the Board determined that Facebook "has shown by a preponderance of the evidence that [independent] claim 1 is unpatentable as obvious over Cheng in view of Falchuk." Appx35.[2]

Because the Board treated that claim as representative, Appx6, any error in its analysis of claim 1 undermines its determination of every claim.

Xerox timely appealed. Appx733-736.

## SUMMARY OF THE ARGUMENT

1. The Board erred in its construction of two claim terms. The Board concluded that it had no need to construe the term "context graph"—as it was forced to in the companion Snap proceeding—because Facebook's expert assumed (unlike Snap's position and argument) that the term "context graph" requires a "graph-based model." Appx13. The Board did, however, misconstrue two other claim terms: "facts and assertions" and "notification of context graph change."

The dispute as to the first term was straightforward: when the claims recite "facts and assertions," is that referring to one thing? Or two? The Board

[2] The Board also denied a contingent motion to amend filed by Xerox. Appx64. Because the issues raised in this appeal confirm that the Board erred in determining that the original claims were unpatentable, there should be no need for the Court to consider or address that motion or the proposed claim amendments.

acknowledged that the claim language, the controlling law, and the agreement of the parties and their experts all pointed to Xerox's position: "facts" and "assertions" are different things with different meanings for purposes of the '439 patent claims. Appx14-16. Even so, the Board reasoned that, in "ordinary" parlance, a "fact" could also be considered "a type of assertion," so a collection of "facts" alone read on the recited "facts and assertions." Appx15-16. The Board offered an example that, it believed, showed that its construction did not render "and assertions" superfluous, Appx16, but its example showed the opposite. The Board's construction renders "and assertions" meaningless by reading those words out of the claims.

The Board also resolved a second dispute that arose between the parties through claim construction. That dispute was whether the "notification of context graph change" recited in claim limitation 1[c] had to be a notification "of context graph change." Appx32-33. That was Xerox's position. Because Facebook had identified no prior art that sent a notification "*of* context graph change," it argued that "any notification triggered *by* a context graph change would meet limitation 1[c]." Appx32 (emphases added). The Board again came down on Facebook's side. "[B]y the plain claim language," the Board concluded, "any notification that alerts the recommender that the context graph has changed in a manner matching the registration is sufficient to meet limitation 1[c], whatever the content of the notification." Appx33. But critically, the Board's analysis applies in precisely the

same way to limitation 1[c] when that limitation is read without the words "of context graph change." *Infra* § I.B. Again, therefore, the Board's construction renders those words meaningless, and reads them straight out of the claims.

Both of these claim constructions reflect legal error under a substantial line of legal authority from this Court. *Infra* §§ I.A. & I.B.

2. Those erroneous claim constructions were crucial to the Board's findings that Facebook met its burden to show where and how all of the recited claim elements could be found in the prior art. Those findings were also in error.

The Board expressly rested its "facts and assertions" finding on its claim construction: "[t]hus, Facebook persuasively shows that, by disclosing a context graph comprising a collection of facts, Cheng discloses 'facts and assertions' as recited in claim 1." Appx27. Were any doubt remaining that the Board had read the words "and assertions" out of the term, that erroneous finding removed it. But even putting that claim-construction problem aside, Facebook's petition never identified with any particularity, or provided any substantive analysis regarding, how the recited facts and assertions mapped onto Cheng. It offered merely the conclusory assertion—simply parroting the claim language—that Cheng "stores facts and assertions about a user's behavior and interests." Appx251-252. That is insufficient to carry Facebook's burden in this proceeding to prove unpatentability.

The Board also rested its "notification of context graph change" finding on its claim construction. Facebook's theory was that Falchuk disclosed this claim element. But Falchuk did not teach sending a notification of a context graph change (e.g., a notification of a change in location); it sent a notification related to a goal specified the user (e.g., a reminder to mail a package). *Infra* § II.A.2. Recognizing the problem, Facebook argued that the claim should be interpreted so that "any notification triggered by a context graph change would meet" the limitation. Appx32. And the Board agreed, concluding that the "plain claim language" said nothing about "the content of the notification." Appx33. But of course, the claim language *does* expressly recite the necessary content of the notification—the notification must be "of the context graph change." Appx79.

The Board's findings about these missing elements thus necessarily fall with its erroneous claim constructions. Appx27, Appx33.

3. The Board also erred in its finding of a motivation to combine Cheng and Falchuk. Its substantive analysis on the issue was simply this: "[w]e agree with Facebook that Cheng provides little detail about how its recommender would interact with its personal interest graph, and we find persuasive Facebook's argument that a person of ordinary skill in the art would have had reason to look to other references, particularly Falchuk, to fill in the missing details." Appx34-35. There are a number of critical problems with this finding.

This "fill in the missing details" theory is not the motivation-to-combine theory that Facebook advanced in the petition. The petition offered only a "timely recommendation" theory. Appx265. But Xerox demonstrated that this theory was flawed, Appx485-486, and in defending it Facebook was forced to take conflicting positions on whether or not "Cheng already recognizes the importance of timeliness." Appx34, Appx641-642. So the Board's decision not to adopt that theory was understandable. But in latching onto a motivation-to-combine theory not presented in the petition, the Board contravened the administrative and statutory rules that require, among other things, "that the petitioner's contentions, not the [Board's] discretion, define the scope of the litigation all the way from institution through to conclusion." *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1357 (2018).

The Board's "fill in the missing details" theory is also entirely generic and conclusory, and in substance no different from the "could be combined" analyses that this Court has repeatedly found fraught with hindsight bias and insufficient to support an obviousness determination. *See authorities cited infra* § II.B.

The "fill in the missing details" motivation-to-combine theory also fails because Facebook never identified the "details" in Falchuk that it conceded are missing from Cheng—for example, the notification of context graph change. When it was time to locate the missing details in Falchuk, the Board elected instead to construe the relevant limitation to not require the details that were missing from both

references. *Infra* § I.B. This theory thus fails to show, as required, that the references would be combined *in the way claimed* by the ’439 patent.

The “fill in the details” theory is further problematic because, generic and conclusory as it is, it rests logically on the assumption that Cheng and Falchuk operate similarly. It would make no sense to say that Falchuk was simply supplying operational “details” if its combination would transform the way that Cheng worked. But that is the position Facebook took at the hearing. In explaining how Cheng’s recommender would interact with its personal interest graph, Facebook insisted that Cheng says “the exact opposite and reverse of what Falchuk says.” Appx752.

The Board’s motivation-to-combine theory, which was not presented in the petition in any event, also lacks any substantial evidentiary support.

This Court should reverse.

## STANDARD OF REVIEW

The Court’s review of agency actions is rigorous. While a district court may be affirmed so long as its “result is correct,” that is not so for an agency. *SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943). An agency action must be sustained on “the grounds upon which the [agency] itself based its action.” *Id.* Thus the Court may “uphold a decision of less than ideal clarity if the agency’s path may reasonably be discerned,” but will not “supply a reasoned basis for the agency’s action that the

agency itself has not given." *Rovalma, S.A. v. Bohler-Edelstahl GmbH & Co. KG*, 856 F.3d 1019, 1024 (Fed. Cir. 2017) (citation omitted).

In the context of an IPR proceeding, the Administrative Procedure Act (APA) further precludes the Board from "craft[ing] new grounds of unpatentability not advanced by the petitioner." *Arthrex, Inc. v. Smith & Nephew, Inc.*, 935 F.3d 1319, 1326 (Fed. Cir. 2019). The IPR statute likewise requires "that the petitioner's contentions," presented in the petition, must "define the scope of the litigation all the way from institution through to conclusion." *SAS*, 138 S. Ct. at 1355-58. The Board's noncompliance with these constraints raises a question of law subject to de novo review. *In re NuVasive, Inc.*, 841 F.3d 966, 972 (Fed. Cir. 2016).

Here the Board construed claim terms within the '439 patent and found Xerox's claims obvious. "Claim construction is a legal issue reviewed de novo," and when the construction is "based on underlying factual findings," those findings "are reviewed for substantial evidence." *PersonalWeb Techs., LLC v. Apple, Inc.*, 848 F.3d 987, 990 (Fed. Cir. 2017). Similarly, the Court "review[s] the Board's ultimate determination of obviousness de novo and its underlying factual determinations for substantial evidence." *Id.* at 991. Substantial evidence is no toothless standard. The Court "examin[es] the record as a whole, taking into account evidence that both justifies and detracts from an agency's decision." *Id.* (citation and internal quotation

marks omitted). In doing so, the Court asks "whether a reasonable fact finder could have arrived at the agency's decision." *Id.* (citation omitted).

# ARGUMENT

## I. The Board Erred In Claim Construction.

Noting that "Facebook's expert … assumed, for his analysis, that the term 'context graph' requires a 'graph-based model'"—which Snap and X had disputed in the two initial IPRs—the Board concluded that it did "not need to construe the term 'context graph' to reach [its] decision" in this one. Appx13. Instead, the Board misconstrued two different claim terms in its final written decision: (1) "facts and assertions," and (2) "notification of context graph change." Appx13-16, Appx33. Because the Board made no alternative findings to support its decision in the event these separate constructions were not affirmed, a determination that either of the constructions is in error requires reversal.

### A. The Board misconstrued "facts and assertions" by reading "and assertions" out of the claim term.

Facebook "did not propose an explicit construction of the term 'facts and assertions'" in the petition. Appx13. But as the proceeding progressed, a dispute regarding the meaning of the term came into focus: when the claims recite "facts and assertions," is that referring to one thing? Or two? *See* Appx13-14. It was critical for the Board to resolve the dispute, as Facebook made no distinction in its petition between facts and assertions, and made no attempt to identify elements in the prior

art separately corresponding to each. Appx13-15 (noting that the obviousness theory presented in the petition "relied on" Facebook's reading of "facts *and* assertions" as "referring to '*information*'" in the prior art) (emphases added); Appx251-252, Appx721. If "facts" and "assertions" are distinct, with separate meanings for purposes of the '439 patent claims, then the petition's allegations could not carry Facebook's burden in the IPR. *See* 35 U.S.C. § 312(a)(3); *Intelligent Bio-Systems, Inc. v. Illumina Cambridge, Ltd.*, 821 F.3d 1359, 1369 (Fed. Cir. 2016); *see also SAS*, 138 S. Ct. at 1357 ("the petitioner's contentions … define the scope of the litigation all the way from institution through to conclusion").

The Board began its analysis on solid footing, noting that "the parties and their experts appear to agree that a person of ordinary skill in the art would have considered a 'fact' to be different from an 'assertion' because, unlike an assertion, a fact would necessarily include an indication of truth." Appx14. And the Board concurred: "We agree with the parties that a person of ordinary skill in the art would have understood the term 'fact' to include an indication of truth, whereas an assertion need not include such an indication." Appx15. The Board further "agree[d] that the two terms have different meanings in claim 1 based on the plain meaning of each term." Appx15. Finally, the Board acknowledged and "appreciate[d]" Xerox's argument and citation to the decisions of this Court holding "that when two different terms appear in a claim, they presumably refer to different things." Appx15; *see CAE*

*Screenplates, Inc. v. Heinrich Fiedler GmbH & Co.*, 224 F.3d 1308, 1317 (Fed. Cir. 2000) ("In the absence of any evidence to the contrary, we must presume that the use of … different terms in the claims connotes different meanings."); *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010) ("[w]here a claim lists elements separately," the "clear implication" is that those elements are "distinct"); *see also HTC Corp. v. Cellular Comm. Equip., LLC*, 701 F. App'x 978, 982 (Fed. Cir. 2017) (unpublished).

Given these findings that the claim language, the controlling law, and the agreement of the parties and their experts all required the conclusion that "facts" and "assertions" are different things with different meanings for purposes of claim 1, only one rational conclusion on the claim construction dispute was possible: "facts and assertions" necessarily refers to two things, not one, in the claims of the '439 patent. Nevertheless, the Board did not reach that conclusion.

Instead, the Board reasoned that, while "facts" and "assertions" have different meanings, those meanings are not always (or even necessarily) mutually exclusive: in "ordinary and customary" parlance, a "fact" could also be considered "a type of assertion." Appx15. The Board next observed that the specification did not indicate that "facts and assertions" should be given different treatment with respect to how they were stored. Appx15 (citing Appx76 (3:21-22)). The Board then concluded its syllogism by noting: "we find no evidence of record suggesting that either (1) the

ordinary and customary meaning of the term 'assertion' excludes facts, or (2) that the '439 patent uses these terms in a way that departs from their ordinary and customary meaning." Appx15-16. With that logical flourish, the Board read the words "and assertions" straight out of the term "facts and assertions"—and two recited elements with admittedly different meanings became one: "facts."

The Board appeared to recognize the critical problem with its holding, and offered an example demonstrating, it believed, that both terms still had meaning under its construction. Appx16. The Board's example, however, demonstrates the opposite: "That claim 1 requires the presence of both 'facts' *and* 'assertions' does not render the two terms superfluous," the Board postulated, "as this would exclude prior art in which a context graph includes only assertions but not facts. On the other hand, a disclosure of a collection of facts would meet the term 'facts and assertions' because a person of ordinary skill in the art would have regarded any subset of the facts to also be assertions." Appx16. But the Board's example proves what it sought to disprove. The words "and assertions" *are superfluous* under its construction: a claim reciting *only* facts "would exclude prior art in which a context graph includes only assertions but not facts," while, on the other hand, that facts-only limitation would be met by "a disclosure of a collection of facts"—precisely as in the Board's example. Appx16. As a matter of logic, the Board's construction renders "and assertions" meaningless; it reads those words straight out of the claim term.

That was legal error not only under the cases the Board cited—*CAE Screenplates*, 224 F.3d at 1317, *Becton, Dickinson*, 616 F.3d at 1254, and *HTC*, 701 F. App'x at 982—but also under the *Aspex Eyewear*, *Bicon*, and *Exmark* decisions. *Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1348 (Fed. Cir. 2012) (rejecting a construction that effectively read the word "free" out of the claim term "rearwardly directed free end"); *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 951 (Fed. Cir. 2006) (rejecting a construction that effectively "read limitations … out of the claim"); *Exmark Mfg. Co. v. Briggs & Stratton Corp.*, 830 F. App'x 305, 309-310 (Fed. Cir. 2020) (unpublished) (rejecting a construction the effectively read the word "discharge" out of the claim term "discharge opening").

The Board's misstep was in failing to apply the controlling law to the claim language. While it may be true that, in ordinary parlance, a fact can sometimes be considered an assertion, the reason that the dispute arose in this proceeding is that the claims of the '439 patent list them as separate elements: "facts and assertions." And under these circumstances, "they presumably refer to different things." *CAE Screenplates*, 224 F.3d at 1317. The specification passage referenced by the Board does nothing to overcome that presumption—that both "facts" and "assertions" are stored in the same manner says nothing at all about whether "facts and assertions" are one thing, or two, for purposes of claim 1. To the contrary, the specification passage to which the Board cites lists them separately—"facts and assertions"—just

as in the claims. Appx15, Appx76 (3:21-22). The claims and the specification are consistent: “facts and assertions” are two things, not one.

And the claims and the specification are all that are relevant here. Neither party made any argument from the prosecution history, and Facebook offered no argument or evidence in its petition on this point—so there was no extrinsic record on which the Board could rely to rule in Facebook’s favor. Appx251. And while the Board noted that the experts agreed on the different meanings of the “facts” and “assertions” terms, it did not purport to rely on any expert testimony in reading the words “and assertions” out of the claim term “facts and assertions.” Appx14-16.

When the claims are read in light of the specification, and in view of this Court’s controlling authority, the dispute can be resolved only in Xerox’s favor: “facts and assertions” are two things, not one, for purposes of the ’439 patent claims. The Court should reverse.

### B. The Board misconstrued “notification of context graph change” by reading “of context graph change” out of the claim term.

The Board offered a second claim construction later in its final written decision. Appx32-33. It was offered in the middle of the Board’s analysis of limitation 1[c], rather than in the section marked “claim construction.” Appx32. The Board acknowledged that a dispute had arisen between the parties regarding the scope of the claim term “notification of context graph change,” and the Board resolved that dispute through its reading of the “plain claim language” of limitation

1[c]. Appx33. By definition, that was an act of claim construction, *see Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-15 (Fed. Cir. 2005) (en banc), that is subject to de novo review. *PersonalWeb*, 848 F.3d at 990.[3]

The dispute that had arisen between the parties was whether a "notification of context graph change" had to be a notification "*of context graph change*." *See* Appx32-33 (emphasis added). That was Xerox's position. Appx32 (citing to Appx484, Appx639-640). Facebook argued that, as a matter of claim scope, "any notification triggered by a context graph change would meet limitation 1[c]." Appx32 (citing to Appx555). The Board "agree[d] with Facebook that claim 1 does not impose any particular form or content on the notification of a context graph change. It simply recites 'sending a notification of context graph change to a recommender.'" Appx33. "It only expressly requires a notification of 'context change' matching the registration, not any particular details or aspects of that change. Thus, by the plain claim language, any notification that alerts the recommender that the context graph has changed in a manner matching the registration is sufficient to meet limitation 1[c], whatever the content of that

[3] While the Board did not address its construction of the "notification of context graph change" term in the decision's formal "claim construction" section, the Board did recognize, in that section, that it would be engaging in such work elsewhere in the decision. Appx11 (explaining that, "[t]o the extent that other claim terms are significant, we discuss them below in the context of the asserted prior art").

notification." Appx33. The Board read the words "of context graph change" right out of the claim term "notification of context graph change."

Consideration of limitation 1[c] in its entirety confirms that this was the effect of the Board's construction—it rendered the words "of context graph change" nothing but meaningless surplusage in the claim. Limitation 1[c] reads:

> in response to determining that there exists a registration for notification of changes that matches the modification to the context graph, sending a notification of context graph change to a recommender.

Appx79 (claim 1). Under the Board's construction, "any notification that alerts the recommender that the context graph has changed in a manner matching the registration is sufficient to meet" this limitation. Appx33. But precisely the same analysis holds if the words "of context graph change" are struck from the limitation:

> in response to determining that there exists a registration for notification of changes that matches the modification to the context graph, sending a notification […] to a recommender.

Appx79 (claim 1). Whenever the recommender received the "notification" recited in this amended claim—"whatever the content of that notification"—the recommender would know that the notification had been sent "in response to determining that there exists a registration for notification of changes that matches the modification to the context graph." The recommender would thus be alerted, as the Board put it, "that the context graph has changed in a manner matching the registration." Appx33.

Under the Board's construction, the words "of context graph change" have no meaning, and play no substantive role, in limitation 1[c].

That result, however, violates an "important principle" and "cardinal rule" of claim construction: to avoid, if at all possible, rendering language recited in the claims "void, meaningless, or superfluous." *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 801, 809-10 (Fed. Cir. 2021) (citing authorities). It likewise contravenes the many decisions rejecting claim constructions that effectively read words out of claim terms. *See Aspex Eyewear*, 672 F.3d at 1348; *Bicon*, 441 F.3d at 951; *Exmark*, 830 F. App'x at 309-310; *see also CAE Screenplates*, 224 F.3d at 1317; *Becton, Dickinson*, 616 F.3d at 1254; *HTC*, 701 F. App'x at 982.

There are only two circumstances where this rule would *not* come into play: lexicography or disavowal. *See Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). But Facebook has not argued either lexicography or disavowal, and the Board did not base its reading of the claim on those doctrines. Instead, the reading hinged on the "plain claim language." Appx33. And as a reading based on the "plain claim language" of limitation 1[c], the Board's construction cannot stand. Contrary to the Board's holding, the "content of th[e] notification," Appx33, is spelled out explicitly in the claim language: it must be "of the context graph change," Appx79 (claim 1).

Reversal is required on this ground. *Becton, Dickinson*, 616 F.3d at 1254.[4]

## II. The Board Erred In Determining That Facebook Met Its Burden To Prove That Xerox's Claims Are Obvious.

Putting aside the Board's errors in claim construction—which alone are dispositive and require reversal—the Board's determination that Facebook met its burden to demonstrate obviousness required the Board "to make findings, supported by evidence and explanation, on two points." *PersonalWeb*, 848 F.3d at 991. "First, the Board had to find in [Cheng] and [Falchuk] all of the elements of the ['439] patent claims at issue." *Id.*; *see also University of Strathclyde v. Clear-Vu Lighting LLC*, 17 F.4th 155, 160 (Fed. Cir. 2021). The Board failed to make the proper findings, supported by substantial evidence, reasoned explanation, and petition-presented legal theories, on this first point. *Infra* § II.A. But even if the Board had done so, "that would not be enough." *PersonalWeb*, 848 F.3d at 991. "Second, the Board had to find that a person of ordinary skill in the art would have been motivated to combine the prior art in the way claimed by the ['439] patent claims at issue and

---

[4] Because the Board effectively issued this claim construction sua sponte, the Court could alternatively vacate and remand on this issue. *See Quantum v. Intel*, 6 F.4th 1256, 1263 (Fed. Cir. 2021) (vacating and remanding a sua sponte claim construction). Xerox nevertheless believes reversal is appropriate here, as the claim term's meaning was in dispute, both parties took a plain-language approach to the term, and the Board based its construction on a plain-language reading of the term. This Court is fully competent to determine, without need for a remand, whether a plain-language reading that renders claim language meaningless is in error.

would have had a reasonable expectation of success in doing so." *Id.* The Board failed to make properly supported and explained findings on this second point as well. *Infra* § II.B.

### A. The petition identified no prior art combination that discloses claim limitations 1[b] and 1[c].

#### 1. *Facts and assertions.* No combination discloses limitation 1[b]: "modifying a context graph that stores facts and assertions about a user's behavior and interests using the event data."

There is no dispute that the petition failed to identify anywhere in the prior art a context graph that stores "facts" *and* "assertions" about a user's behavior and interests. Indeed, Facebook conceded this point at the hearing: "So just to be honest, Your Honor, the petition does not go out and say ABC and the facts, DE and F are the assertions." Appx721. Facebook merely argued that the petition could still be saved "as a matter of just claim interpretation," Appx721, reading "facts and assertions" as one thing, not two. And the Board applied that construction to find the missing element in Cheng. "Thus, Facebook persuasively shows that, by disclosing a context graph comprising a collection of facts, Cheng discloses 'facts and assertions' as recited in claim 1." Appx27. Because this finding expressly relies on the claim construction addressed above—which is unsustainable—the Board's finding on this point must fail too. *Supra* § I.A.

A second and independent reason justifies reversal on this "facts and assertions" point. Even if it is viewed through the lens of the Board's erroneous

claim construction, Facebook's petition still fails to meet the statutory requirements for "particularity" with respect to these elements. 35 U.S.C. § 312(a)(3).

The "petition [is] the centerpiece of the proceeding both before and after institution," *SAS*, 138 S. Ct. at 1358, and "[i]t is of the utmost importance that petitioners in the IPR proceedings adhere to the requirement that the initial petition identify 'with particularity' the 'evidence that supports the grounds for the challenge to each claim.' 35 U.S.C. § 312(a)(3)." *Intelligent Bio-Systems*, 821 F.3d at 1369; *see also AMC Multi-Cinema, Inc. v. Fall Line Patents, LLC*, No. 21-1051, 2021 WL 4470062, at *5 (Fed. Cir. Sept. 30, 2021) (unpublished) (explaining that the petitioner must "provide in the petition itself an understandable explanation of the element-by-element specifics of its unpatentability contentions, identifying supporting parts of the relied-on prior art"). The law is further clear that conclusory evidence and analysis cannot support a finding of obviousness. *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1381 (Fed. Cir. 2016) ("To satisfy its burden of proving obviousness, a petition cannot employ mere conclusory statements."); *TQ Delta, LLC v. Cisco Sys.*, 942 F.3d 1352, 1362-63 (Fed. Cir. 2019) (explaining that conclusory analysis will not support an obviousness finding); *ActiveVideo Networks, Inc. v. Verizon Comm., Inc.*, 694 F.3d 1312, 1327-28 (Fed. Cir. 2012).

The petition's discussion of "facts and assertions," however, consists of only conclusory sentences appended to unexplained quotes from Cheng. Appx251-252.

Indeed, if the lengthy quotes from Cheng are redacted, the totality of the petition's analysis on this point is found in three sentences:

> Cheng also confirms that the personal interest graph '**stores facts and assertions about a user's behavior and interests**.' …. The passage above makes clear that the personal interest graph stores facts and assertions about user '**interests**' and '**behavior**' (usage or activity). …. The personal interest graph in Cheng, therefore, '**stores facts and assertions about a user's behavior and interests**.'

Appx251-252 (emphasis in original); Appx478-479. There is no analysis there at all. It is entirely conclusory. And that cannot carry the burden of proving unpatentability. *TQ Delta*, 942 F.3d at 1362-63; *Magnum Oil Tools*, 829 F.3d at 1381; *ActiveVideo Networks*, 694 F.3d at 1327-28. Indeed, not only is the discussion conclusory; the emphases chosen by Facebook prove that it was quoting from Cheng in order to highlight the "interests" and "behavior" elements in limitation 1[b], not the "facts" and "assertions" elements.

Xerox raised this issue before the Board, but the Board sided with Facebook, finding "Facebook's arguments in the Petition sufficient to meet its particularity requirement under 35 U.S.C. § 312(a)(3) and its ultimate burden of persuasion." Appx27. The petition met the standard, according to the Board, because it "specifically identifies the ontological relationships between the nodes in Cheng's personal interest graph as the recited 'facts and assertions.'" Appx27. As support, the Board cited to the petition at Appx250-252. Appx27. All of the petition's discussion and analysis of "facts and assertions" on those pages, however, is found

in the block quote above: there is zero discussion and analysis. Nowhere, contrary to the Board's finding, does the petition "specifically identif[y]" the "ontological relationships between the nodes in Cheng's personal interest graph" as the "recited 'facts and assertions.'" Appx27, Appx250-252. The Board's factual findings are reviewed for substantial evidence in this Court. *PersonalWeb*, 848 F.3d at 990-91. That finding has no evidentiary support, and cannot stand.

Indeed, Facebook conceded as much at the hearing, confirming that "the petition does not go out and say ABC and the facts, DE and F are the assertions." Appx721. *Neither* facts *nor* assertions are specifically identified or mapped in the petition: A through F are missing in their entirety. Appx250-252.

The Board also looked to "Facebook's further responses in its Reply" as supplying the necessary particularity. Appx27, Appx544-551. It was in the reply, in fact—as the Board acknowledged elsewhere—that Facebook first "argue[d] that Cheng's personal interest graph includes 'facts and assertions' because Cheng discloses *facts* in the form of ontological relationships (edges of the graph) derived from a user's activity in relation to concepts (nodes of the graph)." Appx26 (citing Appx550) (emphasis added). This resort to reply arguments fails for two reasons.

First, under the statute, the particularly requirement applies to the *petition*. 35 U.S.C. § 312(a)(3); *see also* 37 C.F.R. § 42.104(b)(4) (noting that the petition "must specify where each element of the claim is found in the prior art"); *SAS*, 138 S. Ct.

at 1357 (noting that the contentions in the petition "define the scope of the litigation all the way from institution through to conclusion"); *Intelligent Bio-Systems*, 821 F.3d at 1369 (explaining the "utmost importance" of the particularity requirement as applied to the petition). Under this statutory scheme, the reply cannot be used to fill gaps left in the petition.

Second, because this appeal involves review of an agency action, the Board's conclusion on this "particularity" dispute can be affirmed only on "the grounds upon which the [Board] itself *based*" its conclusion. *See Chenery*, 318 U.S. at 88 (emphasis added). And the Board *based* its conclusion on the finding that the petition itself specifically identified the ontological relationships between the nodes in Cheng as the collection of *facts* that satisfied the "facts and assertions" elements of limitation 1[b]. Appx27. Because that finding has no evidentiary support, Appx250-252, it cannot stand, and the conclusion cannot be affirmed.

There is no substantial evidence supporting the Board's finding that Facebook's petition identified, with particularly, where the recited "facts and assertions" could be found in Cheng. Reversal is required for this reason as well. *See Corning v. Fast Felt Corp.*, 873 F.3d 896, 903 (Fed. Cir. 2017) (reversing where, "[b]ased on the record before [the Court], there is only one permissible factual finding"); *see also Carrum Techs., LLC v. Unified Patents, LLC*, No. 20-2204, 2021 WL 3574209, at *7 (Fed. Cir. Aug. 13, 2021) (unpublished) (same).

**2. *Registration and notification.* No combination discloses limitation 1[c]: "in response to determining that there exists a registration for notification of changes that matches the modification to the context graph, sending a notification of context graph change to a recommender."**

For the "registration" and "notification" elements in limitation 1[c], Facebook's petition looked to Falchuk, rather than Cheng. Appx30-32, Appx259-264, Appx484. According to Facebook, the "registration" element "correspond[ed] in Falchuk to a goal explicitly entered by the user or inferred by the system." Appx31, Appx262. The "notification" element corresponded in turn to reminders that could be sent when the Falchuk system determined that an "event advances a given goal." Appx31, Appx260. So, for example, "[i]f a stated goal is to mail a package before coming home from work, the [Falchuk] system needs to create a reminder to make sure the package is with the user when he/she leaves the house in the morning." Appx484, Appx997 (4:29-36).

The critical problem with this mapping of the elements, as Xerox pointed out in response, is that the claimed "registration" and "notification" elements are expressly *for* and *of* "context graph change[s]." Appx79 (claim 1), Appx484. And "registration" for a notification of changes that matches the modification to the context graph (e.g., a change in location) is *not* the same as registration for a reminder related to a goal specified by the user (e.g., to mail a package). Appx484-485. Similarly, "notification of context graph change" (e.g., notification of a change

in location) is *not* the same as notification related to a goal specified by the user (e.g., "a reminder to make sure the package is with the user when he/she leaves the house in the morning"). Appx484-485, Appx997 (4:29-36).

In reply, Facebook suggested that the obvious discrepancy between the claims and the teachings of Falchuk could be overlooked because "the notification in Falchuk is the direct result of the context graph change, such as a change in the user's location." Appx32, Appx554. And as a matter of claim scope, Facebook further argued, "the recited 'notification'" was not "limited to expressly reporting granular changes to particular aspects of a context graph, such as the simple fact of a change in user location." Appx32, Appx555. Instead, under Facebook's reading of claim 1, "any notification triggered by a context graph change would meet limitation 1[c]." Appx32, Appx555.

It was at this point that the Board resolved the dispute between parties, and found that Facebook had properly identified the missing elements in Falchuk, by resort to its claim construction that read the words "of context graph change" out of the term "notification of context graph change." Appx33. The entirety of the Board's discussion on the point is found in a single paragraph at Appx33, which concludes that, "by the plain claim language, any notification that alerts the recommender that the context graph has changed in a manner matching the registration is sufficient to meet limitation 1[c], whatever the content of the notification." Appx33. As shown

above, that interpretation of the claim's plain language improperly renders meaningless the claim's express recitation of the *content of the notification*: it must be a notification "*of context graph change*." *Supra* § I.B. And while the Board did not offer findings on the "registration" issue, the same analysis necessarily holds: the registration is for a "notification of changes" to the context graph.

Because the Board's finding rested exclusively on its misconstruction of the scope of claim 1, reversal is also required on this issue. *See Corning*, 873 F.3d at 903; *Carrum Techs.*, 2021 WL 3574209, at *7.

**B. The Board also erred in finding a motivation to combine.**

Finding a motivation to combine two particular references in the particular way claimed is a critical step in any obviousness analysis. This is because "inventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418-19 (2007). Given this reality, an invention cannot be rendered unpatentable simply by pointing out later that its building blocks were in the prior art—such a rule would make a functioning patent system impossible. *See Strathclyde*, 17 F.4th at 162 ("[o]bviousness cannot be based on the hindsight combination of components selectively culled from the prior art to fit the parameters of the patented invention"). To address this problem in the IPR-on-obviousness context, and to protect against

the patent system's natural enemy of hindsight bias, the law requires that the petition present, and the Board find (among other things), a motivation to "combine the prior art *in the way claimed* by the … patent claims at issue." *PersonalWeb*, 848 F.3d at 991 (emphasis added). The relevant motivation must further be "to *combine particular references*"—with the understanding that *knowledge* "of a problem and motivation to *solve* it are entirely different" from such a motivation to *combine* references. *ActiveVideo Networks*, 694 F.3d at 1328 (emphases added).

As an administrative agency, the Board must satisfy this requirement with articulated, petition-presented, "logical and rational" reasons for its findings. *PersonalWeb*, 848 F.3d at 992. And critically, neither the reasons, nor the petition-presented arguments cited in support of those reasons, can be conclusory. *TQ Delta*, 942 F.3d at 1362-63; *Magnum Oil Tools*, 829 F.3d at 1381; *ActiveVideo Networks*, 694 F.3d at 1327-28. Any resort to conclusory analysis is "fraught with hindsight bias." *ActiveVideo Networks*, 694 F.3d at 1327-28; *Strathclyde*, 17 F.4th at 161-62.

The Board's finding of a motivation to combine Cheng and Falchuk does not meet the standards laid out in this case law. The Board offered its analysis and conclusion on motivation to combine in a single sentence in its final written decision: "We agree with Facebook that Cheng provides little detail about how its recommender would interact with its personal interest graph, and we find persuasive Facebook's argument that a person of ordinary skill in the art would have had reason

to look to other references, particularly Falchuk, to fill in the missing details." Appx34-35. That is it: Cheng provides little detail about the elements in limitation 1[c], and a skilled artisan would have looked to Falchuk to fill in the details. Appx34-35. The Board added one sentence noting that it did "not regard Facebook's argument as conclusory or as relying on improper hindsight," and another noting that there was no need for Facebook "to show that there was a known deficiency in Cheng." Appx35. But those comments add nothing to the Board's substantive analysis on the issue, which consisted entirely of the conclusory findings that there was a gap in Cheng, and Falchuk could fill it. Appx34-35.

There are critical problems with this motion-to-combine finding.

**1. The motivation to combine adopted by the Board was not the motivation to combine offered in the petition.**

As an initial matter, this is not the motivation to combine Cheng and Falchuk that Facebook presented in its petition. That was offered in the petition section titled "***Rationale and Motivation to Combine (Cheng and Falchuk)***." Appx264-267 (emphasis in original). In that section, Facebook argued that a "skilled artisan would have been amply motivated to combine to provide a clear benefit to the system of Cheng, e.g., timely notifying its recommender about changes to the context graph that are meaningful to the user." Appx265. The Board did not adopt this theory; as support for its finding it cited only to the petition at Appx258, *not* at Appx264-267. Appx35. And the petition at Appx258 contains the statement, referenced by the

Board, that "Cheng does not provide further detail regarding the interaction between the recommender and the personal interest graph." Appx258, Appx34-35. That statement, however, says nothing about any motivation to combine, and does not purport to offer any analysis or evidence on a motivation to combine. It simply concedes that the recited elements of limitation 1[c] are missing from Cheng. Appx258. And the following sentence points the reader to the coming arguments, including the motivation to combine argument cited above: "As explained next, it would have been obvious …." Appx258.

The Board's decision *not* to adopt the "timely recommendation" motivation-to-combine theory that Facebook actually presented in its petition is understandable. As the Board noted in recounting the parties' arguments, Xerox had pointed out in response that "the motivation to provide a 'timely recommendation' is insufficient to show obviousness because this assertion is too 'generic' and 'there is nothing in Cheng to suggest its recommendations are untimely such that it needs to be combined with Falchuk.'" Appx33, Appx485-486. Indeed, "Cheng's recommendations are always timely because they are made with real-time, current data." Appx33, Appx486. The Board further acknowledged Xerox's observation in sur-reply that, in replying to these arguments on the "timely recommendation" theory, Facebook was forced to take conflicting positions on whether or not "Cheng already recognizes the importance of timeliness." Appx34, Appx641-642.

Recognizing that the "timely recommendation" theory was too thin a reed to support an obviousness determination, the Board reached for something else: its "fill in the missing details" theory. Appx35. That was not, however, a motivation-to-combine theory offered in the petition. Appx258. And in adopting a motivation-to-combine theory not offered in the petition, the Board violated both the APA and the governing statute as construed by the Supreme Court. The Board may not "craft new grounds of unpatentability not advanced by the petitioner." *Arthrex*, 935 F.3d at 1326 (citing *NuVasive*, 841 F.3d at 971-72, and *Magnum Oil Tools*, 829 F.3d at 1381); *see also SAS*, 138 S.Ct. at 1357 ("the statute tells us that the petitioner's contentions, not the [Board]'s discretion, define the scope of the litigation all the way from institution through to conclusion").[5]

#### 2. The Board's motivation-to-combine analysis was conclusory, generic, and unsupported.

The initial decision to look beyond the motivation-to-combine theory presented in the petition was a legal error subject to de novo review. *NuVasive*, 841

[5] In *Arthrex* the Court distinguished crafting new grounds of unpatentability from situations in which the Board, though perhaps "not us[ing] the exact language of the petition in the final written decision," nevertheless "relie[s] on the same references, the same disclosures, and the same obviousness theories advanced by the petition"—in such cases it has not "changed theories in a manner inconsistent with the APA and our case law." 935 F.3d at 1328 (finding that the difference between "preferred" and "well-known" did not reflect a different theory). The difference between "timely recommendation" and "fill in the gaps" is a difference in theory, not mere word choice—confirmed by the Board's citation to a part of petition *not* addressing the motivation to combine Cheng and Falchuk. Appx35, Appx258, Appx264-267.

F.3d at 970-71. But even taking the finding on its own terms, it should not survive a substantial-evidence review.

The simple observation that Cheng was missing the "details" of the elements recited in limitation 1[c], and that Falchuk could be used as a building block to fill the gap, Appx34-35, is entirely generic and conclusory, and in substance no different from the generic "could be combined" analyses that this Court has repeatedly found fraught with hindsight bias and insufficient to support an obviousness determination. *See PersonalWeb*, 848 F.3d at 993-94 (holding that a Board finding that two references "*could be* combined … is not enough"); *ActiveVideo Networks*, 694 F.3d at 1327-28 (rejecting as conclusory and "fraught with hindsight bias" a motivation-to-combine theory that the prior art components were modular and could work together); *InTouch Techs., Inc. v. VGo Comm., Inc.*, 751 F.3d 1327, 1349 (Fed. Cir. 2014) (rejecting as insufficient testimony that a skilled artisan "*could* … combine that" and "*can do that*") (emphasis in original); *see also TQ Delta*, 942 F.3d at 1362-63; *Magnum Oil Tools*, 829 F.3d at 1381. Indeed, the Board's adopted motivation-to-combine theory is in practical substance little more than the "hindsight combination of components selectively culled from the prior art to fit the parameters of the patented invention." *Strathclyde*, 17 F.4th at 162. That cannot support an obviousness determination. *Id.*

The conclusory and generic nature of the Board's finding is particularly problematic here, for two more reasons.

For one, the relevant motivation must be to "combine the prior art *in the way claimed* by the ['439] patent claims at issue." *PersonalWeb*, 848 F.3d at 991 (emphasis added). As discussed above, limitation 1[c] recites "registration" and "notification" elements that are expressly *for* and *of* "context graph change[s]." Appx79 (claim 1); *supra* § I.B. And while Facebook admitted from the outset that these "detail[s]" are missing from Cheng, Appx258, the litigation confirmed that they are also missing from Falchuk, *supra* § II.A.2. Given the lack of evidence on where the particular elements are to be found in the prior art, a clear explanation with supporting evidence showing "*how* the combination of the two reference was supposed to work" is a necessary "prerequisite," in this case, "to adequately explaining and supporting a conclusion that a relevant skilled artisan would have been motivated to make the combination and reasonably expect success in doing so." *PersonalWeb*, 848 F.3d at 991. And that is missing from the Board's decision. Appx34-35. Indeed, while the Board found that a skilled artisan would look to Falchuk to "fill in the missing details," Appx35, when it was time to locate those missing details in Falchuk, the Board elected instead to construe the limitation to avoid requiring the details that were missing from both references. *Supra* § II.A.2.

The conclusory nature of the Board's finding is problematic for another important reason. Generic and conclusory as it is, the Board's finding that a skilled artisan would look to Falchuk merely to supply "details" missing from Cheng rests logically on the assumption that Cheng and Falchuk operate similarly—it would make no sense to say that Falchuk was simply supplying operational "details" if its combination would fundamentally change the way that Cheng worked. But that is precisely the position that Facebook took at the hearing:

> [Cheng] says, 'At the time of the recommendation, the system first gathers the current situation data and derives the user's current situation.' It goes on and says, it queries it and ranks the concepts and recommendations. So what this does is you have the recommendation time. At that time, it goes and figures out do I have recommendations for you based on your situation data? *That's the exact opposite and reverse of what Falchuk says.* Falchuk says when there's a change in the context, that's going to trigger a notification, it's going to detect and trigger the notification. That concept of detecting a change and triggering it is missing from Cheng. Cheng just says at recommendation time we go and figure out the situation and figure out what the recommendations are.

Appx752 (emphasis added).

The Board was right to steer clear of the "timely recommendations" theory when the Board recognized that it led to inconsistent positions on Facebook's part. Appx33-35. But the Board should have steered clear of its "fill in the missing details" theory for the same reason. Facebook cannot consistently argue that Falchuk is simply filling in details missing from Cheng's disclosure while also pointing out

that, with respect to the recommendation and notification features at issue, Cheng discloses "the exact oppose and reverse of what Falchuk" discloses. Appx752.

A substantial-evidence review requires examination of the "record as a whole, taking into account evidence that both justifies and detracts from [the Board's] decision." *Intelligent Bio Systems*, 821 F.3d at 1366. Here, such a review confirms that there is no reasonable basis to conclude that a skilled artisan looking only for "details about how [Cheng's] recommender would interact with its personal interest graph," Appx34, would pick out a reference that disclosed interaction with a recommender that was "the exact opposite and reverse" of the general approach disclosed in Cheng, Appx752.

On both legal and substantial-evidence grounds, therefore, the Board erred in finding a motivation to combine Cheng and Falchuk in the way claimed.

## CONCLUSION

Every ground in Facebook's petition relied on the combination of Cheng and Falchuk for every challenged '439 patent claim: 1-5, 7-11, 13-17, 19, and 20. Appx63. Because that combination fails to render the challenged claims obvious as a matter of law, the final written decision should be reversed. At a minimum, the final written decision should be vacated and remanded for further proceedings.

Respectfully submitted,

*<u>/s/ Joel L. Thollander</u>*
Joel L. Thollander
James E. Quigley
Kyle N. Ryman
MCKOOL SMITH, P.C.
303 Colorado Street, Ste. 2100
Austin, TX 78701
(512) 692-8700

David Sochia
Alexandra F. Easley
MCKOOL SMITH, P.C.
300 Crescent Court, Ste. 1500
Dallas, TX 75201
(214) 978-4000

Kevin L. Burgess
MCKOOL SMITH, P.C.
104 East Houston Street, Ste. 300
Marshall, TX 75670
(903) 923-9000

*Attorneys for Appellant*
*Xerox Corporation*

# ADDENDUM

**XEROX CORPORATION V. FACEBOOK, INC.**

No. 23-1969

**APPELLANT'S ADDENDUM**

**TABLE OF CONTENTS**

**Judgment and Order**

Final Written Decision
(March 22, 2023) (Paper 41)........................................................................Appx1

**Patents**

Ex. 1001: U.S. Patent No. 9,208,439 ..............................................................Appx66

Trials@uspto.gov
571-272-7822

Paper 41
Date: March 22, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

FACEBOOK, INC.,
Petitioner,

v.

PALO ALTO RESEARCH CENTER LLC,
Patent Owner.

---

IPR2021-01461
Patent 9,208,439 B2

---

Before KARL D. EASTHOM, SHEILA F. McSHANE, and CHRISTOPHER L. OGDEN, *Administrative Patent Judges*.

OGDEN, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
Denying Patent Owner's Motion to Amend
*35 U.S.C. § 318(a)*

## I. INTRODUCTION

In response to a Petition (Paper 2, "Pet.") filed by Petitioner Facebook, Inc. ("Facebook"), the Board instituted an *inter partes* review of claims 1–5, 7–11, 13–17, 19, and 20 of U.S. Patent No. 9,208,439 B2 (Ex. 1001, "the '439 patent"). Paper 9, ("Dec."). Patent Owner Palo Alto Research Center Inc. (now Palo Alto Research Center LLC) ("PARC") filed a Patent Owner Response (Paper 14, "PO Resp."), Facebook filed a Reply to the Patent Owner Response (Paper 20, "Pet. Reply"), and PARC filed a Sur-reply (Paper 27, "PO Sur-reply").

PARC also filed a Contingent Motion to Amend proposing substitute claims 21–40 if we find the original claims unpatentable. Paper 13 ("MTA"). Facebook filed an Opposition to this Motion to Amend (Paper 19, "Pet. Opp. MTA"). After we issued Preliminary Guidance on the Motion to Amend under the Board's Motion to Amend Pilot Program (Paper 25), PARC filed a Reply (Paper 26, "PO Reply MTA"). PARC's Reply stipulated to the withdrawal of proposed substitute claims 26, 32, and 38. *See* PO Reply MTA 1. Then Facebook filed a Sur-reply. Paper 31 ("Pet. Sur-reply MTA").

We held an oral hearing on December 12, 2022, and the transcript is entered on the record. Paper 37 ("Tr.").

This is a final written decision under 35 U.S.C. § 318(a) as to whether the claims challenged in the *inter partes* review are unpatentable. For the reasons below, we conclude that Facebook has shown that all the challenged claims are unpatentable on at least one ground of the Petition. Facebook has also shown, by a preponderance of the evidence, that all pending proposed

substitute claims are unpatentable and PARC has failed to show that they do not contain new matter, so we also deny PARC's Motion to Amend.

## II. BACKGROUND

### A. RELATED PROCEEDINGS

Both parties are involved in the following related U.S. district court case: *Palo Alto Research Center Inc. v. Facebook, Inc.*, No. 2:20-cv-10753-AB (C.D. Cal. filed Nov. 25, 2020). Pet. 1; Paper 3, 2. According to Facebook, the district court granted a stipulated stay of this proceeding. Pet. 4 (citing Ex. 1014 (granting joint request to stay proceedings)). The parties also identify the following related matters: *Palo Alto Research Center Inc. v. Twitter, Inc.*, No. 2:20-cv-10754-AB (C.D. Cal. filed Nov. 25, 2020); *Palo Alto Research Center Inc. v. Snap Inc.*, No. 2:20-cv-10755-AB (C.D. Cal. filed Nov. 25, 2020). Pet. 1; Paper 3, 2–3.

As PARC notes, the '439 patent is also the subject of *inter partes* reviews IPR2021-00986 (instituted Nov. 23, 2021) and IPR2021-01430 (instituted Mar. 15, 2022). Paper 3, 3.

### B. THE '439 PATENT (EX. 1001)

The '439 patent issued on December 8, 2015 from an application filed on April 29, 2013. Ex. 1001, codes (22), (45). It relates to "a method and system for collecting mobile device contextual information and facilitating efficient adaptation of a generic contextual intelligence system for customized applications." Ex. 1001, 1:8–12. A context-aware system on a mobile device detects the computing environment, and the system may

recommend activities, such as leisure activities, based on a user model. *Id.* at 1:22–23, 1:30–31.

Figure 6, reproduced below, is a flowchart illustrating the steps of processing an event. Ex. 1001, 2:23–25.




**FIG. 6**

In the steps shown in Figure 6 above, a server receives event data from clients (operation 602), and then stores and processes the event data (operation 604). *Id.* at 9:13–19. The server then analyzes the event data and uses it to update a "context graph" (operation 606). *Id.* at 9:19–24. Next, the

server sends the context graph data, and changed graph data, to relevant "recommenders" (operation 608). *Id.* at 9:26–29.

According to the '439 patent, "[a] context graph is an in-memory model that stores facts and assertions about a user's behavior and interests." Ex. 1001, 3:20–22. "A recommender is an application that recommends items or activities for a user." *Id.* at 3:23–25.

Figure 4, reproduced below, is a block diagram relating events, a mapper, and a context graph. Ex. 1001, 6:59–61.




FIG. 4

As shown in Figure 4, event posting interface 302 sends events received from clients to publish/subscribe event system 308. *Id.* at 7:7–9. Based on subscriptions to publish/subscribe event system 308, mapper 314 uses the event data to modify context graph 406. *Id.* at 7:7–9, 7:44–47. "Context graph 406 functions as a storage component of a generalized user model. A

user model describes predicted current and future activities and interests for a user." *Id.* at 7:34–36.

### C. CHALLENGED CLAIMS AND GROUNDS

Claims 1, 7, and 13 of the '439 patent are independent. Claim 1, representative of the challenged claims, reads as follows:

> 1. A method, comprising:
>
> [a] receiving, from a mobile device, event data derived from contextual data collected using detectors that detect a physical context surrounding the mobile device;
>
> [b] modifying a context graph that stores facts and assertions about a user's behavior and interests using the event data;
>
> [c] in response to determining that there exists a registration for notification of changes that matches the modification to the context graph, sending a notification of context graph change to a recommender.

Ex. 1001, 10:30–40 (Facebook's reference letters added in brackets).

Facebook argues three grounds for *inter partes* review, as summarized in the following table:

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1–4, 7–10, 13–16, 20 | 103[1] | Cheng,[2] Falchuk[3] |
| 5, 11, 17 | 103 | Cheng, Falchuk, Richardson[4] |

[1] 35 U.S.C. § 103 (2018).

[2] Cheng, US 2013/0018954 A1 (published Jan. 17, 2013) (Ex. 1003).

[3] Falchuk et al., US 8,694,901 B2 (issued Apr. 8, 2014) (Ex. 1004).

[4] Leonard Richardson & Sam Ruby, RESTFUL Web Services (2007) (Ex. 1005).

| | | |
|---|---|---|
| 19 | 103 | Cheng, Falchuk, Shalloway,[5] Powell[6] |

Pet. 3.

D. DECLARATORY TESTIMONY

Facebook relies on two declarations by Christopher M. Schmandt. Exs. 1002, 1021. Facebook also relies on a declaration by Dr. Sylvia D. Hall-Ellis (Ex. 1015) as to the public availability of Richardson, Shalloway, and Powell. *See* Pet. 11.

PARC relies on two declarations by Dr. David Martin. Exs. 2017, 2024.

## III. PARC'S OBJECTIONS TO ALLEGED UNTIMELY ARGUMENTS

On September 13, 2022, in lieu of a motion to strike, we authorized PARC to submit a list of allegedly untimely arguments made in Facebook's Reply. Paper 22; Ex. 3001. We noted that an order striking portions of a party's brief "is an exceptional remedy that the Board expects will be granted rarely" because in most cases, "the Board is capable of identifying new issues or belatedly presented evidence when weighing the evidence at the close of trial, and disregarding any new issues or belatedly presented evidence that exceeds the proper scope of reply." Paper 22, 1 (quoting PTAB Consolidated Trial Practice Guide 80 (Nov. 2019), https://go.usa.gov/xpvPF). PARC submitted such a list (Paper 23), and

[5] Alan Shalloway & James R. Trott, Design Patterns Explained: A New Perspective on Object-Oriented Design (2d ed. 2005) (Ex. 1006).

[6] Thomas A. Powell, Ajax: The Complete Reference (2008) (Ex. 1007).

Facebook responded (Paper 24). PARC also addressed the issue in its Sur-reply. *See* PO Sur-reply 5–7.

All of the allegedly untimely arguments relate to either the construction of the term "facts and assertions" or the identification of facts and assertions within Cheng. *See* Paper 23, 1–2. Having reviewed the arguments, we do not consider them untimely. As we discuss in more detail below, Facebook relied on the ordinary and customary meaning of the term "facts and assertions" in its Petition, and then when PARC raised an alternative construction of the term in its Response, Facebook responded to those arguments. *See infra* Sections IV.B.2, IV.C.4(a).

Facebook's Reply only responded to arguments raised in PARC's Response and was not untimely. *See* 37 C.F.R. § 42.23(b) (permitting a petitioner to respond to arguments in a patent owner response); *Anacor Pharm., Inc. v. Iancu*, 889 F.3d 1372, 1380–81 (Fed. Cir. 2018) ("[T]he petitioner in an inter partes review proceeding may introduce new evidence after the petition stage if the evidence is a legitimate reply to evidence introduced by the patent owner, or if it is used 'to document the knowledge that skilled artisans would bring to bear in reading the prior art identified as producing obviousness.'" (quoting *Genzyme Therapeutic Prod. Ltd. P'ship v. Biomarin Pharm. Inc.*, 825 F.3d 1360, 1369 (Fed. Cir. 2016))). Moreover, PARC had a meaningful opportunity to address the arguments in its Sur-reply and in oral argument. *See* PO Sur-reply 7–12; Tr. 22–34.

Thus, we do not find Facebook's contested arguments untimely and we have considered them in our decision.[7]

## IV. GROUNDS OF THE PETITION

For the reasons below, we determine that Facebook has shown, by a preponderance of the evidence, that claims 1–4, 7–10, 13–16, and 20 of the '439 patent are unpatentable under the ground based on Cheng and Falchuk; that claims 5, 11, and 17 are unpatentable under the ground based on Cheng, Falchuk, and Richardson; and that claim 19 is unpatentable under the ground based on Cheng, Falchuk, Shalloway, and Powell. Before analyzing these grounds in detail, we address two matters that underlie our analysis: the level of ordinary skill in the art and the construction we will apply to the claim terms.

### A. Level of Ordinary Skill in the Art

The level of ordinary skill in the pertinent art at the time of the invention is a factor in how we construe patent claims. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc). It is also one of the factors we consider when determining whether a patent claim is obvious over the prior art. *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

To assess the level of ordinary skill, we construct a hypothetical "person of ordinary skill in the art," from whose vantage point we assess obviousness and claim interpretation. *See In re Rouffet*, 149 F.3d 1350, 1357

---

[7] We do not consider one of the challenged arguments, offered in the alternative, because we find Facebook's main argument persuasive. *See infra* note 11.

(Fed. Cir. 1998). This legal construct "presumes that all prior art references in the field of the invention are available to this hypothetical skilled artisan." *Id.* (citing *In re Carlson*, 983 F.2d 1032, 1038 (Fed. Cir. 1993)).

Relying on Mr. Schmandt's testimony, Facebook argues that a person of ordinary skill in the art "would have possessed at least a bachelor's degree in electrical engineering or computer science, and two years of work experience in the field of context-based computer systems, such as the collection, processing and use of context data in computer systems capable of adapting their operation based on context." Pet. 6 (citing Ex. 1002 ¶¶ 15–18). Facebook also contends that a person might qualify as an ordinarily skilled artisan "with more formal education and less technical experience, or vice versa." *Id.*

For this proceeding, PARC does not dispute this proposed level of ordinary skill. PO Resp. 16–17. Because Facebook's uncontroverted articulation of the level of ordinary skill in the art is supported by testimonial evidence and appears consistent with the types of problems and solutions in the '439 patent, we adopt it for this decision. *See, e.g.*, Ex. 1001, 1:4–33 ("Background" section of the '439 patent, describing the field and related art as relating to the use of using contextual data in computer systems).

### B. Claim Construction

In an *inter partes* review, we construe a patent claim "using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. 282(b)." 37 C.F.R. § 42.100(b) (2021). This generally includes "construing the claim in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in

the art and the prosecution history pertaining to the patent." *Id.* The ordinary and customary meaning of a claim term "is its meaning to the ordinary artisan after reading the entire patent," and "as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1313, 1321. There are only two circumstances in which a construction departs from the ordinary and customary meaning: "1) when a patentee sets out a definition and acts as [their] own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). Any such special meaning of a term "must be sufficiently clear in the specification that any departure from common usage would be so understood by a person of experience in the field of the invention." *Multiform Desiccants Inc. v. Medzam Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998).

To construe the claim terms, "we look principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1014 (Fed. Cir. 2006).

Facebook did not initially identify any claim terms needing an explicit construction. *See* Pet. 8. However, PARC identified two terms for which it offered substantial claim construction arguments: the term "context graph" and the term "facts and assertions." We address these two terms below. To the extent that other claim terms are significant, we discuss them below in the context of the asserted prior art.

*1. "Context Graph"*

PARC argues that we should construe the term "context graph" to mean a "per-user, in-memory, graph-based model." PO Resp. 18 (emphasis

omitted). According to PARC, "the claim language itself explicitly states that the facts and assertions are stored in a graph." *Id.* at 18–19. PARC also points to dependent claim 20, which refers to "topological changes in the context graph" and to "properties of nodes and edges in the context graph." *Id.* at 19 (emphasis omitted) (quoting Ex. 1001, 12:53–55); *see also* PO Sur-reply 2–3 (arguing that Facebook improperly reads out the word *graph* in its analysis of the term "context graph").

PARC also points to supporting disclosures in the '439 patent specification, including Figure 4, which according to PARC describe context graph 406 as having nodes and edges that, through their topology, store facts and assertions about user behavior and actions. PO Resp. 20–21 (citing Ex. 1001, 7:26–28, 7:58–60, Fig. 4; Ex. 2017 ¶ 81); *see also* PO Sur-reply 3–5. PARC acknowledges that the '439 patent discloses a number of ways to store the context graph in memory, for example using a "type-less approach to data storage" or storing the data as "entity-relationship data and unstructured data." PO Resp. 21 (quoting Ex. 1001, 7:36–40) (citing Ex. 2017 ¶¶ 81–86). But no matter the underlying representation, PARC contends that the data is ultimately stored as a graph-based model. *Id.* PARC also contends that, during prosecution of the '439 patent, the applicant "distinguished the prior art on the basis of the context graph's nodes." PO Resp. 21–22 (citing Ex. 2020, 118–19).

In its Reply, Facebook contends that PARC "does not present any argument that [its proposed] construction would provide any basis to distinguish the prior art in this IPR." Pet. Reply 2 (emphasis omitted). Thus, Facebook urges us to reject PARC's construction as immaterial in this proceeding. *Id.* at 2–4.

We agree with Facebook. As we discuss below, Cheng teaches a graph-based model that stores data in memory on a per-user basis. *See infra* Section IV.C.4(a); Ex. 1003, Fig. 7. Also, as PARC acknowledges, Facebook's expert Mr. Schmandt stated in deposition that he assumed, for his analysis, that the term "context graph" requires a "graph-based model." PO Resp. 22 (citing Ex. 2019, 36:16–37:8); *see also* PO Sur-reply 4.

Thus, because Facebook's analysis of Cheng is consistent with the assumption that "context graph" has the meaning PARC proposes in this proceeding, we do not need to construe the term "context graph" to reach our decision. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("[W]e need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy' . . . ." (quoting *Vivid Techs., Inc. v. Am. Sci & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

*2. "Facts and Assertions"*

In its Petition, Facebook did not propose an explicit construction of the term "facts and assertions," but appears to have relied on what it regarded as the term's plain and ordinary meaning as referring to "information" about a user's behavior and interests that is stored in the form of nodes (concepts) and edges (ontological relationship between concepts) of a context graph. Pet. 8, 19–21.

In its Response, PARC argues that Facebook fails to explain any distinction between "facts" and "assertions." PO Resp. 25. According to PARC, these terms must be presumed to mean different things. *Id.* at 27 (citing *CAE Screenplates Inc. v. Heinrich Fiedler GmbH*, 224 F.3d 1308,

1317 (Fed. Cir. 2000); *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010)).

Facebook disagrees that claim 1 or the '439 patent as a whole require that "facts" and "assertions" be entirely distinct categories. Pet. 5–6. According to Facebook, the only two mentions of "facts" and "assertions" in the '439 patent specification do not distinguish between the two or between how the two might be stored or handled. Pet. Reply 6–7 (citing Ex. 1001, 3:20–22, 7:26–33). Facebook also contends that both Facebook's and PARC's experts agree that both facts and assertions refer to "a property of an entity," and that a "fact" further includes an indication of truth. *Id.* at 7 (citing Ex. 1018, 12:10–24; Ex. 2019, 41:9–11; Ex. 1021 ¶ 21–22). Thus, according to Facebook, "[a] particular stated property could . . . qualify as *both* a fact *and* an assertion. An assertion with an indication of truth, for example, qualifies as a fact." Pet. Reply 7; *see also id.* at 7–8 (citing Ex. 1021 ¶ 23). PARC does not appear to contest this. *See* Tr. 26:5–8 (counsel for PARC stating that "both experts did read the specification and provide their interpretations of what facts and assertions are and . . . I do believe that at least as to facts they both agree that it's something that has an indication of truth").

Thus, the parties and their experts appear to agree that a person of ordinary skill in the art would have considered a "fact" to be different from an "assertion" because, unlike an assertion, a fact would necessarily include an indication of truth.[8] Where the parties' positions appear to differ is that

[8] PARC contends that Facebook made inconsistent arguments in this regard by also arguing that there is no difference between facts and assertions. *See* PO Resp. 28–29 (citing Pet. 20–21; Ex. 2019, 41:3–11); PO Sur-reply 7

Facebook contends that a single data entity in a context graph can be both a fact and an assertion, whereas PARC disagrees. Pet. Reply 7–8; PO Sur-reply 8 (citing *Becton, Dickinson*, 616 F.3d at 1254; *HTC Corp. v. Cellular Commc'ns Equip., LLC*, 701 F. App'x 978, 982 (Fed. Cir. 2017)); *id.* at 10 (arguing that a fact ("something that is true") cannot be an assertion ("something that may or may not be true")).

We agree with the parties that a person of ordinary skill in the art would have understood the term "fact" to include an indication of truth, whereas an assertion need not include such an indication. However, we disagree with PARC that a person of ordinary skill would have considered the term "assertion" to exclude facts. Indeed, in its ordinary and customary meaning, a fact stored in a context graph would be a type of assertion.

We appreciate PARC's argument that when two different terms appear in a claim, they presumably refer to different things. *See* PO Resp. 27 (citing *CAE Screenplates*, 224 F.3d at 1317). And we agree that the two terms have different meanings in claim 1 based on the plain meaning of each term. However, the specification refers to "stor[ing] facts and assertions about a user's behavior and interests," which simply appears to identify a single category of data for storage, i.e., "facts and assertions," without specifying a clear difference between "facts" and "assertions." *See* Ex. 1001, 3:21–22. In any event, we find no evidence of record suggesting that either (1) the

---

(citing Pet. Reply 8–9). Because Facebook appears to have been relying on what it regarded as the plain meaning of the terms without proposing an explicit construction, we do not interpret Facebook's argument in the Petition (Pet. 20–21) to imply that there is no distinction between a fact and an assertion, and do not find Mr. Schmandt's later testimony (*see, e.g.*, Ex. 2019, 41:3–11) inconsistent with arguments made in the Petition.

ordinary and customary meaning of the term "assertion" excludes facts, or (2) that the '439 patent uses these terms in a way that departs from their ordinary and customary meaning. That claim 1 requires the presence of both "facts" *and* "assertions" does not render the two terms superfluous, as this would exclude prior art in which a context graph includes only assertions but not facts. On the other hand, a disclosure of a collection of facts would meet the term "facts and assertions" because a person of ordinary skill in the art would have regarded any subset of the facts to also be assertions.

### C. CLAIM 1

Turning to the grounds of the Petition, we begin with the challenge to claim 1, which asserts that claim 1 is unpatentable under 35 U.S.C. § 103 as obvious over Cheng in view of Falchuk. *See* Pet. 3, 11–36. For this challenge, Facebook relies primarily on Cheng for the preamble and limitations 1[a]–[c] except for the final aspect of limitation 1[c] that recites "sending a notification of context graph change to a recommender." Pet. 9. For that part of limitation 1[c], Facebook relies on the teachings of Falchuk. Pet. 9–10.

A claim is unpatentable under § 103 for obviousness "if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains." 35 U.S.C. § 103; *see also KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). When a ground in a petition is based on a combination of references, we consider "whether there was an apparent reason to combine the known elements in the fashion

claimed by the patent at issue." *Id.* at 418 (citing *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)).

We base our obviousness inquiry on factual considerations including (1) the scope and content of the prior art, (2) any differences between the claimed subject matter and the prior art, (3) the level of skill in the art, and (4) any objective indicia of obviousness or non-obviousness that may be in evidence. *See Graham*, 383 U.S. at 17–18.

Considering these factors,[9] we determine that Facebook has shown, by a preponderance of the evidence, that claim 1 is unpatentable under § 103 as obvious over Cheng in view of Falchuk. We begin our analysis with a brief overview of Cheng and Falchuk, and then we address the parties' contentions with respect to the limitations of claim 1.

*1. Overview of Cheng*

Cheng describes "situation-aware user sentiment social interest models," particularly in the context of social networking services. Ex. 1003 ¶¶ 3, 5–9. In discussing the background art, Cheng notes that other companies had been developing analytics to extract a user's interest and sentiments from social networking data, but these efforts were "blind[] about the user's situation" at any particular moment, which a system might use to make contextually appropriate suggestions to the user. *Id.* ¶ 10. "For example, even though a user may like good wine, suggesting going to a wine tasting nearby may not be a good idea when his friends with him at the time do not like wine." *Id.*

[9] Neither party presents evidence of objective indicia of obvious or non-obviousness, so no such evidence factors into our decision.

Thus, Cheng describes "[a] method for constructing user models from user usage and context data . . . where a personal interest graph for a user is construct[ed] from interests of the user derived from usage data and situational data derived from one or more sensors of [an] electronic device." Ex. 1003, code (57). "The personal interest graph can be modified by annotating one or more nodes of the personal interest graph with influence information." *Id.*

Figure 2 of Cheng, reproduced below, illustrates the high-level architecture of this system (Ex. 1003 ¶ 19):




FIG. 2

As shown above in Figure 2, Cheng's system has two main parts: (1) situation-aware user activity tracker 200, which logs user activity data within a device and application, and corresponding situation data at the time

of usage; and (2) user model construction/update module 202, which "builds and updates user models." Ex. 1003 ¶ 37. Storage 208 stores the user's annotated "relations, interests, influence, and sentiments." *Id.* "[T]he output of the system is a set of models 204 about the user's relationship, interests, who influences the user about a topic, whom the user influences about a topic, and the user's sentiments towards a topic/concept or person." *Id.*

As part of construction/update module 202, sentiment analysis module 226 "can compute the user's sentiments about people and concepts in various situations" (Ex. 1003 ¶ 48), as illustrated below in Figure 7:




FIG. 7

Figure 7, above, depicts "the output of sentiment analysis." Ex. 1003 ¶ 48. The lower part of Figure 7 illustrates how module 226 may obtain user sentiments "by tracking user actions such as clicks of a like, share, or recommend button," or "by analyzing the texts associated with user online

activities such as blogs, emails, tweets, reviews, comments, etc." *Id.* Using this information, module 226 constructs personal interest graph 700, a tree-like structure that includes a number of edges and nodes such as node 702. *Id.* Node 702 "can be annotated with the sentiment information about the concept represented by the node," as illustrated in the box above personal interest graph 700. *Id.* These annotations may include "the types and the strengths of users' sentiments and the situation in which such sentiments are expressed." *Id.*

For example, an "edge" may link the user to a node representing another person. *See* Ex. 1003 ¶ 48. "When the user expresse[s] sentiments toward a person, the sentiment information can be recorded in the personal social graph, for example by annotating the edge linking the user to the person." *See id.*

Once constructed, the personal interest graphs "can then be directly used by applications, such as for predicting user needs, for making recommendations, and for decision making." Ex. 1003 ¶ 52. In one embodiment, "a client device runs the situation-aware user activity tracker and sends the data to be stored on a server or in a cloud." *Id.* ¶ 55. Then, "[a]t recommendation time, the client device identifies the current situation, and asks the server/cloud to identify the items for recommendation." *Id.*

2. *Overview of Falchuk*

Falchuk describes a "system and method for determining and presenting contextual suggestions on a mobile device" relating to a "user context." Ex. 1004, code (57). By "user context," Falchuk "mean[s] a machine[-]readable version of the multitude of information surrounding the daily life of a user." *Id.* at 2:11–13. The user context can be stored "as a

series of instances" of "a hierarchic, rich state model having subtrees, such that each subtree is an instance of a context ontology and thus permits machine-readable interpretation and inference." *Id.* at 4:42–44, 4:61–64. "The model is dynamically . . . updated as context changes," and "[a] key part of the system captures the user's 'goals.'" *Id.* at 5:23–24, 5:28. These goals can be entered explicitly or inferred based on the user's context. *See id.* at 5:39–44. The system seeks to "provide the right reminder at the right time and place, as well as mitigating conflicting and complementary reminders and events." *Id.* at 2:7–9.

The components of Falchuk's system are illustrated below in Figure 2:

FIGURE 2




Figure 2, above, shows server 10 on the right-hand side, which includes components such as incoming context handler 24. Ex. 1004, 3:33–34. Incoming context handler 24 receives and parses incoming messages relating to the user's context. *See id.* at 4:47–54. Client 12 is shown on the left-hand side of Figure 2, and has components including context-presentation

manager 14, which "can operate to queue up notifications and/or suggestions that are to be conveyed to the user." *Id.* at 3:56–58. Client 12 also includes notifier 16, which "can marshal a visual or ambient notification that the system intends the user to consume." *Id.* at 4:4–5. Server 10 and client 12 may each also have goal resolution components 18, goal inferral components 20, and user context components 22, which are involved in identifying goals and storing the user context. *See id.* at 3:32–33, 3:35–36, 4:10–29.

When an event occurs that changes the user context, "goal resolution component 18 scours the user context 22, possibly applying rules, to see whether a given goal can be advanced by a given event(s). For example, if event e (that just happened) makes goal g possible, then a notification may be readied." Ex. 1004, 4:10–18. Context-presentation manager 14 queues up such notifications until an appropriate time, after which notifier 16 displays the notification to the user, where the display may be on the screen of a mobile device. *See id.* at 3:56–60, 6:28–31.

### *3. Preamble and Limitation 1[a]*

The preamble and limitation 1[a] of claim 1 recite "[a] method, comprising: receiving, from a mobile device, event data derived from contextual data collected using detectors that detect a physical context surrounding the mobile device." Ex. 1001, 10:30–33. Facebook argues that Cheng and Falchuk both disclose this method, and that "Cheng discloses receiving event data from a mobile device, such as a mobile phone, as claimed." Pet. 11.

In particular, Facebook identifies the recited "contextual data" in Cheng's disclosure as "raw data collected by sensors associated with a

mobile device," and identifies "event data" as "data derived by 'pre-processing' the collected contextual data or alternatively, to the data derived from one or more steps of the 'data fusion' process described in Cheng." Pet. 13; *see also* Pet. 11–18 (citing Ex. 1001, 2:60–62 (explaining the term "[c]ontextual data"), 3:4–12, 3:49–51, 9:2–5, 9:9–11; Ex. 1002 ¶¶ 62, 65, 66, 68; Ex. 1003 ¶¶ 11, 31, 32, 34, 35, 37, 38, 40, 42, 55, 57, claim 24, Fig. 2).

PARC does not contest Facebook's arguments regarding the preamble[10] or limitation 1[a]. *See generally* PO Resp. We find those arguments persuasive, and we credit Dr. Schmandt's supporting testimony, in particular, that a person of ordinary skill in the art would have considered the raw data collected by the sensors in Cheng's mobile device to meet limitation 1[a]. *See* Ex. 1002 ¶¶ 62–68.

*4. Limitation 1[b]*

Limitation 1[b] recites "modifying a context graph that stores facts and assertions about a user's behavior and interests using the event data." Ex. 1001, 10:34–36. Facebook contends that Cheng discloses the recited context graph in the form of Cheng's "personal interest graph." *See* Pet. 19–26 (citing Ex. 1001, 3:20–22 (explaining the term "context graph"), 7:26–29, 9:60–10:2; Ex. 1002 ¶¶ 70, 72–76; Ex. 1003 ¶¶ 14, 29, 31, 32, 37, 40, 45, 46, 49, 53, 54, 56, 58, Figs. 5, 8, 9).

[10] The preamble merely indicates that the claimed invention is a method, which we presume limits the scope of claim 1. But we need not resolve that question because neither party raises the issue and Facebook shows sufficiently that Cheng discloses a method.

(a) Whether Facebook's Arguments Are Conclusory or Insufficiently Specific.

In particular, Facebook contends that Cheng's personal interest graph "stores facts and assertions about a user's behavior and interests," as recited, because in this graph, a node "represents a concept and an edge connecting the two concept nodes represents the ontological relationship between the concepts." Pet. 20 (quoting Ex. 1003 ¶ 45) (citing Ex. 1003 ¶ 14). For example, Facebook points to Cheng's disclosure that "[a] node may also carry the information to indicate the degree of a user's interest about the concept represented by the node." Pet. 21 (emphasis omitted) (quoting Ex. 1003 ¶ 46).

In its Response, PARC argues that Facebook fails to explain, in a non-conclusory way, how Cheng teaches limitation 1[b]. PO Resp. 23–24 (citing *TQ Delta, LLC v. Cisco Sys.*, 942 F.3d 1352, 1358 (Fed. Cir. 2019)). In particular, PARC contends that Facebook does not identify which of Cheng's alleged teachings qualify as the recited "facts and assertions" or "a user's behavior and interests." *Id.* at 25. Nor, according to PARC, does either Facebook or Mr. Schmandt explain, in sufficient detail, why Cheng teaches these elements. *See id.* at 25–27 (citing Pet. 21; Ex. 1002 ¶ 72). PARC also argues that Facebook failed to separately identify which elements in Cheng's personal interest graph correspond to "facts," "assertions," "interests," or "behaviors." *Id.* at 27.

In its Reply, Facebook first argues that PARC's arguments as to limitation 1[b] do not hinge on its proposed construction of the term "context graph," and PARC does not contest the Petition on that basis. Pet. Reply 4. We agree. Facebook argues in its Petition that Cheng's personal

interest graph is "per-user," is stored in memory, and is graph-based, which fulfils PARC's proposed construction of the term "context graph" as being a "per-user, in-memory, graph-based model." *See* Pet. 19–25. PARC does not specifically contest these arguments (*see* PO Resp. 23–27), and we find them persuasive.

Next, Facebook argues that Cheng's personal interest graph includes "facts and assertions" because Cheng discloses facts in the form of ontological relationships (edges of the graph) derived from a user's activity in relation to concepts (nodes of the graph). Pet. Reply 9. According to Facebook, Cheng's disclosure that "concepts can be extracted by analyzing the data associated with a user activity, such as text of a user's online posts . . . is not materially different from the '439 patent's example of 'facts and assertions' about a user's visit to a coffee shop around four o'clock, and the conclusion extracted by analyzing that data that a user 'tends' to drink coffee at four o'clock." *Id.* (quoting Ex. 1003 ¶ 46); Ex. 1001, 7:29–33. Facebook contends that these examples in Cheng and in the '439 patent would qualify as both facts and assertions. Pet. Reply 8–9.[11]

[11] Facebook also argues, alternatively, that "assertions" could "be mapped to the higher-level determinations in [Cheng's] personal interest graph derived from the 'facts,' such as 'the degree of a user's interest about the concept representing the node,'" or "'information about . . . a sentiment of the user at the time when the usage data suggests that the user expressed interest in the in the interest [sic; concept].'" Pet. Reply 9–10 (alterations in original) (quoting Ex. 1003 ¶ 46; and then quoting *id.* ¶ 14); PO Sur-reply 10–12 (replying to this argument). We need not address this alternative argument because we find Facebook's main argument persuasive.

In its Sur-reply, PARC does not dispute that the ontological relationships in Cheng's personal interest graph constitute "facts," but argues that these relationships are not assertions, because according to PARC, assertions "may *or may not* be true." PO Sur-reply 10 (citing Ex. 1018, 12:16–13:11; Ex. 2019, 41:3–11).

We find Facebook's argument persuasive, and we disagree with PARC that Cheng's ontological relationships relating to its concept nodes would not also be "assertions" as we construe that term. As we discuss above, the evidence indicates that a person of ordinary skill in the art would have regarded a "fact" as a type of assertion. *See supra* Section IV.B.2. Thus, Facebook persuasively shows that, by disclosing a context graph comprising a collection of facts, Cheng discloses "facts and assertions" as recited in claim 1.

We also find Facebook's arguments in the Petition sufficient to meet its particularity requirement under 35 U.S.C. § 312(a)(3) and its ultimate burden of persuasion. *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016) ("To satisfy its burden of proving obviousness, a petitioner . . . must . . . articulate specific reasoning, based on evidence of record, to support the legal conclusion of obviousness." (citing *KSR*, 550 U.S. at 418)). The Petition specifically identifies the ontological relationships between the nodes in Cheng's personal interest graph as the recited "facts and assertions." *See* Pet. 19–21. This is sufficiently specific to meet Facebook's burden, particularly in light of Facebook's further responses in its Reply. *See* Pet. Reply 4–10.

(b) Whether Cheng Teaches the "Behavior" Aspect of Limitation 1[b]

Facebook argues that Cheng's personal interest graph includes facts and assertions "about a user's behavior and interests" as recited in limitation 1[b]. Pet. 19–21. Specifically, Facebook identifies the interests and behavior as "usage or activity" derived from Cheng's sensor event data. Pet. 21 (citing Ex. 1003 ¶¶ 14, 46; Ex. 1002 ¶ 72). Facebook also argues that Cheng's personal interest graph is modified based on the collected situation data derived from the sensors. Pet. 25–26 (citing Ex. 1003 ¶¶ 37, 40, 45, 53).

In response, PARC argues that Cheng does not teach the "behavior" aspect of limitation 1[b]. PO Resp. 29. According to PARC, this is because in Cheng, any information in the personal interest graph about a user's behavior is not modified "using the event data" as recited in the limitation, which PARC contends must be based on the user's "physical surroundings," such as "the location, movement, and/or compass measurement of the mobile device." *Id.* at 29–31 (quoting Ex. 1001, 9:3–5) (citing Ex. 1001, 1:43–46, 2:60–62, 5:36–38, 9:2–5, 10:31–36, 11:4–6, 11:54–56, 13:47–51; Ex. 2017 ¶¶ 89–90). Rather, PARC contends that this information in Cheng "relates to 'advertisement[s] the user clicked or shared, an item the user bought, rated, reviewed, shared, recommended," and/or 'updating a profile, adding/deleting friends, tweets/retweets, likes, shares, recommends, clicks, online posts, etc.'" *Id.* at 30 (alteration in original) (quoting Ex. 1003 ¶ 46; and then quoting *id.* ¶ 39).

Facebook argues that PARC mischaracterizes the claim language, which requires "modifying a context graph . . . using the event data," not

that the "facts and assertions about a user's behavior and interests"—which "is merely an additional clause that describes properties of the claimed context graph"—must directly be derived from the event data. Pet. Reply 10–11 (citing Ex. 1021 ¶ 14); *see also id.* at 12 (citing Ex. 1021 ¶ 17). According to Facebook, in cross examination Dr. Martin agreed with Facebook's interpretation of the claim. *Id.* at 11 (citing Ex. 1018, 14:13–15:8). Facebook also points to disclosures in the '439 patent that describe modifying the context graph using the event data without reference to how the user's behavior data within the context graph is derived. Pet. 11–12 (citing Ex. 1001, 3:18–22, 3:62–64, 6:8–10, 9:23–25).

In its Sur-reply, PARC characterizes Facebook's argument as "a tortured grammatical exercise" because "how can location be used to modify the context graph if location cannot be reflected in the contents of the context graph?" PO Sur-reply 13. PARC also argues that Dr. Martin's cross-examination testimony is consistent with PARC's argument because whether the context graph or the stored behavior data is modified "using the event data" is "a distinction without a difference." *Id.* According to PARC, "since the context graph is composed of facts and assertions about a user's behavior and interests, the event data must cause a modification to those facts and assertions about a user's behavior and interests. Whether the event data triggers a *modifying* step or a *storing* step is irrelevant." *Id.* at 13–14.

We find Facebook's argument persuasive and disagree with PARC's alternative reading of this part of limitation 1[b]. The sole verb in limitation 1[b] is "modifying," and it is clear that the modification of the context graph, not the storage of behavior data, is what "us[es] the event data." *See* Ex. 1001, 10:34–36. Although the context graph includes

information about a user's behavior, claim 1 does not explicitly or implicitly require that the behavior data is solely or directly derived from the recited event data.

Thus, we find that Facebook has shown that Cheng discloses modifying the context graph "using the event data" as recited in limitation 1[b]. We also find that, as recited in claim 1, this context graph may include (as it indisputably does in Cheng) behavior and interest information derived from a user's online activity and not necessarily from sensor data describing the physical surroundings of the mobile device.

*5. Limitation 1[c]*

Limitation 1[c] recites, "in response to determining that there exists a registration for notification of changes that matches the modification to the context graph, sending a notification of context graph change to a recommender." Ex. 1001, 10:37–40. Facebook relies on the combination of Cheng and Falchuk to teach this limitation. *See* Pet. 26–36. In particular, Facebook notes that the '439 patent describes a "recommender" as "an application that recommends items or activities for a user." Pet. 26 (emphasis omitted) (quoting Ex. 1001, 3:23–25). Facebook contends that Cheng uses a recommender in conjunction with its personal interest graph for making recommendations based on the model. Pet. 27 (citing Ex. 1003 ¶¶ 11, 52, 54, 56).

But according to Facebook, "Cheng does not provide further detail regarding the interaction between the recommender and the personal interest graph." Pet. 27. Thus, Facebook argues that a person of ordinary skill in the art would have looked to Falchuk for the specific teaching recited in limitation 1[c]. *Id.* Facebook contends that, like Cheng, Falchuk discloses a

model of user context in the form of a hierarchical tree structure representing a context ontology, which "can include items such as short and long term goals." Pet. 28 (quoting Ex. 1004, 4:65–67) (citing Ex. 1003 ¶ 45; Ex. 1004, 4:42–46, 4:61–64). Facebook contends that in Falchuk, "'events'—such as a change in a user's location—change the user context model," and "in response . . . , the goal resolution component determines whether the event advances a given goal—which may cause a *notification* to occur." Pet. 29 (citing Ex. 1002 ¶ 86; Ex. 1004, 4:10–18, 6:15–31).

According to Facebook, the "registration" recited in limitation 1[c] "corresponds in Falchuk to a goal explicitly entered by a user or inferred by the system." Pet. 31. Facebook identifies the recited "recommender" as Falchuk's "context presentation manager" 14 and "notifier" 16 components, "both individually and collectively." Pet. 33 (citing Ex. 1002 ¶ 89). And Facebook contends that the step of "sending a notification of context graph change" corresponds to "the process of reporting a notification to the context presentation manager in Falchuk and/or instructing the notifier to display the notification to the user." Pet. 32–33 (citing Ex. 1002 ¶ 89).

Facebook also contends that "[i]t would have been obvious to combine Cheng's system with Falchuk's teachings regarding adding, matching and providing notifications about goals." Pet. 33. According to Facebook, an ordinarily skilled artisan would have recognized in Falchuk "a clear benefit to the system of Cheng, *e.g.*, timely notifying its recommender about changes to the context graph that are meaningful to the user." Pet. 34 (citing Ex. 1002 ¶ 94). Specifically, Facebook points to a teaching in Cheng that, "[a]t a particular moment, what a user needs or likes and what is appropriate to suggest to the user can be highly variable based upon the

user's situation," which suggests a motivation for using a recommender like in Falchuk that would allow such recommendations to be made in a timely manner as soon as the context graph changes. Pet. 35 (alteration in original) (quoting Ex. 1003 ¶ 10) (citing Ex. 1002 ¶ 94). Also, Facebook argues that incorporating Falchuk's recommender into Cheng's system would obviate any need for the user to request a recommendation explicitly, and allow the system to make recommendations at a time when "the user may not even realize . . . that they should request a recommendation." *Id.* (citing Ex. 1002 ¶¶ 94–96; Ex. 1004, 3:23–28).

PARC argues that limitation 1[c] requires a registration for the notification of changes relating to the context graph modification, and Falchuk's registration to trigger a reminder of a user's goal is not analogous to this. PO Resp. 32 (citing Ex. 2017 ¶¶ 98–103); *see also* PO Sur-reply 15–16 (arguing that "[e]ach step in the claims requires that the registration and notification be limited to the specific change to the particular aspect of the context graph that was modified in the earlier claim step").

In its Reply, Facebook argues that "this purported distinction is non-existent because, under the proposed combination, the notification in Falchuk is the direct result of the context graph change, such as a change in the user's location." Pet. Reply 13 (emphasis omitted) (citing Ex. 1004, 4:10–18). Facebook disagrees that claim 1 requires the recited "notification" must have any particular form or content, or that it "be limited to expressly reporting granular changes to particular aspects of a context graph, such as the simple fact of a change in user location." *Id.* at 14. According to Facebook, any notification triggered by a context graph change would meet limitation 1[c]. *Id.* (citing Ex. 1021 ¶¶ 33–34).

We agree with Facebook that claim 1 does not impose any particular form or content on the notification of a context graph change. It simply recites "sending a notification of context graph change to a recommender." Ex. 1001, 10:39–40. It only expressly requires a notification of "context change" matching the registration, not any particular details or aspects of that change. Thus, by the plain claim language, any notification that alerts the recommender that the context graph has changed in a manner matching the registration is sufficient to meet limitation 1[c], whatever the content of that notification.

PARC also contends, in its Response, that Facebook has failed to carry its burden of showing, without the use of improper hindsight, that a person of ordinary skill in the art would have combined Cheng and Falchuk as Facebook asserts. PO Resp. 33–35. According to PARC, the motivation to provide a "timely recommendation" is insufficient to show obviousness because this assertion is too "generic" and "there is nothing in Cheng to suggest its recommendations are untimely such that it needs to be combined with Falchuk." *Id.* at 33–34 (citing Ex. 2017 ¶¶ 94–95; *TQ Delta*, 942 F.3d at 1363; *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1328 (Fed. Cir. 2012) (determining that a generic assertion of efficiency was insufficient to show obviousness)); *see also* PO Sur-reply 16–17. PARC argues that "Cheng's recommendations are always timely because they are made with real-time, current data." PO Resp. 34 (citing Ex. 1003 ¶ 37; Ex. 2017 ¶¶ 94–95); *see also id.* at 35 (citing Ex. 2017 ¶¶ 94–97).

Facebook replies that PARC fails to address the drawback of Cheng, which Facebook identified in its Petition, that Cheng "does not disclose providing recommendations automatically, *i.e.*, without requiring that the

user request them." Pet. Reply 14–15 (citing Ex. 1002 ¶ 95). Thus, Facebooks asserts, Cheng does not solve the problem that "the user may not even realize at [the time of the context graph change] that they should request a recommendation." *Id.* (quoting Pet. 35) (citing Ex. 1002 ¶¶ 94, 96). Moreover, Facebook argues that Cheng's disclosure of timely changes to the context graph has nothing to do with when the *recommendations* based on those changes are actually delivered, or whether those recommendations are timely. *Id.* at 15–16 (citing Ex. 1021 ¶ 29). Facebook also argues that "[a]n ordinarily skilled artisan would . . . have been motivated to combine with Falchuk simply because [Falchuk] provides far more detail than Cheng in how to implement a recommendation system." *Id.* at 16 (citing Pet. 27; Ex. 1002 ¶ 92; Ex. 1021 ¶¶ 29–30).

In its Sur-reply, PARC contends that Facebook's argument contradicts its previous position that Cheng already recognizes the importance of timeliness. PO Sur-reply 17 (citing Pet. 51; Ex. 1002 ¶ 137). PARC also argues that Cheng already discloses providing long-term and serendipitous recommendations based on current context data, and there is no evidence that Cheng is not automatic or that it requires the user to make an explicit request or a recommendation. *Id.* at 17–19 (citing Ex. 1003 ¶¶ 10, 37, 54; Ex. 2017 ¶¶ 94–97). PARC also characterizes as conclusory Facebook's argument that Falchuk provides more detail than Cheng about how to implement a recommender system. *Id.* at 19 (citing *ActiveVideo Networks*, 694 F.3d at 1327–28).

We agree with Facebook that Cheng provides little detail about how its recommender would interact with its personal interest graph, and we find persuasive Facebook's argument that a person of ordinary skill in the art

would have had reason to look to other references, particularly Falchuk, to fill in the missing details. *See* Pet. 27. We do not regard Facebook's argument as conclusory or as relying on improper hindsight because Facebook articulates a persuasive reason for the combination that relies only on the prior art teachings and not on the '439 patent itself. *See In re McLaughlin*, 443 F.2d 1392, 1395 (CCPA 1971) (A prior art combination is not improper hindsight "so long as it takes into account only knowledge which was within the level of ordinary skill at the time the claimed invention was made and does not include knowledge gleaned only from applicant's disclosure."). We also disagree with PARC's suggestion that, to meet its burden of showing obviousness, Facebook necessarily needs to show that there was a known deficiency in Cheng. *See Unwired Planet, LLC v. Google Inc.*, 841 F.3d 995, 1002-03 (Fed. Cir. 2016) (A patent challenger "does not need to show that there was a known problem with the prior art system in order to articulate the required rational underpinning for the proposed combination.").

By a preponderance of the evidence, Facebook has shown that the combination of Cheng and Falchuk teaches limitation 1[c], and has sufficiently articulated a reason why a person of ordinary skill would have modified Cheng by incorporating Falchuk's system for providing goal-based recommendations associated with changes in Cheng's personal interest graph.

#### 6. *Conclusion as to Claim 1*

For all reasons discussed in the sections above, we determine that Facebook has shown by a preponderance of the evidence that claim 1 is unpatentable as obvious over Cheng in view of Falchuk.

D. CLAIMS 2–4, 7–10, 13–16, AND 20

Independent claims 7 and 13 are directed to a "computer-readable storage medium" and a "computing system," respectively, that implement essentially the same method as claim 1. *Compare* Ex. 1001, 10:30–40, *with id.* at 11:1–13, *and id.* at 11:47–12:7. For these claims, Facebook relies substantially on its arguments for claim 1. *See* Pet. 44–46 (claim 7) (citing Ex. 1001, 10:60–11:2; Ex. 1002 ¶¶ 113–115; Ex. 1003 ¶¶ 40, 55, 57, 58); Pet. 46–47 (claim 13) (citing Ex. 1002 ¶ 123; Ex. 1003 ¶ 57).

Claims 2, 8, and 14 depend from independent claims 1, 7, and 13, respectively, and further recite the following additional steps: (a) "receiving, from the mobile device, additional event data including application event data and/or operating system event data;" (b) "modifying the context graph based on the additional event data;" (c) "determining that the modification to the context graph matches the registration;" and (d) "sending a second notification of context graph change to the recommender." Ex. 1001, 10:41–50 (claim 2); *accord id.* at 11:14–26 (claim 8); *id.* at 12:8–20 (claim 14). Essentially, these claims repeat the steps of claim 1 except with regard to "additional event data including application event data and/or operating system event data." *Id.* at 10:42–44. For these limitations, Facebook relies on Cheng and Falchuk in an analogous way to that discussed above in the context of claim 1. *See* Pet. 36–40, 46, 47.

Claims 3, 9, and 15 depend from claims 1, 7, and 13, respectively, and further recite that "the event data includes high-level event data generated by the mobile device from contextual data." Ex. 1001, 10:51–53 (claim 3); *accord id.* at 11:27–29 (claim 9); *id.* at 12:21–23 (claim 15). For these claims, Facebook relies on the disclosure in Cheng of two levels of event

data derived from the contextual data, one of which is the result of a data fusion step which, according to Facebook, corresponds to the recited "high-level event data." *See* Pet. 40–43 (citing Ex. 1001, 4:45–48; Ex. 1002 ¶¶ 108–109; Ex. 1003 ¶¶ 40, 42, 55, Fig. 2).

Claims 4, 10, and 16 depend from claims 1, 7, and 13, respectively, and further recite steps of "receiving a query for context graph data from the recommender; and sending the context graph data to the recommender." Ex. 1001, 10:54–57 (claim 4); *accord id.* at 11:30–34 (claim 10); *id.* at 12:24–30 (claim 16). Facebook contends that "Cheng makes clear that a recommender application queries a personal interest graph for data" and argues that "[b]ecause the query for the context graph data comes from the recommender, as noted, it is the recommender that receives that data in response to its query." Pet. 43–44 (citing Ex. 1002 ¶¶ 111–112; Ex. 1003 ¶¶ 34, 54–56); Pet. 46 (claim 10); Pet. 47 (claim 16).

Claim 20 depends from claim 1 and further recites "wherein sending the notification comprises notifying the recommender of topological changes in the context graph and/or changes to individual properties of nodes and edges in the context graph." Ex. 1001, 12:52–55. Facebook relies essentially on its arguments for claim 1, and particularly limitation 1[c]. Pet. 47; *see supra* part IV.C.5. Facebook also argues that "[b]ecause concepts are represented as nodes in the personal interest graph, a skilled artisan would have understood that adding a node for a new concept based on usage activity data would result in a topological change to the graph." *See* Pet. 48–49 (citing Ex. 1003 ¶ 45). Thus, according to Facebook, "[a] notification associated with such an update . . . would comprise notifying the recommender of topological changes in the personal interest graph and/or

changes to the individual properties of nodes in the personal interest graph." Pet. 49 (citing Ex. 1002 ¶ 133).

PARC does not contest Facebook's specific showing for claims 2–4, 7–10, 13–16, or 20. *See generally* PO Resp. We find those arguments persuasive, and credit Mr. Schmandt's supporting testimony. For all the reasons above, we find Facebook's arguments persuasive that Cheng, in view of Falchuk, teaches all the limitations in these claims and that a person of ordinary skill in the art would have had reason to combine Cheng with the teachings of Falchuk. Thus, we determine that Facebook has shown by a preponderance of the evidence that claims 2–4, 7–10, 13–16, and 20 are unpatentable as obvious over Cheng in view of Falchuk.

### E. CLAIMS 5, 11, AND 17

Claims 5, 11, and 17 depend from claims 1, 7, and 13, respectively, and further recite "receiving real-time event data through a RESTful WebAPI; and modifying the context graph based on the received real-time event data." Ex. 1001, 10:58–62; *accord id.* at 11:35–40; *id.* at 12:31–38. In its second ground, Facebook argues that "[b]oth Cheng and Falchuk disclose web-based systems, although neither explicitly describes the use of a RESTful WebAPI." Pet. 53 (citing Ex. 1003 ¶¶ 31, 40). However, Facebook argues that a person of ordinary skill in the art would have modified the Cheng–Falchuk combination by incorporating Richardson's teachings about using of a RESTful WebAPI for receiving real-time event data in the context of Amazon's S3 cloud storage service. *See* Pet. 49–54, 57–58 (citing Ex. 1001, 4:60–64, 5:9–14, 5:16–17, 5:62–67, 7:18–21, 9:19–21; Ex. 1002 ¶¶ 114–115, 123, 136–142, 151–156; Ex. 1003 ¶¶ 7, 10, 31, 40, 53, 54;

Ex. 1004, 2:5–9, 3:46–48, 4:10–23, 4:56–58, 5:23–24, 7:12–21; Ex. 1005, 36, 45–73). According to Facebook, incorporating the teachings of Richardson into the Cheng–Falchuk combination would have been a "clear and straightforward" combination motivated by the desire "to use an existing, well-established storage service in order to save on implementation and maintenance costs—and Amazon's S3 is one of the most well-known 'cloud' storage services." Pet. 55 (citing Ex. 1002 ¶ 147; Ex. 1003 ¶ 40, 55; Ex. 1005, 36). Facebook also contends that "an ordinarily skilled artisan would have been motivated to use a RESTful WebAPI to harness an industry standard and technologically mature technology." Pet. 55–56 (citing Ex. 1002 ¶ 148).

PARC does not dispute Facebook's specific showing for claims 5, 11, or 17. *See generally* PO Resp. We find those arguments persuasive, and credit Mr. Schmandt's supporting testimony. For all the reasons above, we find Facebook's arguments persuasive that Cheng, in view of Falchuk and Richardson, teaches all the limitations in these claims and that a person of ordinary skill in the art would have had reason to combine Cheng with the teachings of Falchuk and Richardson. Thus, we determine that Facebook has shown by a preponderance of the evidence that claims 5, 11, and 17 are unpatentable as obvious over Cheng in view of Falchuk and Richardson.

### F. CLAIM 19

Claim 19 depends from claim 1 and further recites "sending a second notification to the recommender by pushing events into the recommender's publish/subscribe system asynchronously using a long-poll persistent push connection." Ex. 1001, 12:47–51. For its third ground challenging claim 19,

Facebook relies on the arguments for claim 1, and also argues that the combination of Cheng and Falchuk would send a second notification to the combined recommender by "pushing" events into the system, which according to Facebook "generally refers to providing information automatically without requiring a user to make a specific request for ('pull') it." Pet. 59 (citing Ex. 1002 ¶ 159; Ex. 1010, 13; Ex. 1011, 9).

Facebook also contends that "the '439 patent makes clear that 'publish/subscribe' is a known software design pattern—i.e., a general, reusable solution to a commonly occurring problem within a given context in software design." Pet. 60 (citing Ex. 1001, 4:49–51, 7:54–60, 8:4–9; Ex. 1006, 69–83; Ex. 1011, 8; Ex. 1002 ¶ 160). According to Facebook, "[a] person of ordinary skill would have understood Falchuk's technique of entering goals into its system and then automatically providing related notifications to a recommender at a later time to involve a 'publish/subscribe' system." Pet. 60–61 (citing Ex. 1002 ¶ 161). In other words, "a recommender is 'subscribed' to receive notifications about certain events by entering a goal into the system. Notifications are then 'published' to the recommender at a later time when they are reported to the recommender." Pet. 61 (citing Ex. 1002 ¶ 161).

Facebook also relies on Shalloway as teaching a push-based notification system, and on Powell for teaching that the push notification would be performed "asynchronously using a long-poll persistent push connection." *See* Pet. 58–67 (citing Ex. 1001, 4:49–51, 7:54–60, 8:4–9; Ex. 1002 ¶¶ 158–161, 164–168, 170–176; Ex. 1003 ¶¶ 31, 40, 55, 56; Ex. 1004, 3:46–48, 4:56–58, 6:15–21; Ex. 1006, 69–83; Ex. 1007, 19, 65–68; Ex. 1010, 5, 13; Ex. 1011, 5–6, 8–9).

According to Facebook, a person of ordinary skill in the art would have had reason to use Shalloway's push-based notification system because Cheng and Falchuk already teach such a system, and Shalloway would have provided "software design techniques and practices when implementing that functionality." Pet. 62 (citing Ex. 1002 ¶ 166). Facebook also contends that Shalloway teaches that a publish/subscribe pattern "is a very common one," and provides its own motivations for using one, such as that it decouples notifiers from notifyees, and "adds flexibility to a system to better adapt to future system changes." Pet. 62–63 (citing Ex. 1006, 72–73; Ex. 1002 ¶ 167).

Facebook also contends that the use of a long-poll persistent push connection "again simply describes well-known software techniques and is not an invention of the '439 patent." Pet. 63. According to Facebook, Powell teaches that such techniques are a good way to implement highly responsive web applications. Pet. 63–64 (citing Ex. 1007, 19, 65–68; Ex. 1002 ¶ 170). Facebook argues that Cheng and Falchuk describe such systems, and thus a person of ordinary skill in the art would have turned to Powell's teachings to implement such a system using an asynchronous long-poll persistent push connection. Pet. 65–66 (citing Ex. 1003 ¶¶ 31, 40, 56; Ex. 1004, 3:46–48, 4:56–58)

In its Response, PARC argues that a "publish/subscribe system" is an established term of art which does not correspond to how Facebook interprets the term. PO Reply 36–37 (citing Ex. 1006, 73; Ex. 2017 ¶¶ 104–105). PARC contends that Facebook does not explain, in a non-conclusory way that does not rely on improper hindsight, how a person of ordinary skill

in the art would have combined Cheng and Falchuk with Shalloway and Powell. *Id.* at 37; *see also* PO Sur-reply 20.

PARC also contends that there would have been no motivation to combine Powell with Cheng and Falchuk because Falchuk's alleged recommender "runs on a mobile device client, not a web browser" as Powell teaches. PO Resp. 38–39 (citing Ex. 2017 ¶¶ 107–121). According to PARC, "Cheng does not remedy this deficiency" because it relies on information gathered from hardware devices, so a person of ordinary skill in the art "would not understand Cheng's recommender to be a web browser." *Id.* at 39 (citing Ex. 2017 ¶ 114); *see also* PO Sur-reply 21–23 (arguing that Facebook has not shown that one would use Powell's teachings in a non-web-browser environment). PARC also argues that Powell teaches that there are "limitations and problems presented by a long-poll technique," such as that "[h]eld connections and some Web server application server architectures may not get along well," or that there may be a "gap of no connectivity when browser re-establishes connection after data transfer or timeout." PO Resp. 39 (quoting Ex. 1007, 66). According to PARC, Powell also mentions possible scalability problems which may require "moving operations outside of the web browser/server environment." *Id.* at 39–40 (citing Ex. 1007, 77–78; Ex. 2017 ¶ 119). PARC contends that a person of ordinary skill in the art would have used a simpler alternative to that disclosed in Powell. *Id.* at 40 (citing Ex. 2017 ¶ 120).

In its Reply, Facebook argues that PARC has not clearly explained why there is a problem with Facebook's understanding of a "publish/subscribe system." Pet. Reply 17. According to Facebook, Dr. Martin's definition of such a system on cross-examination is substantially

the same as the definition in a technical dictionary cited in the Petition, which is a "communication paradigm in which one party (e.g. person or computer program) releases data and notifies a list of interested recipients called subscribers that it is available." *Id.* (quoting Ex. 1011, 8) (citing Ex. 1018, 15:19–16:12; Ex. 1021 ¶ 36). Facebook also argues that claim 19 does not require any particular entity or component to perform the act of subscribing or the acts of sending notification or pushing events. *Id.* at 18–19.

As to the proposed motivation to combine, Facebook contends that PARC does not dispute that Powell discloses a long-poll persistent push contention as recited in claim 19. Pet. Reply 19. Facebook disagrees with PARC that Powell's teachings are limited to a web-browser environment, but even if it did, Facebook argues that Falchuk teaches an embodiment that runs on the web browser of a mobile device. *Id.* at 20 & n.3 (citing Ex. 1004, 4:56–58). Facebook also disagrees with PARC that Powell discourages the use of a long-poll technique, because Powell merely teaches (at the very end of a 15-page discussion) that there are tradeoffs in using the technique, as well as solutions to the problems. *Id.* at 20–22 (citing Ex. 1007, 63–78; Ex. 1021 ¶¶ 43, 46). In particular, according to Facebook, "Powell emphatically explains that HTTP long-polling is preferable over alternative approaches that require continuously checking the status of the server at regular intervals," which would be inefficient for "irregularly occurring events such as those in the Cheng/Falchuk system." *Id.* at 21–22 (citing Ex. 1007, 63–64; Ex. 1021 ¶ 45). Thus, Facebook contends that the problems identified in Powell fail to rise to teaching away.

We find Facebook's arguments persuasive, and we credit the supporting testimony of Mr. Schmandt. As to the recited "publish/subscribe system," the parties appear to agree that such systems are well-known in the art. In particular, we find persuasive Facebook's argument that Cheng, in view of Falchuk, already teaches such a system, and that a person of ordinary skill in the art would have looked to Shalloway for implementation details. *See* Pet. 62; Ex. 1002 ¶ 166.

As to pushing "asynchronously using a long-poll persistent push connection," it appears to be undisputed that Powell teaches such a connection. We agree with Facebook that Powell's teachings are not limited only to a web-browser environment, but even if they were, we agree that Falchuk teaches an embodiment that operates on a web browser. *See* Ex. 1004, 4:56–58. We also agree with Facebook that Powell's discussion of problems and limitations of a long-pull persistent push connection do not rise to the level of teaching away, because Powell teaches both drawbacks and benefits of such a system. *See* Ex. 1007, 63–78. We credit the testimony of Mr. Schmandt that the benefits outweigh the drawbacks and that it would have been within the ordinary level of skill in the art to overcome the known problems in incorporating the use of long-poll persistent push connections into the Cheng–Falchuk combination. *See* Ex. 1021 ¶¶ 43–47.

For all reasons discussed above, we determine that Facebook has shown by a preponderance of the evidence that claim 19 is unpatentable as obvious over Cheng in view of Falchuk, Shalloway, and Powell.

## V. PARC'S CONTINGENT MOTION TO AMEND

Because we conclude that all of the challenged claims are unpatentable based on the grounds of the Petition, we consider PARC's Contingent Motion to Amend. *See* MTA (Paper 13) 1 (stating that the Motion to Amend is contingent on if "the Board finds any of the original claims 1–20 unpatentable"). Although PARC originally submitted proposed substitute claims 21–40 to replace original claims 1–20, PARC has withdrawn proposed substitute claims 26, 32, and 38. *See* PO Reply MTA 1.

For the reasons below, we find that each of pending proposed substitute claims 21–25, 27–31, 33–37, 39, and 40 would introduce new matter, and that they are unpatentable under § 103. Therefore, we deny the Contingent Motion to Amend.

### A. PROPOSED SUBSTITUTE CLAIMS

PARC proposes claims 21–25, 27–31, 33–37, 39, and 40 as substitutes for original claims 1–5, 7–11, 13–17, 19, and 20 of the '439 patent, respectively. *See* MTA App'x A. Proposed substitute claim 21 is reproduced below, with underlining to indicate the text proposed to be added to original claim 1:

> 21. (Proposed substitute for claim 1, if found unpatentable) A method, comprising:
>
> [a] receiving, from a mobile device, event data derived from contextual data collected using detectors that detect a physical context surrounding the mobile device;
>
> [b] <u>aggregating the event data from multiple mobile device clients for analysis, at a server-side architecture, regarding co-location events;</u>

[c] modifying a context graph that stores facts and assertions about a user's behavior and interests using the event data, wherein the context graph includes nodes shared between two or more users;

[d] in response to determining, at the server-side architecture, that there exists a registration for notification of changes that matches the modification to the context graph, sending, by the server-side architecture, a notification of context graph change to a recommender.

MTA App'x 1 (PARC's reference letters added, and formatting added for consistency with the original claims). PARC proposes similar amendments in proposed substitute independent claim 27, corresponding to original claim 7 (*id.* at 3–4) and proposed substitute independent claim 33, corresponding to original claim 13 (*id.* at 5–6).

### B. PARC's Burden to Show Compliance with Statutory and Regulatory Requirements

We first consider whether PARC has met its burden to show that it has met the statutory and regulatory requirements for a motion to amend. "Before considering the patentability of any substitute claims, . . . the Board first must determine whether the motion to amend meets the statutory and regulatory requirements set forth in 35 U.S.C. § 316(d) and 37 C.F.R. § 42.121." *Lectrosonics, Inc. v. Zaxcom, Inc.*, IPR2018-01129, Paper 15 at 4 (PTAB Feb. 25, 2019) (precedential). Accordingly, a patent owner must make a claim listing reproducing each proposed substitute claim (which it has, *see* MTA App'x A), and must make an initial showing to demonstrate the following: (1) the amendment proposes a reasonable number of substitute claims; (2) the amendment responds to a ground of unpatentability involved in the trial; (3) the amendment does not seek to enlarge the scope of the claims of the patent; and (4) the proposed claims are supported in the

original disclosure (and any earlier filed disclosure for which the benefit of filing date is sought) without introducing new subject matter. *See* 35 U.S.C. § 326(d); 37 C.F.R. § 42.121.

### 1. *Whether There Is a Reasonable Number of Substitute Claims and Whether the Proposed Amendment Responds to a Ground of Unpatentability Involved in the Trial*

PARC contends that it has proposed a reasonable number of substitute claims and that the proposed amendments respond to the patentability grounds involved in this trial. *See* MTA 2–3. In its Opposition, Facebook pointed out that proposed substitute claims 26, 32, and 38 corresponded to claims that were not challenged in this proceeding. Pet. Opp. MTA 1–2. PARC responded by withdrawing claims 26, 32, and 38 from its Contingent Motion to Amend. PO Reply MTA 1.

Apart from the issue addressed by PARC's withdrawal of proposed claims 26, 32, and 38, Facebook does not otherwise challenge the number of proposed claims or whether the proposed amendments respond to issues involved in the trial. *See* Pet. Opp. MTA 1–2; *see generally* Pet. Sur-reply MTA. Because of this withdrawal, PARC now only proposes one substitute claim per original claim challenged in the Petition, which is reasonable. And we determine that these proposed amendments respond to issues raised in the Petition.

### 2. *Whether the Proposed Amendment Seeks to Enlarge the Scope of the Original Claims*

PARC alleges that its "proposed substitute claims retain all of their original features and add narrowing elements." MTA 4. However, Facebook contends that proposed substitute independent claims 27 and 33

impermissibly broaden original claims 7 and 13, respectively. Pet. Opp. MTA2–3. Proposed substitute claim 27 amends the final limitation of original claim 7 as follows:

> in response to determining, at the server-side architecture, that there exists a registration for notification of changes that matches the modification to the context graph, sending, by the server-side architecture, a notification of context graph change to a recommender.

MTA App'x 3–4 (formatting added consistent with the original claim limitation). Proposed substitute claim 33 includes a similar amendment to original claim 13. *See id.* at 6.

Facebook argues that because of the addition of "by the server-side architecture" in these two claims (a requirement that carries over into dependent claims 28–32 and 34–38), the claims "no longer require that the "sending . . . a notification" and "determining" steps be performed by the 'instructions' on the 'computer-readable storage medium'" because, instead, a "'server-side architecture' now performs these steps, which could be the same device or an entirely separate device from the one that has the claimed 'computer-readable storage medium.'" Pet. Opp. MTA3 (emphasis omitted).

PARC disagrees. According to PARC, proposed substitute claims 27 and 33 "recite 'a' computer-readable medium, which 'carries the meaning of 'one or more' in the open-ended claims containing the transitional phrase 'comprising.'" PO Reply MTA1–2 (quoting *SanDisk Corp. v. Kingston Tech. Co.*, 695 F.3d 1348, 1360 (Fed. Cir. 2012)) (citing Ex. 2024 ¶¶ 63–65). PARC argues that "[t]he fact that some or all of the computer readable medium/instructions may be at server-side architecture does not render the substitute claims broader than the originals, which have no limitation on

where—or how many—computer readable mediums operate to execute the instructions." *Id.* at 2 (citing Ex. 2024 ¶¶ 63–65).

Facebook replies that under the proposed amendments, "the 'server-side architecture' . . . need not have any relationship to any computer-readable storage medium recited in the claim," so that, "unlike original claims 7 and 13, the 'determining' and 'sending a notification' steps no longer have to be performed by the claimed computer-readable storage medium, regardless of whether the medium comprises one, two, or ten thousand devices." Pet. Sur-reply MTA 1–2 (emphasis omitted).

We disagree. First, we note that Facebook's argument does not appreciate that, as recited in original claims 7 and 13 and proposed substitute claims 27 and 33, it is the "computer" or the "processors," respectively, not the "non-transitory computer-readable medium," that actually perform the "determining" and "sending . . . a notification" steps. *See* MTA App'x 3 ("instructions that when executed by the computer cause *the computer to perform* a method, the method comprising . . ."), *id.* at 6 ("instructions stored [on the medium] that, when executed by the one or more processors, cause *the one or more processors to perform* operations comprising . . ."). We raised this point in our Preliminary Guidance, and expressed our preliminary view that "[t]he claims and the supporting specification do not appear to restrict the type of 'computer' that the method can be run on, including a server or other computer that is part of a server-side architecture." Paper 25, 5 (citing Ex. 2020 ¶¶ 23, 33, 36, 37, 40, 41, 43, 63, Fig. 3; Pet. 45–46).

Thus, the question we must consider is whether PARC's limitation of the processing hardware that performs the "determining" and "sending" steps to the "server-side architecture" broadens the original claims, which do

not specify the location of the computer or processors, including whether they are part of a server-side architecture, a client-side architecture, or some combination of the two. Although PARC's argument focuses on the location of the medium, rather than the computer or processors, PARC's argument is valid that original claims 7 and 13 do not specify the location of the recited processing steps, or whether the steps take place in multiple locations (e.g., by a distributed system).[12] *See* PO Reply 2. *Id.* at 2.

The proposed amended claims would simply limit the location of the processing hardware performing the "determining" and "sending" steps *solely* to the server-side architecture. Because this narrows the original claims, we determine that PARC's proposed amendment does not seek to enlarge the scope of the original claims.

#### *3. Whether the Proposed Amendment Introduces New Matter*

We next consider whether the proposed substitute claims (including material found in the original claims) are supported in the original disclosure and whether the proposed amendment introduces new matter in violation of 35 U.S.C. § 316(d)(3). New subject matter is any addition to the claims that lacks sufficient support in the subject patent's original disclosure. *See TurboCare Div. of Demag Delaval Turbomach. v. Gen. Elec. Co.*, 264 F.3d 1111, 1118 (Fed. Cir. 2001) ("When [an] applicant adds a claim . . . , the new

---

[12] Facebook points out a practical difficulty that would occur if PARC tried to enforce the proposed substitute claims against a system with client and server parts operated by two distinct parties, as no single party would satisfy all the claim limitations. *See* Pet. Sur-reply MTA2. This is a separate issue from the question before us of whether the proposed amendments seek to enlarge the scope of the original claims.

claim[] must find support in the original specification.”). The Board requires that a patent owner show in a motion to amend that there is written-description support in the originally filed disclosure of the subject patent for each proposed substitute claim, and also set forth support in an earlier-filed disclosure for each claim for which the patent owner seeks the benefit of the earlier-filed disclosure’s filing date. *See* 37 C.F.R. §§ 42.121(b)(1), 42.121(b)(2).

The test for determining whether an amendment lacks written description support in the original disclosure is not simply the presence or absence of literal support in the disclosure for the claim language, but rather, whether the disclosure as originally filed reasonably conveys to a person of ordinary skill in the art that the inventor had possession of the claimed subject matter at the time of filing. *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc); *Vas-Cath, Inc. v. Mahurkar*, 935 F.2d 1555, 1563 (Fed. Cir. 1991); *In re Kaslow*, 707 F.2d 1366, 1375 (Fed. Cir. 1983).

In its Motion to Amend, PARC contends that “the proposed substitute claims are supported in the original non-provisional application and thus do not introduce new subject matter.” MTA 4. As support, PARC provides the testimony of Dr. Martin including a table that purportedly shows where support for each limitation may be found in the non-provisional parent application, App. No. 13/873,061 (“the ’061 application,” Ex. 2020). MTA 5 (citing Ex. 2017 ¶¶ 53–60). PARC also provides an outline of this support in its Contingent Motion to Amend. MTA 5–8.

Facebook contends that the proposed substitute claims lack support for the limitation “wherein the context graph includes nodes shared between

two or more users" in proposed substitute independent claims 21, 27, and 33 and in the other proposed substitute claims through dependency. *See* Pet. Opp. MTA 12–13. Facebook argues that "[t]he only potential support in the originally-filed specification for this new limitation appears to be a single sentence that merely states: 'Note that context graphs can also be shared between users.'" *Id.* (quoting Ex. 2020 ¶ 49). According to Facebook, "[t]his statement does not state that individual *nodes* of a context graph can be shared." *Id.* at 13. This difference is significant, Facebook argues, because "an ordinarily skilled artisan would have interpreted the statement about sharing context graphs as describing the ability of a user to share their context graph with other users, for example, by granting other users access to access to information in the graph." *Id.* (citing Ex. 1021 ¶¶ 62–64). But according to Facebook, "this statement does not disclose that underlying *nodes* within a context graph are shared between multiple users." *Id.* (citing Ex. 1021 ¶ 63).

PARC replies that the '061 application "explains that (1) "[e]ach user is associated with a context graph," (2) "context graphs can also be shared between users[,]" and (3) "context graphs with greater numbers of nodes [can be managed] using cross module interconnections." PO Reply MTA 8 (alterations in original) (quoting Ex. 2020 ¶¶ 48–49) (citing Ex. 2024 ¶¶ 74–81). Based on these disclosures, PARC contends that a person of ordinary skill in the art would have understood "that each user has his/her own context graph, but that nodes may be shared using known data structure sharing techniques." *Id.* (citing Ex. 2024 ¶¶ 82–88). According to PARC, this is because duplicate nodes for different users would be stored in the same memory location to minimize storage space, and using cross-module

interconnections, the system would distribute nodes for large graphs across multiple software modules on different devices. *See id.* (citing Ex. 2024 ¶¶ 90–90, 98–99).

Facebook counters that PARC "does not explain how the brief mention of 'cross module interconnections' provides any support for sharing of nodes in a context graph between two or more users." Pet. Sur-reply MTA 7. Because "[t]he term 'module' merely refers to hardware and/or software for carrying out the invention," the disclosure of cross-module interconnections, "at best, merely describes a feature for scaling the system to handle more nodes by allowing interconnections between the various hardware and/or software modules used to carry out the alleged invention." *Id.* at 7–8 (emphasis omitted) (citing Ex. 1001, 7:41–43, 10:11–20; Ex. 2020 ¶¶ 49, 66). According to Facebook, "[c]ross module interconnections have nothing to do with sharing individual nodes of context graphs between two or more users." *Id.* at 8 (emphasis omitted).

We agree with Facebook. At best, PARC's arguments go to whether the sharing of nodes would have been obvious in view of the disclosure in the '061 application. Although "the description requirement does not demand any particular form of disclosure, . . . a description that merely renders the invention obvious does not satisfy the requirement." *Ariad Pharms.*, 598 F.3d at 1352 (citing *Carnegie Mellon Univ. v. Hoffmann–La Roche Inc.*, 541 F.3d 1115, 1122 (Fed. Cir. 2008); *Lockwood v. Am. Airlines*, 107 F.3d 1565, 1571–72 (Fed. Cir. 1997)).

Thus, we find that PARC has failed to show support in the original disclosure for the added phrase "wherein the context graph includes nodes shared between two or more users." Consequently, we find that each of the

proposed substitute claims would introduce new matter, and the amendments are disallowed under 35 U.S.C. § 316(d)(3).

### C. PATENTABILITY OF THE PROPOSED SUBSTITUTE CLAIMS

Having considered whether PARC has met its statutory and regulatory burden for a motion to amend, we next consider whether the record as a whole shows that the proposed substitute claims are patentable.

"A petitioner bears the burden of persuasion to show, by a preponderance of the evidence, that any proposed substitute claims are unpatentable." 37 C.F.R. § 42.121(d)(2); *see also Bosch Automotive Service Solutions, LLC v. Matal*, 878 F.3d 1027, 1040 (Fed. Cir. 2017), *amended by Bosch Automotive Service Solutions, LLC v. Iancu*, No. 2015-1928 (Fed. Cir. Mar. 15, 2018). To determine whether a petitioner has proven the substitute claims are unpatentable, the Board focuses on "arguments and theories raised by the petitioner in its petition or opposition to the motion to amend." *Nike, Inc. v. Adidas AG*, 955 F.3d 45, 51 (Fed. Cir. 2020). The Board itself also may justify any finding of unpatentability by referring to evidence of record in the proceeding. *Lectrosonics*, Paper 15 at 4 (citing *Aqua Products v. Matal*, 872 F.3d 1290, 1311 (Fed. Cir. 2017) (O'Malley, J.)).

Facebook contends that each of the proposed substitute claims is unpatentable under 35 U.S.C. §§ 101, 103, 112(a), and 112(b). Pet. Opp. MTA 3–25. The table below is a summary of the unpatentability grounds Facebook advances in its Opposition to the Contingent Motion to Amend:

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 21–25, 27–31, 33–37, 39, 40[13] | 112(a) | Written Description |
| 21–25, 27–31, 33–37, 39, 40 | 112(b) | Indefiniteness |
| 21–25, 27–31, 33–37, 39, 40 | 101 | Eligibility |
| 21–24, 27–30, 33–36, 40 | 103 | Cheng, Falchuk, Tseng[14] |
| 25, 31, 37 | 103 | Cheng, Falchuk, Richardson, Tseng |
| 39 | 103 | Cheng, Falchuk, Shalloway, Powell, Tseng |

Of the above grounds, we only address those based on § 103, which are sufficient to show unpatentability of all the proposed substitute claims.[15] We note that Facebook's arguments under § 112(a) overlap with the discussion above about whether PARC's proposed amendment complies with 35 U.S.C. § 316(d)(3), and we do not further address this ground. *See supra* Section V.B.3.

1. *Obviousness of Proposed Substitute Claims 21, 27, and 33 over Cheng, Falchuk, and Tseng*

In addition to its prior arguments regarding original claims 1, 7, and 13, Facebook contends that corresponding proposed substitute claims 21, 27,

---

[13] Proposed substitute claims 26, 32, and 38 have been withdrawn, and we do not consider them in our analysis. *See* PO Reply MTA 1.

[14] Tseng et al., US 2012/0166432 A1 (published June 28, 2012) (Ex. 1020).

[15] Facebook state that, "[w]ith respect to limitations that were not amended, the analysis from the Petition remains applicable." Pet. Opp. MTA 13. We incorporate our analysis above with respect to these limitations. *See supra* Section IV.

and 33 are unpatentable under § 103 as obvious over Cheng, Falchuk, and Tseng. Pet. Opp. MTA 13–22. We address Facebook's arguments below.

(a) Overview of Tseng

Tseng describes a social networking system that "provides relevant third-party content objects to users by matching user location, interests, and other social information with the content, location, and timing associated with the content objects." Ex. 1020, code (57). The location data is provided by mobile devices. *See id.* ¶ 27.

Figure 8a, depicted below, is part of "a series of sample screenshots illustrating how a client device may display a ranked list of search results to a user of [the disclosed] social networking system, where the search results are presented based on the user's location and social information" (Ex. 1020 ¶ 13):




FIG. 8a

Figure 8a, above, "is a sample screenshot of how a context search query 805*a* for coffee may be displayed." Ex. 1020 ¶ 120. The image shows the

word "Coffee" in search bar 805*a*, and below that, graphical map 815*a* showing coffee locations A, B, C, and D (820*a*), which, below that, are also "listed 825*a* in order according to their relevance scores." *Id.* List 825*a* labels location A as "Starbucks" and indicates that there are "3 likes" (830*a*) and "7 comments" (835*a*), and indicates that social connections (840*a*) "Joe, Bob & Jim are here." Location B is labeled "Peets," but does not indicate the presence of any likes, comments or social contacts.

(b) Amendments Regarding "Co-Location Events"

Facebook contends that Cheng teaches the added limitation "aggregating the event data from multiple mobile device clients for analysis, at a server-side architecture, regarding co-location events." Pet. Opp. MTA 14–15. According to Facebook, Tseng teaches the use of location data from social contacts to determine the relevance of search queries, and this relevance takes into consideration whether there are contacts at the location of interest. *See* Pet. Opp. MTA 16–18 (citing Ex. 1020 ¶¶ 17–18, 27, 44, 51, 106, 109, 111, 115, 118, 120–122, 128, 145–148, Figs. 8a–d; Ex. 1021 ¶¶ 84–85). According to Facebook, a person of ordinary skill in the art would have had reason to incorporate Tseng's co-location teachings into Cheng's system because the resulting "recommendations would have taken into account the proximity of the user to other users and thus provid[e] an opportunity for social interaction." *Id.* at 19 (citing Ex. 1020 ¶ 115; Ex. 1021 ¶¶ 89–90).[16]

---

[16] Facebook alternatively argues that Cheng, alone, teaches the "co-location events" limitation. *See* Pet. Opp. MTA 14–15. We need not address this argument because we determine that Cheng teaches this limitation in light of the teachings of Tseng.

PARC responds that "Cheng determines proximity through 'social sensors and a microphone,' not through location information." PO Reply MTA 11 (citing Ex. 1003 ¶ 42). According to PARC, the Cheng–Tseng combination would have used Cheng's sensors, which "only consider[] whether the user is alone or with friends as determined by the social sensors and microphone, not *where* the user(s) are located." *Id.* (citing Ex. 1003, Fig. 8; Ex. 1021 ¶ 82; Ex. 2024 ¶¶ 117–118, 123–126). PARC also argues that "Cheng analyzes data at the client device, not server-side architecture." *Id.* (citing Ex. 1003 ¶ 55).

Facebook disagrees that Cheng only determines location based on social sensors and a microphone, because "Cheng clearly discloses using GPS to determine user location." Pet. Sur-reply 8 (citing Pet. 13–14; Ex. 1003 ¶¶ 32, 35). Facebook also disagrees that, in the proposed combination, the aggregation of event data would take place at the client side, because Facebook relies on Tseng for aggregating the location data, on the server side, obtained from Cheng's location sensors. *See id.* at 8–9 (citing Pet. Opp. MTA 16–19).

We find Facebook's arguments persuasive because we agree that Cheng teaches the use of GPS sensors to determine location, and the evidence suggests that a person of ordinary skill in the art would have had reason to use Tseng's system to aggregate that location data, on the server side, to determine when social contacts are co-located within the same area of interest.

(c) Amendments Regarding Sharing Nodes Between Two or More Users

Facebook contends that Cheng discloses a context graph in which nodes are shared because "multiple users who express interest in the same concepts will have links to the same corresponding concept nodes in the global ontology." Pet. Opp. MTA 20 (citing Ex. 1003 ¶¶ 46, 51; Ex. 1021 ¶ 92).[17]

PARC disagrees that "links to Cheng's social graph can satisfy the 'shared nodes' element." PO Reply MTA 12. According to PARC, "Cheng's social graph is a multi-user graph rather than a per-user graph as required by a proper construction of the term 'context graph.'" *Id.* (citing Ex. 2024 ¶ 120). PARC contends that "[e]ach node in Cheng's social graph is a person, which results in a multi-user graph," so "[a] personal interest graph that links to this multi-user social graph results in a multi-user interest graph, which fails to comply with both parties' understanding of the term 'context graph'" as being "per-user." *Id.* (citing Ex. 1003 ¶¶ 44, 49, 51, Fig. 8; Ex. 2019, 36:16–37:8; Ex. 2024 ¶ 120).

Facebook disagrees that a shared context graph could not also be "per-user," because otherwise, "the substitute claims themselves would be inoperable" given PARC's position that a person of ordinary skill in the art would have understood the term "context graph" to be "per-user." Pet. Sur-reply MTA 10–11 & n.1. But according to Facebook, a "per-user interest

[17] Alternatively, Facebook argues that Cheng's personal interest graph can be "constructed as a separate ontology that is a subset of the global ontology." *Id.* (quoting Ex. 1003 ¶ 45). We need not address this alternative because we find Facebook's first argument persuasive.

model can include concept nodes in the global ontology shared with other users," so "Cheng . . . discloses a per-user context graph, even if some nodes in that graph are shared." *Id.* (emphasis omitted).

We agree with Facebook, and credit Mr. Schmandt's supporting testimony, that Cheng's embodiment in which the personal interest graph for multiple users can have links to the same nodes in a shared global ontology. *See* Ex. 1003 ¶¶ 46, 51; Ex. 1021 ¶ 92. We also disagree that such an arrangement is not, still, "per-user" in the sense that each user has its own, non-shared nodes in a context graph, so we perceive no contradiction with either parties' proposed interpretations of the term "context graph." *See supra* Section IV.B.1. Thus, Facebook has shown that Cheng discloses the limitation "wherein the context graph includes nodes shared between two or more users."

(d) Amendments Regarding "Server-Side Architecture"

Facebook argues that, as it explained in its Petition, Falchuk teaches the "determining" and "sending" limitations of the proposed substitute claims, which must take place at the "server-side architecture." Pet. Opp. MTA21–22 (citing Pet. 29–31). According to Facebook, "[i]n one embodiment, the goal resolution component in Falchuk is included as part of its server-side architecture." *Id.* at 21 (citing Ex. 1004, 3:33–35). Facebook also argues that "the location of the functional components, *e.g.*, whether they reside on the client or the server, would have been regarded as a routine implementation decision." *Id.* at 21–22 (citing Pet. 43–43, 45–46; Ex. 1002 ¶¶ 109, 115; Ex. 1003 ¶¶ 40, 55; Ex. 1021 ¶ 95). Facebook contends that the

same analysis applies to the "sending" limitation. *Id.* at 22 (citing Ex. 1004, 2:32–34; Ex. 1021 ¶¶ 97–98).

PARC does not dispute Facebook's arguments regarding these "server-side architecture" limitations, and we find them persuasive for the reasons above. *See generally* PO Reply MTA.

(e) Conclusion as to Proposed Substitute Claims 21, 27, and 33

For all reasons discussed in the sections above, we determine that Facebook has shown by a preponderance that proposed substitute independent claims 21, 27, and 33 are unpatentable as obvious over Cheng in view of Falchuk and Tseng.

*2. Obviousness of Proposed Substitute Claims 22–25, 28–31, 34–37, 39, and 40*

For proposed substitute dependent claims 22–25, 28–31, 34–37, 39, and 40, Facebook relies on its arguments in the Petition for the limitations found in the original dependent claims. *See* Pet. Opp. MTA 1. PARC does not separately challenge these arguments in its Contingent Motion to Amend. *See generally* MTA; PO Reply MTA.

Thus, for all the above reasons, we conclude that Facebook shows, by a preponderance of the evidence, that proposed substitute claims 22–24, 28–30, 34–36, and 40 are unpatentable as obvious over Cheng in view of Falchuk and Tseng; that proposed substitute claims 25, 31, and 37 are unpatentable as obvious over Cheng in view of Falchuk, Richardson, and Tseng; and that proposed substitute claim 39 is unpatentable as obvious over Cheng in view of Falchuk, Shalloway, Powell, and Tseng.

## VI. CONCLUSION[18]

For the reasons above, Facebook has shown by a preponderance of the evidence that claims 1–5, 7–11, 13–17, 19, and 20 of the ’439 patent are unpatentable under § 103 as obvious over Cheng in view of Falchuk (claims 1–4, 7–10, 13–16, 20), over the Cheng in view of Falchuk and Richardson (claims 5, 11, and 17), and over the combination of Cheng, Falchuk, Shalloway, and Powell (claim 19).

Also, because PARC has failed to show, by a preponderance of the evidence, that proposed substitute claims 21–25, 27–31, 33–37, 39, and 40 do not contain new matter, and because Facebook has shown, by a preponderance of the evidence, that the claims are unpatentable under § 103, we deny PARC’s Contingent Motion to Amend.

## VII. ORDER

In consideration of the foregoing, it is

ORDERED that claims 1–5, 7–11, 13–17, 19, and 20 of the ’439 patent are unpatentable;

FURTHER ORDERED that PARC’s Contingent Motion to Amend (Paper 13) is *denied*; and

---

[18] Should PARC wish to pursue amendment of claims in a reissue or reexamination proceeding after this decision, we draw PARC’s attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding*. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If PARC chooses to file a reissue application or a request for reexamination of the challenged patent, we remind PARC of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

FURTHER ORDERED that parties to this proceeding seeking judicial review of our decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

In summary:

| **Claim(s)** | **35 U.S.C. §** | **Reference(s)/ Basis** | **Claims Shown Unpatentable** | **Claims Not Shown Unpatentable** |
|---|---|---|---|---|
| 1–4, 7–10, 13–16, 20 | 103 | Cheng, Falchuk | 1–4, 7–10, 13–16, 20 | |
| 5, 11, 17 | 103 | Cheng, Falchuk, Richardson | 5, 11, 17 | |
| 19 | 103 | Cheng, Falchuk, Shalloway, Powell | 19 | |
| **Overall Outcome** | | | 1–5, 7–11, 13–17, 19, 20 | |

The table below summarizes our conclusions as to PARC's Motion to Amend the claims:[19]

| Motion to Amend Outcome | Claim(s) |
|---|---|
| Original Claims Cancelled by Amendment | |
| Substitute Claims Proposed in the Amendment | 21–25, 27–31, 33–37, 39, 40 |
| Substitute Claims: Motion to Amend Granted | |
| Substitute Claims: Motion to Amend Denied | 21–25, 27–31, 33–37, 39, 40 |
| Substitute Claims: Not Reached | 26, 32, 38[20] |

[19] Should PARC wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw PARC's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If PARC chooses to file a reissue application or a request for reexamination of the challenged patent, we remind PARC of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

[20] PARC has withdrawn substitute claims 26, 32, and 38 from its Motion to Amend. *See* PO Reply MTA 1.

For PETITIONER:

Heidi L. Keefe
Phillip Morton
Andrew C. Mace
COOLEY LLP
hkeefe@cooley.com
pmorton@cooley.com
amace@cooley.com

For PATENT OWNER:

James Quigley
Alexandra Easley
MCKOOL SMITH, P.C.
jquigley@mckoolsmith.com
aeasley@mckoolsmith.com

US009208439B2

(12) **United States Patent**
**Roberts et al.**

(10) **Patent No.: US 9,208,439 B2**
(45) **Date of Patent: Dec. 8, 2015**

(54) **GENERALIZED CONTEXTUAL INTELLIGENCE PLATFORM**

(71) Applicant: **Palo Alto Research Center Incorporated**, Palo Alto, CA (US)

(72) Inventors: **Michael Roberts**, Los Gatos, CA (US); **Shane P. Ahern**, Foster City, CA (US); **Oliver Brdiczka**, Mountain View, CA (US)

(73) Assignee: **PALO ALTO RESEARCH CENTER INCORPORATED**, Palo Alto, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 282 days.

(21) Appl. No.: **13/873,061**

(22) Filed: **Apr. 29, 2013**

(65) **Prior Publication Data**

US 2014/0324751 A1 Oct. 30, 2014

(51) **Int. Cl.**
***G06N 5/02*** (2006.01)
***G06Q 30/02*** (2012.01)

(52) **U.S. Cl.**
CPC .............. ***G06N 5/02*** (2013.01); ***G06Q 30/0269*** (2013.01)

(58) **Field of Classification Search**
CPC ........................................................ G06N 5/02
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 2002/0173295 | A1 | 11/2002 | Nykanen et al. | |
| 2012/0046770 | A1 * | 2/2012 | Becker et al. | 700/94 |
| 2012/0122476 | A1 | 5/2012 | Lee et al. | |
| 2012/0203640 | A1 * | 8/2012 | Karmarkar et al. | 705/14.66 |
| 2013/0110992 | A1 * | 5/2013 | Ravindra et al. | 709/220 |
| 2013/0254213 | A1 * | 9/2013 | Cheng et al. | 707/748 |
| 2014/0297739 | A1 * | 10/2014 | Stein et al. | 709/204 |

OTHER PUBLICATIONS

Bellotti, Victoria et al., "Activity-Based Serendipitous Recommendations with the Magitti Mobile Leisure Guide", CHI 2008 Proceedings, Apr. 5-10, 2008.

* cited by examiner

*Primary Examiner* — Alan Chen
(74) *Attorney, Agent, or Firm* — Shun Yao; Park, Vaughan, Fleming & Dowler LLP

(57) **ABSTRACT**

One embodiment of the present invention provides a system for providing user information to a recommender. During operation, the system receives, from the recommender, a registration for notification of changes to a context graph. The context graph includes information about user behavior and/or user interests. Next, the system receives, from a mobile device, event data derived from contextual data collected using detectors that detect the mobile device's physical surroundings. The system modifies the context graph based on the event data. The system then determines that the modification to the context graph matches the registration, and sends a notification of context graph change to the recommender.

**20 Claims, 8 Drawing Sheets**









FIG. 1


TO CLIENT APPLICATION
IN-MEMORY PUBLISH/ SUBSCRIBE SYSTEM 218
HTTP SERVER STUB 220
TO SERVER-SIDE ANALYTICS, LOGGING, AND APPLICATION FUNCTIONALITY
200
CLIENT ANALYTICS PACKAGE 216
DATA LOGGER 210
DATABASE ABSTRACTION LAYER 214
PLATFORM DATABASE 212
PLATFORM API 208
CAPTURED APPLICATION DATA 209
GPS 202
ACCELEROMETER 204
COMPASS 206

FIG. 2


TO CONTEXT GRAPH
HIGH-LEVEL EVENT STREAM
PUBLISH/SUBSCRIBE EVENT SYSTEM 308
SERVER-SIDE ANALYTICS 310
HIGH-LEVEL EVENTS
MOBILE DEVICE 300
CLIENT-SIDE ANALYTICS 216
GPS 202
COMPASS 206
USER INTERACTIONS 301
LOW-LEVEL EVENTS
EVENT POSTING INTERFACE 302
REAL-TIME EVENT STREAM
REAL-TIME EVENT STREAM PER-USER
DATA STORE ADAPTER 304
LOW-LEVEL EVENT HISTORY DATABASE 306

FIG. 3


TO
APPLICATION-
SPECIFIC USER
MODELS
RESTFUL WEBAPI 408
DEPENDENCY
SYSTEM
410
406
MAPPER
314
EVENT POSTING
INTERFACE 302
EVENTS
FROM
CLIENTS
PUBLISH/SUBSCRIBE
EVENT SYSTEM
308
MACHINE LEARNING MODULE1 402
MACHINE LEARNING MODULE2 404
SERVER-SIDE ANALYTICS 310

FIG. 4


START
COLLECT PHYSICAL, APPLICATION, AND OPERATING SYSTEM CONTEXTUAL DATA
502
STORE COLLECTED CONTEXTUAL DATA AND GENERATE HIGH-LEVEL EVENTS
504
PUBLISH EVENT DATA TO SUBSCRIBERS ON CLIENT AND SERVER
506
END

FIG. 5


START
RECEIVE EVENT DATA FROM CLIENTS
602
STORE AND PROCESS EVENT DATA
604
UPDATE CONTEXT GRAPH
606
SEND UPDATED GRAPH DATA TO RECOMMENDERS
608
END

FIG. 6


DISPLAY
705
COMPUTER AND COMMUNICATION SYSTEM
700
PROCESSOR
702
MEMORY
704
STORAGE
706
PLATFORM API
208
CLIENT ANALYTICS
PACKAGE
216
DATA LOGGER
210
PUBLISH/
SUBSCRIBE
SYSTEM
218
APPLICATION
707
APPLICATION
709

**FIG. 7**


MACHINE LEARNING MODULE 402
MAPPER 314
DISPLAY 815
DEPENDENCY SYSTEM 408
COMPUTER AND COMMUNICATION SYSTEM 800
CONTEXT GRAPH 406
PROCESSOR 802
STORAGE 806
RESTFUL WEBAPI 408
MEMORY 804
RECOMMENDER 824
APPLICATION 810
KEYBOARD 816
POINTING DEVICE 818
APPLICATION 812

FIG. 8

# GENERALIZED CONTEXTUAL INTELLIGENCE PLATFORM

## BACKGROUND

1. Field

This disclosure is generally related to contextual intelligence. More specifically, this disclosure is related to a method and system for collecting mobile device contextual information and facilitating efficient adaptation of a generic contextual intelligence system for customized applications.

2. Related Art

As mobile devices equipped with technology to detect physical surroundings become more pervasive in our everyday lives, software on the mobile devices that detect and make use of physical surroundings can increasingly contribute to improving the lifestyle of mobile device users. Such software includes context-aware systems that may adapt to the computing environment, including physical surroundings, and make recommendations based on the physical surroundings. A context-aware system on a mobile device detects the computing environment and adapts to changing conditions detected from the environment, such as location and movement of the mobile device, nearby devices, and other surrounding conditions.

Such context-aware systems may vary according to architecture and user model. A user model describes user activity and interests at different points in time, including present and future activity. The system may recommend activities, such as leisure activities, based on the user model. Unfortunately, it takes considerable time and expense to develop such context-aware systems.

## SUMMARY

One embodiment of the present invention provides a system for providing user information to a recommender. During operation, the system receives, from the recommender, a registration for notification of changes to a context graph. The context graph includes information about user behavior and/or user interests. Next, the system receives, from a mobile device, event data derived from contextual data collected using detectors that detect the mobile device's physical surroundings. The system modifies the context graph based on the event data. The system then determines that the modification to the context graph matches the registration, and sends a notification of context graph change to the recommender.

In a variation on this embodiment, the system receives, from the mobile device, additional event data including application event data and/or operating system event data. The system then modifies the context graph based on the additional event data. The system determines that the modification to the context graph matches the registration, and sends a notification of context graph change to the recommender.

In a variation on this embodiment, the event data includes high-level event data generated by the mobile device from contextual data.

In a variation on this embodiment, the system receives a query for context graph data from the recommender, and sends the context graph data to the recommender.

In a variation on this embodiment, the system receives real-time event data through a RESTful WebAPI, and modifies the context graph data based on the received real-time event data.

In a variation on this embodiment, the system receives bulk upload of event data through an event posting interface, and modifies the context graph data based on the received bulk upload event data.



## BRIEF DESCRIPTION OF THE FIGURES

FIG. **1** presents a block diagram illustrating mobile devices communicating event data to a server, according to an embodiment.

FIG. **2** presents a block diagram illustrating a client side architecture, according to an embodiment.

FIG. **3** presents a block diagram illustrating the relationship between client-side and server-side event processing components, according to an embodiment.

FIG. **4** presents a block diagram illustrating the relationship between events, the mapper, and the context graph, according to an embodiment.

FIG. **5** presents a flowchart illustrating an exemplary process of collecting and publishing event data on the client, according to an embodiment.

FIG. **6** presents a flowchart illustrating an exemplary process of event processing on the server, according to an embodiment.

FIG. **7** illustrates an exemplary mobile device for capturing event data, in accordance with one embodiment of the present invention.

FIG. **8** illustrates an exemplary server for processing events, in accordance with one embodiment of the present invention.

In the figures, like reference numerals refer to the same figure elements.

## DETAILED DESCRIPTION

The following description is presented to enable any person skilled in the art to make and use the embodiments, and is provided in the context of a particular application and its requirements. Various modifications to the disclosed embodiments will be readily apparent to those skilled in the art, and the general principles defined herein may be applied to other embodiments and applications without departing from the spirit and scope of the present disclosure. Thus, the present invention is not limited to the embodiments shown, but is to be accorded the widest scope consistent with the principles and features disclosed herein.

Overview

Embodiments of the present invention solve the problem of efficiently developing context aware systems by providing a generic contextual intelligence platform that may be adapted for specific applications. Such a contextual intelligence system facilitates real-time processing of contextual information and support contextual application development for Web and mobile applications.

The generic contextual intelligence platform includes a client-side architecture and a server-side architecture. The client-side architecture collects contextual data and sends processed contextual data to the server-side architecture as event data. Contextual data describes a computing context detected by a mobile device client, such as physical surroundings and/or application and/or operating system context. The server-side architecture stores the contextual data and uses the contextual data to modify a graph containing user behavior and interest information. Applications may use information from the graph to modify application-specific user models and generate recommendations.

The client-side architecture collects contextual data by detecting a computing context including physical surroundings, application, and operating system context, and analyzes and writes the collected data to storage. The client-side architecture processes context detected through a hardware detector, from an application, or from the operating system, and the resulting contextual data is stored as low-level event data. Low-level event data indicate events that are detected from context, and not generated, by the client-side architecture. For example, a low-level event can be a walking pattern sensed by an accelerometer, the selection of a button in an application, or a screen capture. The client-side architecture may generate high-level events using the contextual data and send the high-level events to a server. A high-level event can be, for example, a user reading e-mail. The client-side architecture may also send event data to applications executing on the client.

The server-side architecture receives event information from the client and may analyze the event information to modify a context graph. A context graph is an in-memory model that stores facts and assertions about a user's behavior and interests. The server may also use a publish/subscribe event system to send events to recommenders. A recommender is an application that recommends items or activities for a user. These recommenders maintain application-specific user models using user information derived from the context graph. The server sends event data to a recommender when the event matches a subscription request from that particular recommender. The recommenders then modify their application-specific user models with the user information and make recommendations based on the application-specific user models.

In order to adapt the disclosed generic infrastructure to customized needs, one need only provide customized activity detection modules, customized user models, and/or customized recommenders. The infrastructure is designed as a modular structure and the different functions are compartmentalized and not dependent on each other. One can customize one or more modules for their particular application and/or also use default modules. An engineer adapting the generic infrastructure may embed contextual intelligence in their application and even monetize the application with contextually aware features. By adapting a generic infrastructure, one can save considerable time and expense in developing a customized contextual intelligence system.

Detailed Description

FIG. **1** presents a block diagram illustrating mobile devices communicating event data to a server, according to an embodiment. In FIG. **1**, mobile devices **102**, **104**, and **106** collect contextual data using detectors such as a GPS, an accelerometer, and/or a compass. Such contextual data may indicate that a user is performing certain activities such as, for example, walking, running, or opening an application on the mobile device. The contextual data may also include low-level operating system event data. The mobile devices can process and store the contextual data as low-level event data. The mobile devices can also generate high-level event data, such as data to indicate that a user is writing a document. The mobile devices may send event data to a server **108** through a network **110**. In one embodiment, mobile devices may send only high-level events to the server.

Server **108** stores, analyzes, and publishes the received event data. Server **108** may modify a context graph using the event data. One can modify application-specific user models by using user information stored in the context graph. Such application-specific user models facilitate implementation of recommender applications.



Client-Side Architecture

FIG. **2** presents a block diagram illustrating a client-side architecture, according to an embodiment. Client-side architecture **200** includes various components for collecting physical and application contextual data, then processing and recording the data to a database. The components analyze the data and generate high-level events based on the analyzed data. Client-side architecture **200** publishes the events to applications on a client and to a server.

Client-side architecture **200** includes physical detectors such as GPS **202**, accelerometer **204**, and compass **206**. The physical detectors detect physical context surrounding a mobile device and the system provides abstractions for utilizing the physical detectors, including a platform application programming interface (API) **208**. Platform API **208** facilitates communication with the devices and may preprocess the contextual data. Platform API **208** then sends its output to a data logger **210** and a client analytics package **216**. The client analytics package **216** analyzes the physical and application data and generates high-level events to forward to the server. Multiple analytics components may run on the client. The system can also send captured application data **209** to the data logger **210**. Note that captured application data **209** includes user events occurring within an application. The data logger **210** may write the physical context data and the captured application data to a platform database **212** via a database abstraction layer **214**. Platform database **212** stores historical traces to facilitate analysis of the data.

The system can collect contextual data using a number of different techniques. The system can obtain the contextual data either from inside a client application, or via a specific data-logger application. For example, the system can collect contextual data directly from applications via embedded hooks. The system can also collect contextual data through the operating system, including by capturing screens, detecting click events, and transferring event log files. Further, the system can collect contextual data from devices such as GPS receivers, accelerometers, etc.

The client-side architecture **200** implements a centralized listener pattern that allows for connected applications to register to receive contextual events from the analytics system. There may be a number of applications and modules that register for and utilize contextual information. Using the centralized listener pattern, the client can also transfer events to a centralized server system, either as low-level activity traces, or as higher level events generated by the analytics systems.

An in-memory publish/subscribe system **218** implements the centralized listener pattern to provide contextual events to client applications and to the HTTP server stub **220**. The client-side architecture **200** allows applications to register for particular types of events. For example, an application interested in location-specific events may choose to register for GPS events. With client-side analytics and interest registration, the infrastructure can reduce the impact of a multi-user system with a large volume of events, thereby reducing the likelihood of overloading a server.

In one embodiment, the HTTP server stub **220** facilitates transmission of high-level events to a remote server. The HTTP server stub **220** can receive events from the publish-subscribe system **218** and transmit events using HTTP to a remote server system (e.g., in JavaScript Object Notation (JSON) format). Note that one can configure the stub to customize transmission of events. In one embodiment, the stub only relays events that are registered with the publish/subscribe system.

Sending Data to Server

Server-side processing facilitates social applications, applications that require a higher level of data processing than can be accomplished on a single client, or applications that require a server-side persistent state. For these scenarios requiring server-side processing, the client can upload data to the server either by uploading in real time or using bulk upload.

For continuous, real-time events upload, the client can post JSON messages to a server-based RESTful Web API. A RESTful web API is a web service implemented using HTTP and the principles of representational state transfer (REST). REST is a style of software architecture for distributed systems such as the World Wide Web. The client can identify the real-time events with a userid for the user the data is associated with. Real-time upload of events allows the client to continuously update user state for real-time applications.

For bulk uploads the client can use HTTP POST to upload large data files (e.g., from a database). Application-specific code can process such bulk uploads into a server-side data store. Note that clients can use bulk upload for large blocks of data, such as screenshots or extensive low-level log files intended for analysis using machine-learning techniques.

Server-Side Event Processing

FIG. **3** presents a block diagram illustrating the relationship between client-side and server-side event processing components, according to an embodiment. FIG. **3** illustrates an event processing system in the server receiving event data from a mobile device and the subsequent analysis and storage of the event data. This figure also shows server component interactions with a publish/subscribe event system that sends event data to a context graph. The context graph stores generic user model information that may be adapted for application-specific user models and is further described in conjunction with FIG. **4**.

In FIG. **3**, as described with respect to FIG. **2**, a mobile device **300** initially collects physical contextual data using GPS **202** and compass **206**, as well as detect application events including user interactions **301**. Mobile device **300** may analyze contextual data and/or generate high-level events using client-side analytics **216** and transmit events to the server. The client can transmit both high-level events and low-level events to the server via an event posting interface **302** and/or a RESTful WebAPI (see FIG. **4**).

When the server receives events at the server-side RESTful WebAPI, the server can convert the events into internal message queue events. Using a message queuing architecture on the server allows the system to decouple event reception from event processing. Any module on the server can subscribe to the message queue, either using a user identifier or otherwise.

The server may write the event data to storage, analyze the data, and/or publish the event data. The server may write the data to storage for subsequent analysis. The server may transfer event information from an event posting interface **302** to data store adapter **304**. Such event information may be transferred via a real-time event stream, which may include streams of real-time events for each user. The server may use a data store adapter **304** to record events to low-level storage, such as low-level event history database **306**. Low-level event history database **306** can be, for example, a NoSQL database storing low-level event history information.

Server-side analytics **310** can include machine learning modules for analyzing the event data. Components in server-side analytics **310** can access real-time data from the publish/subscribe event system **308** or historical data from the low-level event history database **306**. Typically, such components run in batch mode rather than real-time. In one implementation, such components may run during low load periods (e.g., at night time) in order to optimize user models. The system may redirect the processing output from such components back into the event processing system for transfer into a context graph. The server can also write the output from server-side analytics **310** into low-level event history database **306**.

The server may also publish event data to subscribers, and may use some of the event data to modify a context graph, as further discussed in FIG. **4**. The server may publish events through a publish/subscribe event system **308** using multiple, concurrent, queues. Server-side analytics **310** may use a high-level event stream to send events to publish/subscribe event system **308**.

In one implementation, the server may use RabbitMQ for message queuing functionality. The server may also use high performance event processing subsystems for greater transaction volumes, such as that based on OMQ or message passing interface (MPI). OMQ is a high-performance synchronous messaging library for use in scalable distributed or concurrent applications. MPI is a portable, standardized message-passing system that functions on parallel computers. In one implementation, the system includes an embeddable stub that allows analytic components to post data from an application into publish/subscribe event system **308**, where the data can be transferred to a context graph.

The server can also receive and combine data from multiple clients to leverage its greater processing power. In one embodiment, the server may analyze data aggregated from a number of clients. For example, the server may analyze co-location events involving locations of a number of clients. To transfer data back to a client, a server-side application may push events into a client's publish/subscribe system asynchronously using a long-poll persistent push connection. For example, the server may push notifications to the clients involved in the co-location events. Note that the system may also use a long-poll connection to deliver recommendations to clients. For example, the system may inject recommendations as specially labeled messages into the event processing system, which transfers the messages to the client for display via a long-poll connection. Note that the system may also use traditional polling instead of long-polling.

One embodiment of the present invention may also include a framework for developing machine learning components that include stubs providing access to stored event data and real-time events, and access to publish/subscribe event system **308** for posting events into the system. Machine learning modules can use a data-driven approach, in that their parameters are serializable into a database.

In one embodiment, the system instantiates a machine learning component in an application using a low number of function calls. The system can instantiate a suitable component with data from the database. The system can then connect the component to the event processing system, and activate the component for a particular user. In one implementation, a web-based authoring system can facilitate the design and provisioning of such functionality.

Relationship Between Events, Mapper, and Context Graph

FIG. **4** presents a block diagram illustrating the relationship between events, the mapper, and the context graph, according to an embodiment. The operation of the server includes receiving events from clients and publishing events to subscribers. Some of the subscribers are machine learning modules, and others include a mapper and a dependency system. The mapper and a RESTful WebAPI modify the context graph, and the dependency system provides context graph change information to recommenders. The recom-

menders can modify implementation-specific user models based on the data received from the context graph, and make recommendations based on the information-specific user models. For example, a recommender can utilize data from a user model to affect the score of an item when determining a recommendation.

As illustrated in FIG. **4**, during operation, event posting interface **302** sends events received from clients to publish/subscribe event system **308**. Publish/subscribe event system **308** may send some events to machine learning modules, such as machine learning module1 **402** and machine learning module2 **404**, which form part of server-side analytics **310**. The machine learning modules may determine appropriate responses to events. The system may employ a number of different types of machine learning modules, including classifiers, re-enforcement learners, and other miscellaneous types. The system can train classifiers using historical data from the low-level event history. The classifiers may also have a detection component, which can run either in real-time on the event stream, or periodically on the data in the stored history. Re-enforcement learners can also observe changes to the mobile device context via event observation and learn appropriate responses.

In one embodiment, the system may store contextual data for each user. Each user is associated with a context graph **406** that describes their current state. Context graph **406** is a per-user, in-memory, graph-based model that stores facts and assertions about user behavior and actions. Context graph **406** is a database of information about the user. For example, context graph **406** may include data relating to the personal habits of the user. Such data may include that a user tends to drink coffee at four o'clock, or that the user tends to go to work at two o'clock.

Context graph **406** functions as a storage component of a generalized user model. A user model describes predicted current and future activities and interests for a user. The system can store data in context graph **406** using a type-less approach to data storage. Context graph **406** may store data according to different data models, including data models for entity-relationship data and unstructured data. Note that context graphs can also be shared between users. In one embodiment, the system can manage context graphs with greater numbers of nodes using cross module interconnections.

The system enters data into context graph **406** through subscriptions to publish/subscribe event system **308**. A mapper **314** modifies context graph **406** after receiving information from publish/subscribe event system **308**. The components that transfer event information into context graph **406** can be specially developed for specific applications. As discussed with respect to FIG. **2**, clients may also send and receive information directly to and from the context graph **406** using a RESTful WebAPI **408**.

Dependency System

A dependency system **410** connects recommenders to context graph **406** so that the system may notify recommenders of context graph changes. Changes to the data in context graph **406** trigger changes and alerts via the dependency system **410**. Such changes include topological changes and/or changes to individual properties on objects (e.g., nodes and edges) in context graph **406**.

Dependency system **410** can transfer data from context graph **406** into an application-specific user model. Such an application-specific user model may be used in a rule or mixed-model based recommender or any other type of recommender.

In one embodiment, when the dependency system **410** detects the graph changes, the changes trigger a recommender to compute rankings and/or scores for recommendable items and/or activities and/or services. The recommender may push recommendations asynchronously to the client.

A recommender using the data in context graph **406** can register for graph modification callbacks with dependency system **410**. The recommender can use the callbacks, in conjunction with graph queries and assertions, to update application-specific model values when graph data changes in context graph **406**. The recommender may then generate and/or modify recommendations based on the application-specific model values.

Note that the data stored in context graph **406** and the change notification mechanism is sufficient for many recommendation applications. However, for more sophisticated applications, such as a mixed-model recommendation system, one can add an interface layer for propagating changes from context graph **406** to an application-specific user model. Further, one may also add a query language to the system so that the recommenders may use the query language to issue queries against the context graph, thereby facilitating update of the application-specific user model.

Exemplary Prototype Applications

Two exemplary prototype applications utilizing application-specific user models are discussed below. The first example is a rule-based recommendation engine that uses dependency system **410** to update rules. The second example is a mixed-model content recommendation system that subscribes to the context graph **406** and uses their output to affect changes to its variables. Additionally, modules for combining recommendations are suggested below.

In one embodiment, a system using a rule-based recommendation engine may use the dependency system to update the status of rules, which can push recommendations to a client. Changes to the context graph trigger re-evaluation of the rule state. When the rule state changes, the recommender makes recommendations via the association of a recommendable item with the rule. In a trivial case, the recommender pushes recommendations to a client. More complex systems can vote on recommendations, with the votes assembled via a ranking system.

In another embodiment, a mixed-model content recommendation system can utilize discrete variables to indicate user interest in particular subjects, and can score or rank content that has similar variables indicating the content type. The mixed-model system can subscribe to the context graph, and use their output to affect changes to its variables. Each recommendable item can be characterized by a number of variables in a vector space. Variables can, for example, indicate ethnicity of restaurants. When changes are made to the context graph, the recommender calculates recommendations by executing a calculation relating model factors with recommendation vector variables. The recommender then assigns each recommendable item a numerical score.

The system described herein may also include combiner modules that accept output from recommenders and combine the output to determine a recommendation score. For example, a vote-based combiner can score recommendations according to the number of votes they receive. This is suitable for combining the output from a number of rule-based recommenders. As another example, a combiner may also select a best recommendation from among multiple recommendation scores to determine an output recommendation score.

Exemplary Process for Collecting and Publishing Event Data on the Client

FIG. **5** presents a flowchart illustrating an exemplary process of collecting and publishing event data on the client, according to an embodiment. During operation, the client

initially collects physical, application, and operating system contextual data (operation **502**). For example, the client may collect physical surroundings contextual data such as the location, movement, and/or compass measurement of the mobile device. The client then stores the contextual data (or otherwise processes the contextual data as low-level event data) and generates high-level events (operation **504**). For example, the client may generate high-level event indicating that a user is using a web browser. The client then publishes event data to subscribers on the client and server (operation **506**). The client may use event posting interface **302** and/or RESTful WebAPI **408** to send event data to the server.

FIG. **6** presents a flowchart illustrating an exemplary process of event processing on the server, according to an embodiment. During operation, the server receives event data from clients (operation **602**). The server may queue the event data for processing. Next, the server stores and processes the event data (operation **604**). The server may analyze the event data, either by performing real-time analysis or analyzing in batch mode. The server may publish events to a publish/subscribe event system. Further, the server may analyze co-location events and push events to clients. The server can update context graph **406** using the event data (operation **606**). The server may modify context graph **406** using output from server analytics components. Using dependency system **410**, the server may send context graph **406** data to recommenders (operation **608**). When the graph changes, the system can send the new graph data to relevant recommenders. The recommenders can then form recommendations using the new graph data.

FIG. **7** illustrates an exemplary mobile device for capturing event data, in accordance with one embodiment of the present invention. In one embodiment, a computer and communication system **700** includes a processor **702**, a memory **704**, an optional display **705**, and a storage device **706**. Storage device **706** stores a number of applications, such as applications **707** and **709**. Storage device **706** also stores a platform API **208**, as well as other applications, such as client analytics package **216**, data logger **210**, and publish/subscribe system **218**. During operation, the applications are loaded from storage device **706** into memory **704** and then executed by processor **702**. While executing the program, processor **702** performs the aforementioned functions.

FIG. **8** illustrates an exemplary server for processing events, in accordance with one embodiment of the present invention. In one embodiment, a computer and communication system **800** includes a processor **802**, a memory **804**, and a storage device **806**. Storage device **806** stores a number of applications, such as applications **810** and **812**. Storage device **806** also stores a machine learning module **402**, mapper **314**, dependency system **410**, context graph **406**, RESTful WebAPI **408**, and recommender **824**. During operation, one or more applications are loaded from storage device **806** into memory **804** and then executed by processor **802**. While executing the program, processor **802** performs the aforementioned functions. Computer and communication system **800** is coupled to an optional display **815**, keyboard **816**, and pointing device **818**.

The data structures and code described in this detailed description are typically stored on a computer-readable storage medium, which may be any device or medium that can store code and/or data for use by a computer system. The computer-readable storage medium includes, but is not limited to, volatile memory, non-volatile memory, magnetic and optical storage devices such as disk drives, magnetic tape, CDs (compact discs), DVDs (digital versatile discs or digital video discs), or other media capable of storing computer-readable media now known or later developed.

The methods and processes described in the detailed description section can be embodied as code and/or data, which can be stored in a computer-readable storage medium as described above. When a computer system reads and executes the code and/or data stored on the computer-readable storage medium, the computer system performs the methods and processes embodied as data structures and code and stored within the computer-readable storage medium.

Furthermore, methods and processes described herein can be included in hardware modules or apparatus. These modules or apparatus may include, but are not limited to, an application-specific integrated circuit (ASIC) chip, a field-programmable gate array (FPGA), a dedicated or shared processor that executes a particular software module or a piece of code at a particular time, and/or other programmable-logic devices now known or later developed. When the hardware modules or apparatus are activated, they perform the methods and processes included within them.

The foregoing descriptions of various embodiments have been presented only for purposes of illustration and description. They are not intended to be exhaustive or to limit the present invention to the forms disclosed. Accordingly, many modifications and variations will be apparent to practitioners skilled in the art. Additionally, the above disclosure is not intended to limit the present invention.

What is claimed is:

**1**. A method, comprising:
receiving, from a mobile device, event data derived from contextual data collected using detectors that detect a physical context surrounding the mobile device;
modifying a context graph that stores facts and assertions about a user's behavior and interests using the event data;
in response to determining that there exists a registration for notification of changes that matches the modification to the context graph, sending a notification of context graph change to a recommender.

**2**. The method of claim **1**, further comprising:
receiving, from the mobile device, additional event data including application event data and/or operating system event data;
modifying the context graph based on the additional event data;
determining that the modification to the context graph matches the registration; and
sending a second notification of context graph change to the recommender.

**3**. The method of claim **1**, wherein the event data includes high-level event data generated by the mobile device from contextual data.

**4**. The method of claim **1**, further comprising:
receiving a query for context graph data from the recommender; and
sending the context graph data to the recommender.

**5**. The method of claim **1**, further comprising:
receiving real-time event data through a RESTful WebAPI; and
modifying the context graph based on the received real-time event data.

**6**. The method of claim **1**, further comprising:
receiving bulk upload of event data through an event posting interface; and
modifying the context graph based on the received bulk upload event data.

**7**. A non-transitory computer-readable storage medium storing instructions that when executed by a computer cause the computer to perform a method, the method comprising:

receiving, from a mobile device, event data derived from contextual data collected using detectors that detect a physical context surrounding the mobile device;

modifying a context graph that stores facts and assertions about a user's behavior and interests using the event data;

in response to determining that there exists a registration for notification of changes that matches the modification to the context graph, sending a notification of context graph change to a recommender.

**8**. The non-transitory computer-readable storage medium of claim **7**, wherein the computer-readable storage medium stores additional instructions that, when executed, cause the computer to perform additional steps comprising:

receiving, from the mobile device, additional event data including application event data and/or operating system event data;

modifying the context graph based on the additional event data;

determining that the modification to the context graph matches the registration; and

sending a second notification of context graph change to the recommender.

**9**. The non-transitory computer-readable storage medium of claim **7**, wherein the event data includes high-level event data generated by the mobile device from contextual data.

**10**. The non-transitory computer-readable storage medium of claim **7**, further comprising:

receiving a query for context graph data from the recommender; and

sending the context graph data to the recommender.

**11**. The non-transitory computer-readable storage medium of claim **7**, further comprising:

receiving real-time event data through a RESTful WebAPI; and

modifying the context graph based on the received real-time event data.

**12**. The non-transitory computer-readable storage medium of claim **7**, further comprising:

receiving bulk upload of event data through an event posting interface; and

modifying the context graph based on the received bulk upload event data.

**13**. A computing system comprising:

one or more processors,

a non-transitory computer-readable medium coupled to the one or more processors having instructions stored thereon that, when executed by the one or more processors, cause the one or more processors to perform operations comprising:

receiving, from a mobile device, event data derived from contextual data collected using detectors that detect a physical context surrounding the mobile device;

modifying a context graph that stores facts and assertions about a user's behavior and interests using the event data;

in response to determining that there exists a registration for notification of changes that matches the modification to the context graph, sending a notification of context graph change to a recommender.

**14**. The computer-readable storage medium of claim **13**, wherein the computer-readable storage medium stores additional instructions that, when executed, cause the computer to perform additional steps comprising:

receiving, from the mobile device, additional event data including application event data and/or operating system event data;

modifying the context graph based on the additional event data;

determining that the modification to the context graph matches the registration; and

sending a second notification of context graph change to the recommender.

**15**. The computer-readable storage medium of claim **13**, wherein the event data includes high-level event data generated by the mobile device from contextual data.

**16**. The computer-readable storage medium of claim **13**, wherein the computer-readable storage medium stores additional instructions that, when executed, cause the computer to perform additional steps comprising:

receiving a query for context graph data from the recommender; and

sending the context graph data to the recommender.

**17**. The computer-readable storage medium of claim **13**, wherein the computer-readable storage medium stores additional instructions that, when executed, cause the computer to perform additional steps comprising:

receiving real-time event data through a RESTful WebAPI; and

modifying the context graph based on the received real-time event data.

**18**. The computer-readable storage medium of claim **13**, wherein the computer-readable storage medium stores additional instructions that, when executed, cause the computer to perform additional steps comprising:

receiving bulk upload of event data through an event posting interface; and

modifying the context graph based on the received bulk upload event data.

**19**. The method of claim **1**, further comprising:

sending a second notification to the recommender by pushing events into the recommender's publish/subscribe system asynchronously using a long-poll persistent push connection.

**20**. The method of claim **1**, wherein sending the notification comprises notifying the recommender of topological changes in the context graph and/or changes to individual properties of nodes and edges in the context graph.

* * * * *

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing Brief for Xerox Corporation,

1. Complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B). This brief contains 11,840 words, excluding the parts of the brief exempted by FED. R. APP. P. 5(c), 21(d), 27(d)(2), 32(f), and FED. CIR. R. 32(b). Microsoft Word was used to calculate the word count.

2. Complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6). This brief has been prepared in a proportionally-spaced typeface using Microsoft Word in 14-point Times New Roman type style.

Dated: October 30, 2023

*/s/ Joel L. Thollander*
Joel L. Thollander