No. 23-1969

# United States Court of Appeals for the Federal Circuit

**XEROX CORPORATION,**

*Appellant*,

*v.*

**META PLATFORMS, INC., f/k/a FACEBOOK, INC.,**

*Appellee.*

*On Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board, in Case No. IPR2021-01461*

**BRIEF FOR APPELLEE META PLATFORMS, INC.**

Heidi L. Keefe
Mark R. Weinstein
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304
650-843-5000
hkeefe@cooley.com
mweinstein@cooley.com

Phillip E. Morton
COOLEY LLP
1299 Pennsylvania Ave NW
Suite 700
Washington, DC 20004
202-842-7800
pmorton@cooley.com

*Attorneys for Meta Platforms, Inc.*

## PATENT CLAIMS AT-ISSUE

**U.S. Patent No. 9,208,439 B2 (the '439 Patent)**
**(Claim 1 Treated as Representative by the Board)**

1. A method, comprising:

receiving, from a mobile device, event data derived from contextual data collected using detectors that detect a physical context surrounding the mobile device;

modifying a context graph that stores facts and assertions about a user's behavior and interests using the event data;

in response to determining that there exists a registration for notification of changes that matches the modification to the context graph, sending a notification of context graph change to a recommender.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2023-1969

**Short Case Caption** Xerox Corp. v. Meta Platforms, Inc. fka Facebook, Inc.

**Filing Party/Entity** Meta Platforms, Inc.

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 02/09/2024

Signature: /s/ Heidi L. Keefe

Name: Heidi L. Keefe

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Meta Platforms, Inc.(fka Facebook, Inc.) | N/A | N/A |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Cooley LLP | Lowell Mead | Emily Terrell |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below) ☐ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| None | | |
| | | |

# TABLE OF CONTENTS

**Page**


I. INTRODUCTORY STATEMENT ..... 1

II. STATEMENT OF RELATED CASES ..... 1

III. JURISDICTIONAL STATEMENT ..... 2

IV. COUNTERSTATEMENT OF THE ISSUES ..... 3

V. COUNTERSTATEMENT OF THE CASE ..... 3

A. Overview of the ’439 Patent ..... 3

B. The Prior Art ..... 8

1. Cheng ..... 8

2. Falchuk ..... 10

C. Proceedings Before the PTAB. ..... 14

VI. SUMMARY OF ARGUMENT ..... 14

VII. ARGUMENT ..... 19

A. Standard of Review ..... 19

B. Substantial Evidence Supports the Board’s Finding that the Prior Art Renders the Context Graph Limitation. ..... 20

1. Because the Board Properly Applied the Agreed-Upon Definitions of “Facts” and “Assertions,” There Is No Claim Construction Issue to Review. ..... 21

2. Substantial Evidence Supports the Board’s Finding That Cheng Discloses “Facts and Assertions.” ..... 28

3. Xerox’s Procedural Arguments Are Meritless and Unreviewable. ..... 29

C. Substantial Evidence Supports the Board’s Finding That the Prior Art Discloses and Renders Obvious the Claimed Notification of Claim Limitation 1[c]. ..... 33

1. The Cheng-Falchuk Combination Discloses the Claimed “Notification of Context Graph Change.” ..... 37

2. Substantial Evidence Supports the Board’s Findings that Cheng and Falchuk Are Properly Combinable. ..... 41

VIII. CONCLUSION ..... 47

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied Erecting & Dismantling Co., Inc. v. Genesis Attachments, LLC*, 825 F.3d 1373 (Fed. Cir. 2016) ....................35

*In re Cree, Inc.*, 818 F.3d 694 (Fed. Cir. 2016) .................... 20, 27

*DuPuy Spine, Inc. v. Medronic Sofamor Danek, Inc.*, 567 F.3d 1314 (Fed. Cir. 2009) ....................36

*Elbit Sys. of Am., LLC v. Thales Visonix, Inc.*, 881 F.3d 1354 (Fed. Cir. 2018) ....................26

*In re Fulton*, 391 F.3d 1195 (Fed. Cir. 2004) ....................36

*In re Gartside*, 203 F.3d 1305 (Fed. Cir. 2000) ....................19

*Hewlett-Packard Co. v. Mustek Sys., Inc.*, 340 F.3d 1314 (Fed. Cir. 2003) .................... 27, 43

*Intel Corp. v. PACT XPP Schweiz AG*, 61 F.4th 1373 (Fed. Cir. 2023) ....................20

*Monsanto Tech. LLC v. E.I. DuPont de Nemours & Co.*, 878 F.3d 1336 (Fed. Cir. 2018) ....................20

*ParkerVision, Inc. v. Qualcomm Inc.*, 903 F.3d 1354 (Fed. Cir. 2018) .................... 27, 43

*Personalized User Model, LLP v. Google Inc.*, 797 F.3d 1341 (Fed. Cir. 2015) ....................30

*Personalized User Model, LLP v. Google Inc.*, Civ. No. 09-525-LPS (D. Del. Jan. 25, 2012) (ECF No. 348) ....................30

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Uniloc 2017 LLC v. Facebook Inc.*,
989 F.3d 1018 (Fed. Cir. 2021) .......... 19

*Velander v. Garner*,
348 F.3d 1359 (Fed. Cir. 2003) .......... 28

*Xerox Corp. v. Meta Platforms, Inc.*,
No. 2:20-cv-10753 (C.D. Cal. Nov. 25, 2020) .......... 1

*Xerox Corp. v. X Corp.,* f/k/a/ *Twitter, Inc.*, No. 2:20-cv-10754
(C.D. Cal. Nov. 25, 2020) .......... 2

*Yorkey v. Diab*,
601 F.3d 1279 (Fed. Cir. 2010) .......... 28

**Statutes**

35 U.S.C. § 103 .......... 9

**Other Authorities**

Rule
47.4(a)(5) .......... 1
47.5(b) .......... 1

## I. INTRODUCTORY STATEMENT

The Board's comprehensive Final Written Decision correctly found all challenged claims of U.S. Patent No. 9,208,439 B2 ("'439 patent") invalid based on obviousness. Xerox's primary challenge on appeal rests on an argument the Board rejected based on the very claim constructions to which Xerox agreed. Because the Board's decision was correct and supported by substantial evidence, it should be affirmed in its entirety.

## II. STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.4(a)(5) and 47.5(b), counsel for Appellee Meta Platforms, Inc. states:

(1) Appellee Meta Platforms, Inc. ("Meta")[1] and Appellant Xerox Corporation ("Xerox") are parties to a pending district court action, *Xerox Corp. v. Meta Platforms, Inc.*, No. 2:20-cv-10753 (C.D. Cal. Nov. 25, 2020), in which Xerox is asserting the '439 patent. This case is currently stayed pending the outcome of this IPR and several other IPRs relating to other Xerox patents-in-suit. A final decision here affirming the PTAB Final Written

[1] The IPR petition was filed by "Facebook, Inc.," which changed its name to "Meta Platforms, Inc." in October 2021. Meta has filed a motion to amend the case caption to reflect the name change. In the interests of consistency, this brief will refer to "Meta" when referencing the positions taken by appellee during the IPR proceeding before the name change.

Decision would impact Xerox's claims of infringement in the district court against Meta with respect to the '439 patent.

(2) The '439 patent is also the subject of two other IPR proceedings, both of which resulted in Final Written Decisions finding the challenged claims unpatentable, both subject to pending appeals before this Court: *Xerox Corp. v. X Corp.*, No. 23-1968 (Fed. Cir.), and *Xerox Corp. v. Snap, Inc.*, No. 23-1967 (Fed. Cir.). A final decision affirming either of those appeals could impact the present appeal, as each of those appeals involves the same challenged claims of the '439 patent at issue here.

(3) The '439 patent is also the subject of two other pending district court litigations not involving Meta: *Xerox Corp. v. X Corp., F/K/A Twitter, Inc.*, No. 2:20-cv-10754 (C.D. Cal. Nov. 25, 2020), and *Xerox Corp. v. Snap, Inc.*, No. 2:20-cv-10755 (C.D. Cal. Nov. 25, 2020). Both of those litigations are currently stayed pending the outcome of IPRs filed by Snap and Twitter/X against the '439 patent identified in (2).

## III. JURISDICTIONAL STATEMENT

Meta agrees that this Court has jurisdiction over Xerox's appeal.

## IV. COUNTERSTATEMENT OF THE ISSUES

1. Did substantial evidence support the Board's finding that Cheng discloses a context graph with "facts and assertions" as recited in claim limitation 1[b]?

2. Did the Board correctly find that the step of "sending a notification of context graph change to a recommender," as recited in claim limitation 1[c], does not require that the claimed notification contain any particular content?

3. Did substantial evidence support the Board's finding that a skilled artisan would have been motivated to combine Cheng with Falchuk?

## V. COUNTERSTATEMENT OF THE CASE

### A. Overview of the '439 Patent

The '439 patent generally relates to computing systems that utilize "contextual" information obtained by mobile devices. (Appx75 ('439), 1:8-12.) "Contextual" information includes data that "describes a computing context detected by a mobile device client, such physical surroundings and/or application and/or operating system context." (Appx75 ('439), 2:60-63.)

The Background section of the '439 patent acknowledges that "mobile devices equipped with technology to detect physical surroundings [had] become more pervasive in our everyday lives," such that "software on the mobile devices that detect and make use of physical surroundings can

increasingly contribute to improving the lifestyle of mobile device users." (Appx75 ('439), 1:14-18.) Indeed, by the time the application for the '439 patent was filed in April 2013, mobile devices such as the Apple iPhone had been on the market for several years.

The Background of the patent further acknowledges that "context-aware" mobile devices were known. (Appx75 ('439), 1:21-33.) A context-aware mobile device, according to the patent "detects the computing environment and adapts to changing conditions detected from the environment, such as location and movement of the mobile device, nearby devices, and other surrounding conditions." (Appx75 ('439), 1:22-26.) "A user model describes user activity and interests at different points in time, including present and future activity. The system may recommend activities, such as leisure activities, based on the user model." (Appx75 ('439), 1:28-33.)

The '439 patent purports to provide a system for "providing user information to a recommender." (Appx75 ('439), 1:38-39.) Figure 6 of the '439 patent shows the steps of the alleged invention:




**FIG. 6**

(Appx72 ('439), Fig. 6.)

Figure 6 above "presents a flowchart illustrating an exemplary process of event processing on a server, according to an embodiment." (Appx79 ('439), 9:14-16.) Step **602** shows the server receiving event data from clients. ('439, 9:16-17; *see also* Appx76 ('439), 4:3-9.) Client devices can collect event data

using "physical detectors such as GPS **202**, accelerometer **204**, and compass **206**." (Appx76 ('439), 4:10-11.) An event can include, for example, location-specific events based on GPS events. (Appx76 ('439), 4:53-55.) At step **604**, this event data is stored and processed. (Appx79 ('439), 9:18-19.) "The server may analyze the event data, either by performing real-time analysis or analyzing in batch mode." (Appx79 ('439), 9:19-21.)

The next two steps (**606**, **608**) are the key steps for purposes of the issues raised by Xerox on appeal. In the first of these steps, "[t]he server can update context graph **406** using the event data (operation **606**)." (Appx79 ('439), 9:23-25.) The '439 patent describes the context graph **406** in one embodiment as a "per-user, in-memory, graph-based model that stores facts and assertions about user behavior and actions," and "a database of information about the user." (Appx78 ('439), 7:26-29.) "For example, context graph **406** may include data relating to the personal habits of the user. Such data may include that a user tends to drink coffee at four o'clock, or that the user tends to go to work at two o'clock." (Appx78 ('439), 7:29-33.)

In the final step **608** in Figure 6, after the context graph **406** has been updated based on the event data, the server can send the context graph **406** data to recommenders. (Appx79 ('439), 9:26-28; *see also id*, 9:28-29 ("When the

graph changes, the system can send the new graph data to relevant recommenders.").) The patent describes a "recommender" as "an application that recommends items or activities for a user." (Appx76 ('439), 3:23-25.) "The recommenders can then form new recommendations using the new graph data." (Appx79 ('439), 9:30-31.)

Meta's IPR petition challenged claims 1-5, 7-10, 13-17, and 19-20, with claims 1, 7, and 13 being independent claims. Each of these three independent claims is substantially similar with similar limitations, the only material difference being in the claim type (*i.e.* method, computer-readable medium, system). The Board treated claim 1 as representative (Appx6), and all of Xerox's arguments on appeal are directed to claim 1. That claim generally tracks the steps of Figure 6 discussed above, and recites in its entirety:

> 1. A method, comprising:
>
> **[a]** receiving, from a mobile device, event data derived from contextual data collected using detectors that detect a physical context surrounding the mobile device;
>
> **[b]** modifying a context graph that stores facts and assertions about a user's behavior and interests using the event data;
>
> **[c]** in response to determining that there exists a registration for notification of changes that matches the modification to the context graph, sending a notification of context graph change to a recommender.

(Appx79 ('439), 10:30-40 (Claim 1; bracketed notations (e.g., **[a]**) added).)

### B. The Prior Art

Meta's IPR petition (Appx226-298) relied on a combination of the Cheng and Falchuk references. (Appx234; Appx968-985 (Cheng); Appx986-1000 (Falchuk).) The Board found the challenged claims obvious over this combination. (Appx62-63.)[2]

#### 1. Cheng

Cheng, U.S. Patent Application Publication No. 2013/0018954 A1, is entitled "Situation-Aware User Sentiment Social Interest Models." (Appx968.) Cheng describes a system similar to the '439 patent for constructing a "personal interest graph for a user" based on "interests of the user derived from usage data and situational data derived from one or more sensors of the electronic device." (Appx968 (Cheng), Abstract.)

Similar to the '439 patent, Cheng describes a process for collecting data that defines the user "situation" (or "situational state"), such as "outside, afternoon, running, alone, low stress" or "at home, evening, sitting, sad, with

[2] The Board relied on three additional references – Richardson, Shalloway, and Powell – for certain dependent claims. (Appx6-7; Appx38-44.) Xerox does not present any arguments on appeal directed to these references or the dependent claims to which they were applied.

others, high stress." (Appx981 (Cheng), ¶ 0034; *see also id.*, ¶¶ 0031, 0035.) For example, the user's physical activity "may be tracked using a combination of GPS, accelerometer, and gyroscope." (Appx981 (Cheng), ¶ 0035.) The collected information is pre-processed and can be further analyzed to derive the situation best represented by the collected data. (Appx981-982 (Cheng), ¶¶ 0038, 0042; Appx244-247.) For example, the system can "deriv[e] that the user is dancing from one or more accelerometers, deriv[e] that the user is happy from mood sensors," among other examples. (Appx982 (Cheng), ¶ 0042.)

Information about the user's interests is stored in what Cheng refers to as a "personal interest graph." (Appx979 (Cheng), ¶ 0014.) The personal interest graph can also be modified based on situation data. (Appx983 (Cheng), ¶ 0053; Appx256-257.) In one embodiment, the personal interest graph includes nodes and edges; a node "represents a concept," and an edge "connect[s] the two concept nodes [and] represents the ontological relationship between the concepts." (Appx982 (Cheng), ¶ 0045.) Cheng explains, for example, that "a node in the personal interest graph may carry information that indicates the situations in which the user has expressed interests in the concept. The concepts can be extracted by analyzing data associated with a user activity." (Appx982 (Cheng), ¶ 0046.) The IPR petition argued that the

personal interest graph of Cheng disclosed the "**context graph**" recited in the challenged claims of the '439 patent. (Appx250-256.)

Finally, the personal interest graph in Cheng can be "used by applications, such as for predicting user needs, for making recommendations, and for decision making." (Appx983 (Cheng), ¶ 0052; *see also id.*, ¶ 0054 ("…use the models for predicting user needs and making predictive and serendipitous recommendations").) Cheng further explains that "[t]he recommenders can access/interact with the models using technology consistent or interoperable with the encoding/storing technology." (Appx983-984 (Cheng), ¶ 0056.) In one embodiment, "[a]t recommendation time, the client device identifies the current situation, and asks the server/cloud to identify the items for recommendation." (Appx983 (Cheng), ¶ 0055.)

### 2. Falchuk

Falchuk, U.S. Patent No. 8,694,901 B2, is entitled "Method and System for Mashing Up and Presenting Contextual Suggestions to Mobile Users." (Appx986.) Falchuk discloses a system similar to Cheng and the '439 patent for making suggestions (recommendations) based on the context associated with a mobile device. (Appx986 (Falchuk), Abstract.)

The IPR petition relied on Falchuk in combination with Cheng for claim

limitation 1[c], "in response to determining that there exists a registration for notification of changes that matches the modification to the context graph, sending a notification of context graph change to a recommender." The IPR petition observed that (as noted above) Cheng discloses the ability to provide recommendations based on the personal interest graph. (Appx257-258 (citing Appx983-984 (Cheng), ¶¶ 0052, 0054, 0056).) But as explained in the IPR petition and in **Part VII.C.2** below, Cheng does not provide detail about how its recommender interacts with the personal interest graph. (Appx258; Appx557.) Cheng does not specify, for example, how delivery of recommendations is triggered or the timing of their delivery. The IPR petition thus combined Cheng with Falchuk, which describes a system similar to Cheng but provides a more detailed description of its recommendation and notification features. (Appx258-267.)

Like Cheng, Falchuk discloses a "system for determining and presenting contextual suggestions on a mobile device." (Appx996 (Falchuk), 2:24-37; *see also id.*, 2:11-18.) Falchuk's system comprises various components, including "user context," which is a collection of information similar to the personal interest graph in Cheng and the context graph of the '439 patent. (Appx997 (Falchuk), 4:42-46, 61-67.) Falchuk explains that "[b]y user 'context' we mean

a machine readable version of the multitude of information surrounding the daily life of a user." (Appx996 (Falchuk), 2:11-13.) "Examples of user context include user information such as phone number, calendar appointments, physical location, notes, and personal goals, e.g., on matters such as life, financial wellness, and so on." (Appx996 (Falchuk), 2:15-18.)

One of the key features of Falchuk is the ability to specify **goals**, which can be defined by the user or inferred by the system:

> A key part of the system captures the user's "goals" in several ways. These goals can include short term explicitly stated goals, e.g. buy a shirt at The Gap™, short term implicitly inferred goals, e.g. if a shirt is to be bought soon then the credit card must be activated (thus the user sees a notification such as "activate your credit card so that you can buy that shirt you want"), long term explicitly stated goals, e.g., "learn how to play piano", and long term inferred goals.

(Appx998 (Falchuk), 5:28-35.)

Falchuk explains that "events"—such as a change in the user's location—can result in a change to the user context. (Appx996-997 (Falchuk), 4:10-14, 6:17-25 (S5, S6, S7).) Falchuk further explains that, in response to determining that an event resulted in a change to the user context model, a goal resolution component determines whether the event advances a given goal and, if so, causes a notification to be provided:

> As events occur, such as the creation of new scheduled calendar events or a change of location by the user in question, they pass through the system and have some effect on the context, e.g. modify it. Given the goal stored by the system for the user, the goal resolution component **18** scours the user context **22**, possibly applying rules, to see whether a given goal can be advanced by a given event(s). For example, if event e (that just happened) makes goal g possible, then a notification may be readied.

(Appx997 (Falchuk), 4:10-18 (emphasis added); *see* also Appx998 (Falchuk), 6:15-31 ("If a goal-resolution component **18** on the mobile **12** determines that the event has caused a change to context **22** that now allows a goal to be achieved (S7=YES) [in Fig. 4], then the goal-resolution **18** asks for a notification in step S8.").)

The IPR petition argued that it would have been obvious to combine Cheng with Falchuk for the registration and notification features of claim limitation 1[c]. (Appx258-267; Appx899-913, ¶¶ 82-98.) The IPR petition explained that a skilled artisan would have been motivated to combine Cheng to obtain a "clear benefit to the system of Cheng, *e.g.*, timely notifying its recommender about changes to the context graph that are meaningful to the user." (Appx265.) The IPR petition explained that "[t]he notification technique in Falchuk would have enabled the recommender application in Cheng to make a timely recommendation at the time of the context graph

change." (Appx266; *see also* Appx908-911, ¶¶ 94-95.)

### C. Proceedings Before the PTAB.

Meta's IPR petition challenged claims 1-5, 7-10, 13-17, and 19-20 of the '439 patent. (Appx226-298; Appx540-565.) The IPR petition was supported by a detailed analysis from a qualified technical expert. (Appx849-962; Appx1562-1646.) The Board instituted IPR on March 8, 2022. (Appx357-393.) The Board heard oral arguments on December 12, 2022. (Appx710-761.) On March 22, 2023, the Board issued a Final Written Decision finding all challenged claims obvious. (Appx1-65.) This appeal followed.

During the IPR proceedings, Xerox also filed a contingent motion to amend. (Appx45.) The Board denied the motion on the ground that Xerox's proposed substitute claims introduced new matter and were unpatentable under 35 U.S.C. § 103. (Appx45-61.) Xerox does not appeal the Board's denial that motion. (Brief of Xerox Corporation ("Opening Br."), at 21 n.2.)

## VI. SUMMARY OF ARGUMENT

The Board's decision should be affirmed because it is supported by substantial evidence. Xerox's arguments to the contrary lack merit.

***First***, Xerox's primary argument on appeal is that the Board erred in finding that the personal interest graph in Cheng discloses a context graph with

"facts and assertions," as recited in claim limitation 1[b]. (Opening Br. at 21-22, 28-33.) Xerox attempts to recast this argument as a *de novo* issue of claim construction, but it presents no such issue. The experts for both Xerox and Meta ***agreed*** on the definitions of "facts" and "assertions" as those terms are used in the claims of the '439 patent. (Appx13.) As the Board observed, an "**assertion**" is a simply a property of an entity, whereas a "**fact**" is an assertion that is true. (Appx14.) A statement such as "Bill is at the market," therefore, is an assertion and – if true – also a fact. By the terms of the very definitions to which Xerox agreed, therefore, "facts" are a subset of "assertions," and Xerox does not (and cannot) contest this on appeal.[3] (Opening Br. at 29.)

The Board thus correctly held that "in its ordinary and customary meaning, a fact stored in a context graph would be a type of assertion." (Appx15.) The Board's conclusion that Cheng discloses a context graph with "facts ***and assertions***" is thus not reviewable on appeal as it was the logical and inescapable result of applying the definitions to which Xerox agreed during the IPR proceedings. Because there is no legitimate dispute that the context graph

---

[3] Xerox nonsensically argued to the Board that "facts" cannot be "assertions," notwithstanding that the plain language of the definitions of those terms plainly defined the former as a subset of the latter. (Appx15.) Xerox has not renewed that argument on appeal.

in Cheng discloses "facts ***and assertions***,"[4] under the definitions applied by the parties and the Board, Xerox's argument fails.

Xerox nevertheless argues that the Board's analysis improperly reads "assertions" out of the claim and renders that term superfluous, but Xerox is wrong. Xerox relies heavily on *CAE Screenplates, Inc. v. Heinrich Fielder GMBH & Co*., 224 F.3d 1308 (Fed. Cir. 2000), for the proposition that a court should "presume that the use of... different terms in the claims connotes different meanings." *Id.* at 1317. That principle has no application here because, as the Board made clear, "facts" and "assertions" ***do*** have different meanings. (Appx15-16.) The Board's decision merely acknowledged that, as a practical reality when applying a prior art reference or a practicing system to claim limitation 1[b], it is possible for certain information to qualify as both facts and assertions. Xerox cites no precedent suggesting anything improper about this outcome – which flows both logically and inescapably from the definitions Xerox itself applied during the IPR proceedings.

---

[4] As noted in **Part VII.B.3** *infra*, Meta alternatively argued that, even if the claim required a separate identification of different information for the claimed "facts" and the claimed "assertions," Cheng would satisfy any such requirement. (Appx26 n.11; Appx549-551; Appx1580-1582, ¶¶ 25-27.) The Board ultimately found it unnecessary to reach these alternative arguments in light of its application of the agreed-upon definitions. (Appx26 & n.11.)

***Second***, Xerox argues that the Board erred in construing the phrase, "notification of context graph change," as recited in claim limitation 1[c]. (Opening Br. at 22-23, 33-36.) Xerox argues that the claimed notification must include specific content identifying or describing the context graph change that occurred. But the Board correctly found that the plain claim language imposes no such requirement. (Appx33.)

For example, email programs commonly emit an audible "ding" or other sound to indicate that a new email message has been received. That ding provides "***a notification of***" a new message being added to the user's inbox, even though the ding ***itself*** conveys no information about what it represents. It is interpreted by the system and understood by the user as "***a notification of***" a particular type of change to the status of the user's inbox, *i.e.*, the addition of a new incoming message. Xerox's attempt on appeal to rewrite the plain claim language to recite "notification ***describing*** context graph change," or "notification ***detailing*** context graph change," fails.

It is undisputed that in the Cheng-Falchuk combination, the notification is triggered by a context graph change (such as a change in the user's location). That notification can indicate that a goal previously defined for the user (such as picking up a prescription) is now possible because of the context graph

change. (Appx997 (Falchuk), 4:10-18; *see also* Appx260-261; Appx554-555.) Similar to the ding provided by an email program, providing a notification to do something, such as pick up a prescription, is a notification of a context graph change because it is based on the user now being located near the pharmacy. Nothing more is required by the claim language.

Xerox also contends that the Board did not articulate a sufficient rationale and motivation for combining Cheng with Falchuk for claim limitation 1[c]. (Opening Br. at 24-26, 45-51.) But this Court's precedents make clear that the amount of explanation required by the Board necessarily depends on the context. *See, e.g.*, *Paice LLC v. Ford Motor Co.*, 881 F.3d 894, 905-06 (Fed. Cir. 2018). The Board's finding that Cheng and Falchuk are properly combinable flowed directly from its acceptance of Meta's arguments and its rejection of Xerox's, which were detailed over several pages of the Final Written Decision. (Appx30-35.) Xerox framed its challenge to the Cheng-Falchuk combination around its contention that a skilled artisan would not have combined because, according to Xerox, Falchuk did not provide any feature relating to timely notifications that Cheng itself did not already disclose – which the Board rejected. (Appx34-35.) As in *Paice*, "[t]he Board's obviousness determinations flow directly from its rejection of [Xerox's]

arguments, and the Board's analysis is commensurate with [Xerox's arguments]." 881 F.3d at 905. Because Xerox has not shown any flaw in the Board's findings, let alone one that could deprive them of substantial supporting evidence, the Board's decision must be affirmed.

## VII. ARGUMENT

### A. Standard of Review

Obviousness is a question of law based on underlying questions of fact. *Uniloc 2017 LLC v. Facebook Inc.*, 989 F.3d 1018, 1031 (Fed. Cir. 2021); *In re Gartside*, 203 F.3d 1305, 1316 (Fed. Cir. 2000). "What the prior art discloses and whether a person of ordinary skill in the art would have been motivated to combine prior-art references are both fact questions that [the Court] review[s] for substantial evidence." *Bot M8 LLC v. Sony Interactive Ent. LLC*, 66 F.4th 1380, 1384 (Fed. Cir. 2023).

Substantial evidence is "something less than the weight of the evidence but more than a mere scintilla of evidence," which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Monsanto Tech. LLC v. E.I. DuPont de Nemours & Co.*, 878 F.3d 1336, 1341 (Fed. Cir. 2018) (citation omitted). If two inconsistent conclusions may be reasonably drawn from the record evidence, the Board's "decision to

favor one conclusion over the other is the epitome of a decision that must be sustained upon review for substantial evidence." *Id.* (citing *In re Cree, Inc.*, 818 F.3d 694, 701 (Fed. Cir. 2016)).

This Court reviews the Board's ultimate claim construction rulings under a *de novo* standard. *Knowles Elecs. LLC v. Cirrus Logic, Inc.*, 883 F.3d 1358, 1361 (Fed. Cir. 2018). When the PTAB looks beyond the intrinsic record and consults extrinsic evidence, such as testimony, the underlying factual findings are reviewed for substantial evidence. *Id.*

### B. Substantial Evidence Supports the Board's Finding that the Prior Art Renders the Context Graph Limitation.

Xerox's arguments on appeal focus primarily on claim limitation 1[b], which recites the step of "modifying a context graph that stores <u>facts and assertions</u> about a user's behavior and interests using the event data." (Appx79 ('439), 10:34-36 (emphasis added).) Xerox contends that the prior art does not disclose a context graph that stores "facts ***and*** assertions" because, according to Xerox, this claim language requires that separate and distinct information be identified for the claimed "facts" and the claimed "assertions." (Opening Br.

at 28-33, 38-42.) Xerox is wrong.[5]

#### 1. Because the Board Properly Applied the Agreed-Upon Definitions of "Facts" and "Assertions," There Is No Claim Construction Issue to Review.

In an attempt to avoid deferential substantial evidence review, Xerox attempts to characterize its "facts and assertions" argument as involving a *de novo* issue of claim construction – but it does not. All parties and the Board ***agreed*** on the meanings of "facts" and "assertions" for purposes of the '439 patent. (Appx13-15.) Xerox's expert testified that a "**fact**" for purposes of the '439 patent is simply "a stated property of some entity together with some indication that is taken to represent that that property is actually true." (Appx1507-1508, Appx1518 (Martin Depo.), 12:10-24.) He defined an "**assertion**" in remarkably similar terms, as "a stated property of an entity whether or not there is an indication that that property is actually true or not." (Appx1519, 13:2-9.) Meta's expert provided substantially similar definitions

[5] Another claim construction issue arose during the IPR as to the term "context graph," which Xerox argued should be construed as a "per-user, in-memory, graph-based model." (Appx11-12.) Meta argued that the Board did not need to reach that issue because the prior art disclosed Xerox's construction of context graph, even if the Board were adopted it. (Appx543-544.) The Board agreed, and Xerox presents no arguments on appeal about its construction of context graph. (Appx11-12; Opening Br. at 28.) Xerox does not challenge any aspect of the Board's findings with respect to claim limitation 1[b] other than the claimed "facts and assertions."

for both terms. (Appx1562, Appx1578-1579, ¶ 22; Appx3331, Appx3371, 41:9-11.) The Board adopted the parties' positions, observing that "**facts**" and "**assertions**" differed only in that facts have an indication of truth that assertions do not. (Appx14.) Xerox does not dispute any of this on appeal.

These agreed-upon constructions destroy the entire premise of Xerox's argument, *i.e.*, that applying a prior art reference to claim limitation 1[b] necessarily requires identifying separate and distinct pieces of information in the prior art for the claimed "facts" and the claimed "assertions." But under the agreed-upon definitions, "**facts**" are indisputably a subset of "**assertions**," *i.e.*, facts are simply assertions that are believed to be true. As the Board explained, "a disclosure of a collection of facts would meet the term 'facts and assertions' because a person of ordinarily skill in the art would have regarded any subset of facts to also be assertions." (Appx16.) For example, a statement that "Alice is at the courthouse," is an assertion and – if also true – is also a fact.

This point also appears to be undisputed. For example, the Board observed that Meta had argued, in light of these agreed-upon definitions, that "[a] particular stated property could... qualify as both a fact and an assertion. An assertion with an indication of truth, for example, qualifies as a fact."

(Appx14 (quoting Appx548 (Meta Reply), at 7); *see also* Appx1578-1579, ¶¶ 22-23.) The Board further observed that "[Xerox] does not appear to contest this." (Appx14.) Nor does Xerox contest this point on appeal.

There is thus no claim construction issue for this Court to review. The sole question remaining is a purely factual one – reviewed only for substantial evidence – relating to whether the disclosures in Cheng disclose a context graph with the claimed "facts and assertions" under the agreed-upon constructions. *See Bot M8*, 66 F.4th at 1384 ("What the prior art discloses… [is a] fact question[] that we review for substantial evidence."). As noted in **Part VII.B.2** below, Xerox does not dispute that the context graph in Cheng includes "facts," and that under the agreed-upon definition, it therefore also includes "assertions." To the extent Xerox now attempts to argue that no overlap can exist between the claimed "facts" and the claimed "assertions" when applying prior art applied to the claims, Xerox forfeited any such argument through the contrary constructions to which it agreed before the Board.

Xerox's arguments on appeal thus amount to nothing more than an attempt to sidestep the logical and inescapable result of these agreed definitions. For example, Xerox cites to *CAE Screenplates, Inc. v. Heinrich Fielder GMBH & Co.*, 224 F.3d 1308 (Fed. Cir. 2000) for the proposition that

"in the absence of any evidence to the contrary, [a court] must presume that the use of ... different terms in the claims connotes different meanings." *Id.* at 1317. But this principle has no application here because the Board did ***not*** state that "facts" and "assertions" had the same meaning – it stated just the opposite. (Appx15 ("And we agree that the two terms have different meanings in claim 1 based on the plain meaning of each term.").) The Board instead observed the practical reality that a piece of information – based on the agreed-upon definitions – could potentially qualify as both a fact and an assertion. (Appx15-16.) That does not mean that "fact" and "assertion" have identical meanings.

Xerox also argues that the agreed definitions of facts and assertions would render the claimed recitation of "assertions" superfluous. (Opening Br. at 31-32.) But even if those definitions did render assertions superfluous (and they do not as shown below), that would simply be a result of the definitions of "facts" and "assertions" to which Xerox is bound. "The preference for giving meaning to all terms, however, is not an inflexible rule that supersedes all other principles of claim construction." *SimpleAir, Inc. v. Sony Ericsson Mobile Commc'ns. AB*, 820 F.3d 419, 429 (Fed. Cir. 2016). Nevertheless, the Board correctly rejected Xerox's superfluity argument, explaining:

> That claim 1 requires the presence of both "facts" *and* "assertions" does not render the two terms

> superfluous, as this would exclude prior art in which a context graph includes only assertions but not facts. On the other hand, a disclosure of a collection of facts would meet the term "facts and assertions" because a person of ordinary skill in the art would have regarded any subset of facts to also be assertions.

(Appx16 (italics in original).)

Xerox asserts that the second example provided by the Board above (involving "a disclosure of facts") proves its point, but it does not. (Opening Br. at 31-32.) It merely identifies one possible scenario in which overlap can exist between the claimed facts and the claimed assertions. The possibility of overlap between these two categories of information, in one particular situation, does not render the claimed "assertions" superfluous as facts and assertions have different scopes as noted. For example, the first scenario identified by the Board above involves a context graph that does not satisfy the claims because it contains assertions but no facts. Many other scenarios are possible, including a context graph that satisfies the claims by including a combination of "facts" as well as a number of "assertions" that lack a further indication of truth and thus do not also qualify as facts. Xerox's superfluity argument fails.

The other glaring flaw with Xerox's argument is that it has zero support in the intrinsic evidence, as evidenced by the complete absence of any attempt to identify intrinsic support in Xerox's opening brief. The '439 patent does not

suggest any rigid separation between facts and assertions.

"Facts" and "assertions" appear only in two sentences in the entire written description, both of which do little more than restate the claim language. The first mention (in the "Overview" section) merely parrots the "facts and assertions" language of claim 1. (Appx76 ('439), 3:20-22 ("A context graph is an in-memory model that stores <u>facts and assertions about a user's behavior and interests</u>.") (emphasis added).) The second occurrence describes the exemplary context graph **406**, but again, does little more than repeat the language in claim limitation 1[b]:

> Context graph **406** is a per-user, in-memory, graph-based model that stores <u>facts and assertions about user behavior and actions</u>. Context graph **406** is a database of information about the user. For example, context graph **406** may include data relating to the personal habits of the user. Such data may include that a user tends to drink coffee at four o'clock, or that the user tends to go to work at two o'clock.

(Appx78 ('439), 7:26-33 (emphasis added).)

The passage above provides an example in which a context graph may include data relating to the personal habits of the user, such as "that a user tends to drink coffee at four o'clock, or that the user tends to go to work at two o'clock." (Appx78 ('439), 7:29-33.) But the patent does not indicate whether the information in this example (or any other example) comprises "facts,"

"assertions," or both. The patent does not suggest any difference in how facts and assertions are stored or handled by any aspect of the system, let alone how facts can be distinguished from assertions.

In fact, the information in the example above (*i.e.*, "a user tends to drink coffee at four o'clock," and "tends to go to work at two o'clock") qualifies as ***both*** as facts ***and*** assertions because information about the user's tendencies is based on a collection of factual information about their "behavior and actions." (Appx78 ('439), 3:20-22; Appx717-718 (Hearing Tr.), at 8:22-9:19.) For example, the embodiment in the '439 patent collects contextual data for the user based physical detectors "such as a GPS, an accelerometer, and/or a compass." (Appx76 ('439), 3:49-51.) "Such contextual data may indicate that a user is performing certain activities such as, for example, walking, running, or opening an application on the mobile device." (Appx76 ('439), 3:51-54.) Accordingly, information in the context graph about the user's tendency to perform particular activities at particular times indisputably represents factual information, and thus, qualifies as both "facts" and "assertions" as claimed.

That the '439 patent provides no guidance for distinguishing a "fact" from an "assertion" is unsurprising as facts and assertions often overlap in real-world situations, as the examples from the patent itself confirm. (Appx1578-

1579, ¶¶ 21-22.) In light of the complete lack of any disclosure in the written description suggesting any demarcation between "facts" and "assertions," Xerox has no basis to argue that Meta was required to identify separate "facts" from "assertions" in the prior art to satisfy claim limitation 1[b].

### 2. Substantial Evidence Supports the Board's Finding That Cheng Discloses "Facts and Assertions."

The Board found that the personal interest graph in Cheng discloses the claimed "facts and assertions." (Appx24-27.) In particular, the Board found that "by disclosing a context graph comprising a collection of facts, Cheng discloses 'facts and assertions' as recited in claim 1." (Appx27.) The Board observed that Xerox "does not dispute that the ontological relationships in Cheng's personal interest graph constitute 'facts,' but argues that these relationships are not assertions," which the Board rejected as logically incorrect because, as noted, "a 'fact' is a type of assertion." (Appx27.)

Xerox does not challenge the Board's findings on this limitation beyond asserting that it relied on an incorrect claim construction. (Opening Br. at 38.) As noted, Xerox's supposed claim construction argument fails, so too does its challenge to the Board's findings as to this claim limitation.

### 3. Xerox's Procedural Arguments Are Meritless and Unreviewable.

Xerox also devotes several pages to arguing that the IPR petition did not meet the statutory particularity requirements for IPR petitions under 35 U.S.C. § 312(a)(3). (Opening Br. at 38-42.) This argument is frivolous for two reasons. First, the Supreme Court has held that compliance with the particularity requirements of § 312(a)(3) is ***not*** subject to judicial review because such a challenge amounts to a challenge to the Patent Office's unreviewable decision to institute IPR. *See, e.g.*, *ESIP Series 2, LLC v. Puzhen Life USA, LLC*, 958 F.3d 1378, 1386 (Fed. Cir. 2020) ("In [*Cuozzo*], the Supreme Court held that this Court is precluded from reviewing Board decisions concerning the 'particularity' requirement under § 312(a)(3)."); *Cuozzo Speed Techs., LLC v. Lee*, 579 U.S. 261, 276 (2016) ("Cuozzo's claim that [the IPR] petition was not pleaded 'with particularity' under § 312 is little more than a challenge to the Patent Office's conclusion, under § 314(a), that the 'information presented in the petition' warranted review… We therefore conclude that § 314(d) bars Cuozzo's efforts to attack the Patent Office's determination to institute inter partes review in this case.") (internal citations omitted). The Board's express finding that "[Meta's] arguments in the Petition [are] sufficient to meet its particularity requirement under 35 U.S.C.

§ 312(a)(3)" (Appx27) is therefore unreviewable on appeal.

Second, even if there was some basis for Xerox to complain about the particularity of the IPR petition, Xerox identifies no abuse of discretion in the Board's finding that the IPR petition complied with the PTAB's particularity rules. *See, e.g.*, *Rembrandt Diagnostics, LP v. Alere, Inc.*, 76 F.4th 1376, 1382 (Fed. Cir. 2023) ("Decisions related to compliance with the Board's procedures are reviewed for an abuse of discretion.") (citation omitted). Xerox's argument is premised on the false assumption that Meta was obligated in its IPR petition to provide a separate and distinct labeling of "facts" and "assertions" when applying the Cheng prior art reference to the claim. Because the Board correctly determined that the claim language imposes no such requirement as explained in **Part VII.B.1** above, Meta was obviously not required to account for this non-existent limitation in its original IPR petition filing.

The IPR petition explained that the "context graph" in Cheng corresponds to the personal interest graph having both nodes and edges. As the Petition explained, "a node 'represents a concept and an edge connecting the two concept nodes represents the ontological relationship between the concepts.'" (Appx251 (IPR Petition) (quoting Appx982 (Cheng), ¶ 0045); Appx891-892, ¶ 72.) And more specifically with respect to the nodes in the

Cheng interest graph, they "may carry the information that indicates the situations in which the user has expressed interests in the concept," which "can be extracted by analyzing the data associated with a user activity." (Appx251-252 (quoting Appx982 (Cheng), ¶ 0046).) A node may also carry "the information to indicate the degree of a user's interest about the concept represented by the node." (Appx252 (quoting Appx891-892 (Cheng), ¶ 0046).)

Accordingly, the IPR petition actually provided ***more*** specificity about how the claimed "facts and assertions" applied to Cheng, than the '439 patent itself. Xerox's argument about specificity is somewhat ironic given that the written description of the '439 patent, as noted in **Part VII.B.1** above, merely parrots the "facts and assertions" language of the claim and makes no attempt to distinguish facts from assertions. Xerox's argument that claim limitation 1[b] requires identification of separate information for the claimed facts and the claimed assertions, if adopted, would boomerang against Xerox by establishing a lack of adequate written description support for the claimed "facts and assertions" as recited in claim 1.

Nor was the original IPR petition required to anticipate and respond to the failed argument Xerox would later make, *i.e.*, that the claimed "facts" and the claimed "assertions" had to be mapped to separate and different information

in the prior art. This argument was not foreseeable given the plain meaning of "facts" and "assertions," and the absence of any suggestion of separation in the written description. As the Board observed, "[Meta] relied on the ordinary and customary meaning of the term 'facts and assertions' in its Petition, and then when [Xerox] raised an alternative construction of the term in its Response, [Meta] responded to those arguments." (Appx8.) The foreseeability of this argument was further diminished by its lack of merit.

And even if Xerox were to prevail on its argument that claim 1 requires identification of separate information for the claimed "facts" and the claimed "assertions," that argument would not have saved the claims from obviousness. (Appx549 (Meta IPR Reply), at 8 ("But even if the claimed context graph required separate or disjoint information sets for 'facts' and 'assertions,' Cheng would still satisfy such a requirement.") (boldface omitted).) Meta provided at least two different arguments for why Cheng discloses "facts and assertions" under Xerox's narrower interpretation, one of which was articulated by the Board in its own Institution Decision, and both being based on the exact same disclosures from Cheng relied upon in the IPR petition. (Appx549-551 (citing Appx979, Appx982 (Cheng), ¶¶ 0014, 0046); *see also* Appx251-252 (IPR Petition), at 20-21 (citing Appx979, Appx982 (Cheng), ¶¶ 0014, 0045).) The

Board did not need to reach these alternative arguments given its rejection of Xerox's interpretation of "facts and assertions," but to the extent this Court were to adopt Xerox's view, a remand would be required to consider these alternative arguments in the first instance. *See, e.g., Axonics, Inc. v. Medtronic, Inc.*, 75 F.4th 1374, 1384 (Fed. Cir. 2023) (holding that PTAB is obligated to consider an IPR petitioner's arguments and evidence in reply directed to a new claim construction proposed by patent owner after IPR institution).

### C. Substantial Evidence Supports the Board's Finding That the Prior Art Discloses and Renders Obvious the Claimed Notification of Claim Limitation 1[c].

Xerox next argues that the Board erred in finding that the combination of Cheng and Falchuk renders obvious claim limitation 1[c], which recites: "in response to determining that there exists a registration for notification of changes that matches the modification to the context graph, sending a notification of context graph change to a recommender." (Appx79 ('439), 10:37-40.) The Board found this limitation obvious over the Cheng-Falchuk combination. (Appx30-35.) The Board's findings are supported by substantial evidence.

The combination of Cheng and Falchuk, as described in the IPR petition and adopted by the Board, was straightforward. The '439 patent describes the

claimed "recommender" as "an application that recommends items or activities for a user." (Appx76 ('439), 3:23-25.) Cheng discloses a recommender that uses the personal interest graph (mapped to the claimed "context graph"). (Appx257-258; Appx898-899, ¶¶ 80-82; Appx983 (Cheng), ¶ 0052 ("The personal sentiment social and interest graphs built above can then be directly used by applications, such as for predicting user needs, for making recommendations, and for decision making.").) But the IPR petition explained, "Cheng does not provide further detail regarding the interaction between the recommender and the personal interest graph." (Appx258.) For example, Cheng does not provide any detailed disclosure as to how (or when) the delivery of recommendations is triggered. For this reason, the IPR petition combined Cheng with Falchuk.

Falchuk describes a system similar to Cheng "for determining and presenting contextual suggestions on a mobile device." (Appx996 (Falchuk), 2:24-37.) Falchuk's "user context," similar to Cheng's personal interest graph, "stores user context as a series of instances of the meta model of choice" and "can be a hierarchic, rich state model having subtrees, such that each subtree is an instance of a context ontology." (Appx997 (Falchuk), 4:42-46, 4:61-64.)

One of the key features of Falchuk is the ability to specify **goals**, which

can be defined explicitly by the user or inferred by the system:

> A key part of the system captures the user's "goals" in several ways. These goals can include short term explicitly stated goals, e.g. buy a shirt at The Gap™, short term implicitly inferred goals, e.g. if a shirt is to be bought soon then the credit card must be activated (thus the user sees a notification such as "activate your credit card so that you can buy that shirt you want"), long term explicitly stated goals, e.g., "learn how to play piano", and long term inferred goals.

(Appx998 (Falchuk), 5:28-35.)

Like Cheng, Falchuk also explains that "events"—such as a change in a user's location—change the user context model. (Appx997 (Falchuk), 4:10-14.) Falchuk further explains that, in response to determining that an event modifies the user context model, the goal resolution component determines whether the event advances a given goal – which results in a **notification**:

> As events occur, such as the creation of new scheduled calendar events or a change of location by the user in question, they pass through the system and have some effect on the context, e.g. modify it. Given the goal stored by the system for the user, the goal resolution component **18** scours the user context **22**, possibly applying rules, to see whether a given goal can be advanced by a given event(s). For example, if event e (that just happened) makes goal g possible, then a notification may be readied.

(Appx997 (Falchuk), 4:10-18 (emphasis added); *see* also Appx998 (Falchuk),

6:15-31 ("If a goal-resolution component **18** on the mobile **12** determines that the event has caused a change to context **22** that now allows a goal to be achieved (S7=YES) [in Fig. 4], then the goal-resolution **18** asks for a notification in step S8.").)

The combination of Cheng and Falchuk described in the IPR petition was easily understood. As the Board noted, the IPR petition explained that the claimed "registration" of claim 1 corresponded to a goal explicitly entered by a user or inferred by the system as disclosed in Falchuk. (Appx31; Appx262-263.) With respect to the step of "sending a notification of context graph change to a recommender," as noted above, the system in Falchuk reports a notification to the context presentation manager when the user context is modified in a way that advances a goal or allows a goal to be achieved, which in turn can result in a recommendation being presented to the user. (Appx31; Appx263-264.) The IPR petition further explained that a skilled artisan would have been motivated to add Falchuk's registration and notification features to Cheng, in order to provide timely notifications about changes to the Cheng context graph that are meaningful to the user. (Appx31-32; Appx265-267; Appx907-910, ¶¶ 92-95.)

The Board found that "the combination of Cheng and Falchuk teaches

limitation 1[c]," and that Meta "has sufficiently articulated a reason why a person of ordinary skill would have modified Cheng by incorporating Falchuk's system for providing goal-based recommendations associated with changes in Cheng's personal interest graph." (Appx35.) Xerox provides two challenges to the Board's decision, both of which lack merit.

**1. The Cheng-Falchuk Combination Discloses the Claimed "Notification of Context Graph Change."**

Xerox first argues that the claimed "registration" and "notification" of claim 1 are for changes to a context graph. Falchuk does not disclose this, according to Xerox, because its registration and notification in Falchuk relate to a goal – not a change to the context graph. (Opening Br. at 43-44.) Xerox argues that the claimed notification must include content specifically identifying or describing the change to the context graph. (*Id.*)

Xerox argued to the Board, for example, that "the registration and notification [must] be limited to the specific change to the particular aspect of the context graph that was modified in the earlier claim step." (Appx640-641 (Patent Owner Sur-Reply), at 15-16.) When making this argument to the Board, Xerox posited the following hypothetical: "if Falchuk's system senses a change in location, Falchuk is not sending notifications that the user's location has changed," but instead, is "sending a notification to pick up a

prescription, pick up dinner, mail a package, or clean the car." (Appx484 (Patent Owner Response), 32.) But as described below, a notification that a goal (*e.g.*, picking up a prescription) is now possible because of a context graph change clearly qualifies as a "notification ***of*** context graph change," as claimed.

This is consistent with the plain and ordinary meaning of the claim language. For example, email programs commonly emit an audible "ding" or other sound when a new email message is received. That ding clearly provides "***a notification of***" a new message being added to the user's inbox, even though the ding ***itself*** conveys no information about what it represents. It is plainly treated by the system and understood by the user as "***a notification of***" a particular type of change to the status of the user's inbox, *i.e.*, addition of a new incoming message. (Appx726-727 (Hr'g Tr.), at 17:14-18:3.)

And using the examples provided by Xerox to the Board, providing a notification to do something, such as pick up a prescription or dinner, is a notification ***of*** a context graph change because the notification occurred because of the context graph change, *i.e.*, because the user is now located near the pharmacy or restaurant. It is undisputed that, in Falchuk, the notification occurs as a direct result of the change to the context graph such as a change in user location:

> As events occur, such as the creation of new scheduled calendar events or a change of location by the user in question, they pass through the system and have some effect on the context, e.g. modify it. Given the goal stored by the system for the user, the goal resolution component **18** scours the user context **22**, possibly applying rules, to see whether a given goal can be advanced by a given event(s). For example, if event e (that just happened) makes goal g possible, then a notification may be readied.

(Appx997 (Falchuk), 4:10-18; *see also* Appx260-261.) As the IPR Petition explained, "a notification [in Falchuk] is provided when the user context model is modified in a way that the system determines advances a goal or allows a goal to be achieved." (Appx263 (citing Appx904-905, ¶ 88).)

Nothing in the claim language, "notification of context graph change," requires that the notification include content detailing a particular change to the context graph, such as "change XXXX occurred to node #YYYY in the context graph," as Xerox appears to suggest. A more useful notification triggered by a context graph change, such as recommending that the user pick up a prescription or dinner using Xerox's examples, clearly qualifies as a "notification of context graph change" because that notification was the direct result of the change in the context graph, *i.e.*, the user's change in location. (Appx554-555; Appx1585-1587, ¶¶ 33-34.)

As the Board correctly concluded, "claim 1 does not impose any

particular form or content on the notification of a context graph change," it "simply recites 'sending a notification of context graph change to a recommender.'" (Appx33 (citing Appx79 ('439), 10:39-40).) The Board correctly concluded that "by the plain claim language, any notification that alerts the recommender that the context graph has changed in a manner matching the registration is sufficient to meet limitation 1[c], whatever the content of that notification." (Appx33.)

Xerox argues that the Board's decision "renders meaningless the claim's express recitation of the *content of the notification*: it must be a notification '*of context graph change*.'" (Opening Br. at 44-45 (italics in original).) But this argument misses the point – there is nothing in the claim reciting anything about the ***content*** of the notification. Had Xerox intended to limit the content of the notification in this manner, it would have written the claim differently: for example, to recite sending a "notification ***describing*** context graph change," or a "notification ***detailing*** context graph change," or words to similar effect. But claim instead recites "notification ***of*** context graph change," which on its face does not require that the notification include any particular content, let alone content referencing or describing the change to the context graph.

### 2. Substantial Evidence Supports the Board's Findings that Cheng and Falchuk Are Properly Combinable.

Xerox next argues that the Board did not articulate a sufficient rationale for combining Cheng and Falchuk, and contends that the Board's obviousness analysis was confined to a single sentence of its decision. (Opening Br. at 46-47.) But this argument is based on a myopic reading of the Board's decision, which was supported by substantial evidence.

As this Court held in *Paice LLC v. Ford Motor Company*, 881 F.3d 894, 905 (Fed. Cir. 2018), the amount of explanation required by the Board necessarily depends on the context. For example, "[a] brief explanation may do all that is needed if, for example, the technology is simple and familiar and the prior art is clear in its language and easily understood." *Id.* (citation omitted). *Paice* went on to reject an argument that the Board provided an insufficient explanation when, as here, "[t]he Board's obviousness determinations flow directly from its rejection of [patent owner's] arguments, and the Board's analysis is commensurate with [patent owner's] arguments." *Id.* And in *Paice*, as here, "the Board's decisions here cite to the relevant portions of [petitioner's] briefing that explain how the prior art discloses the relevant claim limitations," and concluded that "[i]n this context, the Board's analysis is readily discernible and sufficient…." *Id.* at 905-06.

The Board's finding that Cheng and Falchuk are combinable is similar to *Paice* in that it flowed directly from its acceptance of Meta's arguments and rejection of Xerox's, which were described in detail over several pages of the Final Written Decision. (Appx30-35.) The key argument Xerox provided against the Cheng-Falchuk combination, as noted by the Board, was that "there is nothing in Cheng to suggest its recommendations are untimely such that it needs to be combined with Falchuk." (Appx33 (quoting Appx486 (Patent Owner Response), at 33-34.) Xerox further argued that "Cheng's recommendations are always timely because they are made with real-time, current data." (Appx33 (quoting Appx486 (Patent Owner Response), at 34; *see also* Appx487 (Patent Owner Response), at 35 ("There would therefore be no need for one to look to Falchuk, and even if a POSITA did consult Falchuk, one would not dispose of Cheng's teachings regarding recommendations in favor of Falchuk's.").)

Xerox thus framed its entire challenge to the motivation to combine around a single proposition it viewed as dispositive – that Falchuk's recommendation and notification disclosures did not provide anything that Cheng alone did not already disclose. The Board directly responded to that issue by finding that "Cheng provides little detail about how its recommender

would interact with its personal interest graph" (Appx34), which effectively disposed of Xerox's argument against the proposed combination with Falchuk. The Board explained in that same sentence that "a person of ordinary skill in the art would have had reason to look to other references, particularly Falchuk, to fill in the missing details" (Appx34-35), with the "missing details" referring again to how the Cheng recommender interacts with its personal interest graph. Xerox does not challenge any of these findings on appeal, and under *Paice*, they are sufficient in light of the context in which Meta and Xerox presented their respective arguments to the Board.

This Court has held that "[t]he motivation to combine references can be inferred from the fact that they address the same problem." *In re Kurzweil*, 4 F. App'x 823, 826 (Fed. Cir. 2001) (citing *Pro-Mold & Tool Co. v. Great Lakes Plastics, Inc.*, 75 F.3d 1568, 1573 (Fed. Cir. 1996)); *see also In re Inland Steel Co.*, 265 F.3d 1354, 1362 (Fed. Cir. 2001) ("The motivation to combine particular references may come 'from the nature of the problem to be solved, leading inventors to look to the references relating to possible solutions to that problem.'") (quoting *Pro-Mold & Tool*, 75 F.3d at 1573). The Board articulated a sufficient rationale that, in light of the lack of detail in Cheng about how its recommender interacts with its personal interest graph, a skilled artisan

"would have had reason to look to other references, particularly Falchuk, to fill in the missing details." (Appx34-35.) Cheng and Falchuk both address the same problems through similar systems for providing recommendations based on contextual data. (Appx265; Appx907-912, ¶¶ 92-93, 96.)[6]

The Board also observed and summarized the IPR petition's explanation that a skilled artisan "would have recognized in Falchuk 'a clear benefit to the system of Cheng, e.g., timely notifying its recommender about changes to the context graph that are meaningful to the user.'" (Appx31 (quoting Appx265 (IPR Petition), at 34 (citing Appx908-909, ¶ 94).) The Board also summarized Meta's arguments that the proposed Cheng-Falchuk combination would have obviated the need for the user to expressly request recommendations, resulting in more timely recommendations. (Appx31-32.)

Xerox asserts that the Board did not adopt Meta's argument about the

---

6 Xerox also suggests that what Xerox calls the "fill in the missing details" theory was first articulated by Board without proper notice. (Opening Br. at 49.) This is false, as Meta consistently pointed to the absence of detail in Cheng as a key reason Falchuk was relied upon for claim limitation 1[c]. (Appx258 (IPR Petition) ("But Cheng does not provide further detail regarding the interaction between the recommender and the personal interest graph."); Appx907-908, ¶ 92 ("[A] person of ordinary skill in the art, seeking to implement, adapt or improve the system of Cheng, would have naturally looked to Falchuk for its teachings").) Meta also properly raised the lack of detail argument in reply to Xerox's argument that Cheng itself already discloses timely and automatic notifications. (Appx556-557 (Petitioner Reply).)

benefit of timely notifications, but this assertion again ignores the context in which Meta and Xerox addressed this argument. (Opening Br. at 47-49.) As noted, Xerox rested its argument against the Cheng-Falchuk combination on the proposition that Falchuk had nothing to add to Cheng with respect to delivery of timely notifications. Whether or not the Board explicitly adopted Meta's timely notification theory is beside the point, as the Board's rejection of Xerox's argument, *i.e.*, that Cheng alone was sufficient without having to consult Falchuk, removed Xerox's barrier against the combination. The Board's decision thus rejected Xerox's contention that Cheng alone disclosed timely and automatic notifications, leaving no reason to consult Falchuk.

Xerox also attacks the Board's rationale by explaining that it rests on the assumption that "Cheng and Falchuk operate similarly," but according to Xerox, the combination would have fundamentally changed the way Cheng works. (Opening Br. at 52-53.) Xerox never raised this argument before the Board, and as such, this argument should be rejected. *See Acoustic Tech., Inc. v. Itron Networked Sols., Inc.*, 949 F.3d 1360, 1364 (Fed. Cir. 2020) ("We have 'frequently declined to hear arguments that the applicant failed to present to the Board.'") (quoting *In re Watts, Jr.*, 354 F.3d 1362, 1367 (Fed. Cir. 2004)).

The fact that this argument was never raised below is confirmed by the

fact that Xerox's sole support is an out-of-context quotation of Meta's argument at the oral hearing before the Board. (Opening Br. at 52.)[7] But even Xerox's belated argument is considered, again, the full context of the cited portions of the oral hearing transcript actually reinforce the Board's reasoning and further undermine Xerox's position.

The cited arguments were in support of Meta's position that Falchuk would have provided an improvement to Cheng by delivering notifications *at the time of the context graph change*. (Appx752-753.) As Meta's counsel explained at the hearing, "what Cheng is missing… is the timing." (Appx752 (Hearing Tr.), 43:7-8.) Meta pointed out in its reply briefing and at the hearing that Cheng was unclear as to ***when*** notifications were delivered, or whether they were delivered (automatically) in the absence of a user request. (Appx556-557; Appx752 (Hearing Tr.), at 43:9-12.) Meta's counsel explained at the hearing that Paragraph 0054 of Cheng provided the only "fulsome description of how the recommendations are delivered," but did not specify the timing of delivery of notifications. (Appx752 (Hearing Tr.), at 43:9-15

[7] For example, Xerox did not provide any evidence contradicting the evidence submitted by Meta that Cheng and Falchuk were technologically combinable, describe interoperable components and technologies, and could have been implemented using known techniques with a reasonable expectation of success. (Appx266-267; Appx911-913, ¶¶ 96-98.)

(quoting Appx983 (Cheng), ¶ 0054).) Indeed, Cheng merely states in that paragraph that "[a]t the time of the recommendation, the system first gathers the current situation data and derives the user's current situation" (Appx983, ¶ 0054 (emphasis added)), but Cheng does not further specify what "the time of recommendation" refers to or when it is triggered.

Accordingly, Meta explained at the hearing that Falchuk "has something to add here because it's providing that sort of push notification, that mechanism for providing the notification that Cheng simply doesn't," and again observed that "Falchuk has a lot to offer here because it provides that mechanism in more detail." (Appx752-753 (Hearing Tr.), at 43:25-44:4.) Meta's argument at the oral hearing was thus not based on "fundamentally chang[ing] the way that Cheng worked" (Opening Br. at 52), as Xerox argues, but on adding to Cheng a beneficial and fully-described feature from Falchuk, *i.e.*, an immediate notification in response to a context graph change, that Cheng alone does not disclose. Xerox's challenge to the motivation to combine thus fails.

## VIII. CONCLUSION

Meta respectfully requests that this Court affirm the judgment of the Board that claims 1-5, 7-11, 13-17, and 19-20 are unpatentable as obvious.

Dated: February 9, 2024

Respectfully submitted,

*/s/ Heidi L. Keefe*
Heidi L. Keefe
Mark R. Weinstein
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304
650-843-5000
hkeefe@cooley.com
mweinstein@cooley.com

Phillip E. Morton
COOLEY LLP
1299 Pennsylvania Ave NW
Suite 700
Washington, DC 20004
202-842-7800
pmorton@cooley.com

*Counsel for Appellee*
*Meta Platforms, Inc*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Fed. Cir. R. 32(b):

X The brief contains 10,050 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Fed. Cir. R. 32(b).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6):

X The brief has been prepared in a proportionally spaced typeface using MS Word 2013 in a 14 point Times New Roman font.

Dated: February 9, 2024

/s/ *Heidi L. Keefe*
Heidi L. Keefe